# EXHIBIT A





**Industry-Wide Agreement**

between

New York Hotel and Motel Trades Council, AFL-CIO

and

Hotel Association of New York City, Inc.

(Effective July 1, 2012)

**Introduction - A Message from HTC President Peter Ward** ..................... v

**Industry-Wide Agreement** ............................................................. 1

Preamble ............................................................................... 1

Article 1 ................................................................................. 1

Article 2 - Excluded Categories ................................................... 2

Article 3 - Union Membership ..................................................... 2

Article 4 - Union Dues ............................................................... 3

Article 5 ................................................................................. 3

Article 6 - New Employees ......................................................... 4

Article 7 - Hotel Classification ..................................................... 5

Article 8 - Part-time Work and Premium Pay; Substitute and
Extra Employees ..................................................... 5

Article 9 - Extra Painters ............................................................ 8

Article 10 - Housing-meals ......................................................... 8

Article 11 - Working Hours, Meal Period, Overtime, Etc. .................. 8

Article 12 - Minimum Wage ......................................................... 10

Article 13 - Wages .................................................................... 11

Article 14 - Wage Increases ....................................................... 12

Article 15 - Extra Rooms ............................................................ 12

Article 16 - Cots ...................................................................... 13

Article 17 - Major Structural Alterations ........................................ 13

Article 18 - Employer Rules and Regulations ................................. 13

Article 19 - Duties of Excluded Categories .................................... 14

Article 20 - Relief Employees ...................................................... 14

Article 21 - Hiring ..................................................................... 14

Article 22 - Management Rights ................................................... 17

Article 23 - Seniority ................................................................. 17

Article 24 - Union Activity ........................................................... 19

Article 25 - No Discrimination ..................................................... 19

Article 26 - Complaints, Grievances and Arbitration ........................ 20

Article 27 - Discharge and Discipline ......................................... 21
Article 28 - Vacations .............................................................. 23
Article 29 - Holidays ............................................................... 25
Article 30 - Personal Days ........................................................ 27
Article 31 - Jury Duty .............................................................. 28
Article 32 - Bereavement Pay .................................................... 29
Article 33 - Health Benefits Fund ............................................... 29
Article 34 - 401(k) Plan ........................................................... 29
Article 35 - Pension Fund ......................................................... 30
Article 36 - Training and Scholarship Fund ................................... 30
Article 37 - Legal Fund ............................................................ 31
Article 38 - Strikes and Lockouts ............................................... 31
Article 39 - Contract with Non-member Hotels .............................. 32
Article 40 - Status Quo Agreement of March 23, 1938 .................... 33
Article 41 - Modification of this Agreement .................................. 33
Article 42 - Visitation Clause .................................................... 33
Article 43 - Notices ................................................................ 34
Article 44 - Cost of Living ........................................................ 34
Article 45 - Area Standards and Work Preservation ......................... 34
Article 46 - Furnishing Security ................................................. 35
Article 47 - Banquet Department ................................................ 35
Article 48 - Relief Appeals ....................................................... 40
Article 49 - Uniforms and Employee Facilities ............................... 40
Article 50 - Groups and Porterage .............................................. 41
Article 51 - Night Shift Differential ............................................ 42
Article 52 - Severance Pay ........................................................ 43
Article 53 - Technological Change .............................................. 43
Article 54 - Sick Leave ............................................................ 44
Article 55 - Leave of Absence ................................................... 45
Article 56 - Voluntary Political Action Fund .................................. 46
Article 57 - Conversion to Residential Use .................................... 46

Article 58 - Authority to Enforce Contract ....................... 46
Article 59 - Successors and Assigns ........................................ 46
Article 60 - Accretion and Neutrality/Card Check ..................................... 49
Article 61 - Maintenance and Electrical Work  ......................................... 50
Article 62 - Union Training ........................................................ 51
Article 63 - Spotters ................................................................ 51
Article 64 - Hidden Surveillance Cameras ................................. 52
Article 65 - Bankruptcy ........................................................... 53
Article 66 - Electronic Information ............................................ 53
Article 67 - Immigrants' Rights ................................................ 54
Article 68 - Translations........................................................... 55
Article 69 - Safety and Health ................................................. 55
Article 70 - Panic Buttons......................................................... 57
Article 71 - Adequate Supplies ................................................ 58
Article 72 - Expiration and Renewal ......................................... 58
Article 73 - Separability ............................................................ 59
Article 74 - Ratification of Agreement........................................ 60
Schedule 1 ............................................................................... 61
Schedule A - Minimum Wage Scales ........................................ 62
Schedule A-1 - Classification of Meals, Hours and Wages for
          Banquet Servers & Banquet Captains............................. 77
Schedule A-2 - Vacations, Call-in Pay and Holiday Pay for
          Checkroom and Washroom Attendants .......................... 83
Schedule A-3 - Vacations and Holidays for Steady Extra Banquet
          Bartenders...................................................................... 84
Schedule B - Employee Benefit Funds ..................................... 86
Addendum I............................................................................... 96
Addendum II.............................................................................. 96
Addendum III............................................................................. 97
Addendum IV ............................................................................ 97
Addendum V ............................................................................. 100
Addendum VI ............................................................................ 101

Addendum VII - Study Committee ............................................ 101

Form of Voluntary Contribution Deduction Authorization ........................ 105

Side Letter to IWA (1) ............................................................ 106

Side Agreement (2) .............................................................. 107

Side Agreement (3) .............................................................. 108

**INDEX.....................................................................................................109**

## INTRODUCTION

### A MESSAGE FROM HTC PRESIDENT PETER WARD

To the members of HTC,

This is our union contract. We call it the "Industry-Wide Agreement" or the "IWA." This collective bargaining agreement is between our union – the New York Hotel and Motel Trades Council, AFL-CIO (the "Hotel Trades Council," or "HTC," for short) – and the Hotel Association of New York City Inc. (which is the hotel owners' union). It covers approximately 28,000 hotel workers in New York City. It sets and guarantees your wages, benefits, protections and rights at work. It is also the best union contract for hotel workers in the world.

### 75 years of struggle and progress

The first version of the IWA was signed on January 18, 1939, almost exactly 75 years ago. It was the result of the massive city-wide organizing campaign that founded our union, the Hotel Trades Council. Previously, there had been many failed attempts





by New York hotel workers to unite to obtain decent wages and working conditions. Well-organized hotel owners crushed each try, including citywide hotel strikes in 1912, 1918, 1929, and 1934. Those repeated risings in the New York City hotel industry were desperate responses to low wages, no benefits, rampant discrimination, unfair discipline, dishonest payroll practices, and demeaning treatment – in other words, the same conditions that still exist today for most employees working in hotels world-wide, and many non-union hotels in New York as well. Those early defeats, however, taught hotel workers in this city a hard-earned and priceless lesson – the need to always be solidly united and ready for a fight.

The last 75 years have been a period of struggle and great progress for the members of our union. Starting with that first Industry-Wide Agreement in 1939, and thereafter with each successor contract renegotiated by HTC, the workers represented by our union have risen into the middle class, and have come to expect to be treated with dignity, and not as menial servants.

### Best wages and benefits for hotel workers

Today union hotel jobs in New York City are excellent jobs. In the first year of this contract, a Room Attendant earns $26.36 per hour, a Dishwasher – $25.62, a Front Desk Clerk – $27.51, a Server – $13.63 (not counting tips). In 2018, Room Attendants covered by this contract will earn $59,820 per year. Our wages are the highest in the world for hotel workers.

Under the terms of our Industry-Wide Agreement, hotel owners are required to pay virtually the entire cost of the high-quality benefit package our members enjoy (including family medical and dental insurance, a prescription plan, a pension, a pre-paid legal plan, an occupational training program, and a college scholarship program for our children). Our comprehensive employer-funded benefit package continues to improve at a time when fewer and fewer workers, even public employees, have decent healthcare coverage or any retirement benefits.

### Non-union workers do not have what you have

Non-union hotel employees generally work in an environment of fear and intimidation. The law classifies them as so-called "at-will employees," meaning they do not have a contract. This means they can be punished or dismissed at any moment by the boss, without the slightest justification. They have no choice but to quietly tolerate abuse and exploitation. Management can schedule non-union employees arbitrarily, lay them off without notice, change their job duties, and even reduce their pay, their hours, and their benefits on a corporate whim. Managers and supervisors can bully, belittle, and harass



non-union employees without consequence. Lacking job security, rights or access to an honest grievance process, non-union workers rarely dare even to demand the few legal rights they are supposed to have in theory, because making waves in a non-union workplace is a good way to get yourself fired.

Skim through the employee handbook that hotel companies hand non-union employees, and you will quickly find a passage similar to the following one from the non-union Doubletree by Hilton Financial District Hotel on Stone Street in downtown Manhattan, which effectively makes any promises to employees contained inside laughable and worth less than the paper they are printed on:

*"From time to time, the Company may unilaterally, in its discretion, amend, supplement, change, modify or eliminate one or more of the benefits, work rules or policies described in this Employee Manual or any other employment benefit, work rule or policy without prior notice.*



*"This Employee Manual does not constitute a guarantee that your employment will continue for any specified period of time or under certain circumstances. Nor does it impose procedural restrictions on the hotel. Employment at this facility is a voluntary employment at will relationship for no definite period of time, and nothing in this Employee Manual constitutes an express or implied contract of employment or warranty of any benefits. In fact, you have the right to terminate your employment relationship for any reason with or without cause or notice at any time and, therefore, the hotel reserves the right to terminate your employment at will, with or without cause or notice."*

You will not find anything in this union contract like those two paragraphs in that non-union employee handbook. Just as important as the economic benefits it guarantees, this book greatly multiplies your legal rights. The IWA is binding on management. This means you enjoy many important non-economic protections of which non-union workers can only dream.

### You have job security, power, and a voice at work

After you have passed your probationary period, the IWA defends you against being terminated or disciplined unjustly by management. It requires your employer to provide you a safe and healthy workplace. It obligates management to protect you against abusive guests, and to provide you – if your job requires you to enter guests' rooms – with a "panic button" for summoning help in case of an emergency. It prohibits the misuse of immigration rules by management to harass or discriminate against immigrant workers. It gives the union the power to combat discrimination, abusive treatment, unfairness and favoritism. It enables us to challenge and wipe out unreasonable management rules. It requires management to negotiate with us if they want to make changes to your working conditions, and it allows us to negotiate changes the workers want to make as well. It prevents employers from eliminating your job by subcontracting or outsourcing, and guarantees your rights even if the hotel is sold or changes management.

Compared to other union contracts, the IWA probably has the fairest and fastest mechanism for enforcing workers' contractual rights and settling grievances with management. Unlike most union contracts, the IWA gives our union the right to challenge – not just clearcut violations of the written contract, but – practically any management decision we believe unfairly affects the employees our union represents. Unlike many union contracts, the IWA does not have time limits that prevent the union from raising so-called "untimely" grievances (which often have the effect of letting management get away with violations). For that reason, our union can and routinely does win large back pay claims and penalties when we catch management stealing from employees' wages. Under our contract, there is a dedicated permanent panel of arbitrators always available to hear cases (the Office of the Impartial Chairperson of the Hotel Industry). So, under the IWA, workers represented by HTC can obtain justice without the long delays that characterize most other arbitration systems and the courts.

### We had to fight for what we have

If you are a veteran member of HTC, you know that the rights, wages, and benefits New York hotel workers enjoy did not happen by accident and they were not given to us



as charity. They are the result of 75 years of struggle against powerful employers who fiercely resisted every step forward, and who are constantly trying to turn back the clock on the progress we have made.

In 1985, the hotel owners took advantage of the national anti-union atmosphere fostered by Ronald Reagan to attempt to break our union, insisting in contract negotiations that we agree to a long list of devastating givebacks. The membership of HTC decided

to call a city-wide strike rather than bend to the demands of the owners. That strike lasted 26 days and our union prevailed.

In 1995 and 2006, the workers mobilized for potential strikes when the owners again demanded givebacks at the bargaining table, but on both occasions we won significantly improved contracts without having to walk off the job.

In our latest negotiations, in 2012, the industry again tried to take away many of our most important rights. During the negotiations, management handed us a 17-page proposal designed to eviscerate our contract. Here are a few of the demands management made:

- To weaken the Union's grievance and arbitration rights;
- To give the Hotel Association lopsided influence over the Office of the Impartial Chairperson and undermine its impartiality;
- To reduce the required notice of schedule changes from five days to three days;
- To weaken the provisions that protect the jobs and rights of employees when the hotel changes owners or management companies;
- A wage freeze and many cutbacks in the conditions of banquet servers;
- A reduction in vacation pay;
- To weaken protections for Union delegates;
- To increase the number of extra employees and expand the practice to more job classifications;
- To weaken employee rights regarding holidays;
- Cutbacks in eligibility for health insurance;
- To allow management to subcontract more Union work;
- To weaken the Union's rights to organize non-union hotels;
- Reductions in pay for all Food and Beverage workers;
- Increased job combinations;
- Elimination of hosts/hostesses from the Union;
- Elimination of hiring rights of employees with experience in the industry;
- Elimination of past practices;
- Elimination of pension rights of employees in restaurants;
- Combination of Room Service positions; and
- Elimination of scheduling rights of banquet cooks, housemen and stewards.

The employers failed to get the givebacks they wanted. In fact, we made huge gains, including a 7-year guarantee of our health plan and a 19.5% increase in the employer's contributions to the plan, funding to build a brand new state-of-the-art medical facility

In Brooklyn, excellent wage increases, stronger job-security, stronger health-and-safety protections, stronger protections for immigrant workers, and a 16.67% increase in the funding of our pension plan. We were much more fortunate in our negotiations than most other union members in 2012. That was largely due to the fact that our union represents so high a percentage of the hotel workers in New York City. High "union density" has always been the key to our bargaining power.

### These are dangerous times for working people

As this contract goes to the printer, working people are under attack across the United States. Right-wing politicians are pushing – often, successfully – laws that take away the rights of public employees to join unions and negotiate contracts, even in heavily unionized states like Wisconsin, Michigan and New Jersey. Unionization of the private sector has fallen so low in this country (6.9%) that the voice of the American working class can barely be heard in the halls of power. The rich continue to enjoy unparalleled growth in their wealth while the working middle class is becoming a fond memory.

Also as this contract goes to the printer, here in New York City, 274 new hotels are already either under construction or being planned – the second largest hotel development pipeline in the world (after the United Arab Emirates). This is happening because City Hall has changed the zoning restrictions in approximately 40% of the city, thereby fabulously enriching a small group of real estate speculators. Another result of that huge public gift to the rich has been a serious continuing decline in our union's density in New York City. This constitutes a vital threat to our bargaining power. The new hotels sprouting up are largely limited service operations, owned and managed by new companies, under franchise contracts with the same major hotel chains our members work for. Therefore they do business under all the familiar brand names (e.g., Marriott, Hilton, Sheraton, Holiday Inn, Hampton Inn, etc.). In order to insulate themselves from any legal obligation as employers, many of these hotels use subcontracted companies to employ the hotels' workers. This allows the owners and management companies to exploit their "non-employees" atrociously, paying them much lower wages than our members earn, and offering few or no benefits. Obviously, if hotels continue to succeed in operating in New York City while paying poverty wages, the conditions our union fought to establish over the last 75 years, the future solvency of your pension, our contract, and our union itself are endangered. We must face and defeat this threat – and we can.



### What we need to do now

HTC has been one of the most successful unions at organizing non-union workers in recent times. In the last 15 years, we worked very hard unionizing 75 hotels in New York City, adding more than 7,600 members to our union (that is about one quarter of our union's current



total membership). However, we simply do not have a large enough organizing department to keep up with the sheer magnitude and fast pace of hotel development taking place in New York. Again, there are 274 new hotels already in the works, and many more likely to follow. To organize so many hotels successfully against stiff employer resistance, we need to be able to hire and train larger numbers of talented organizers willing to work very long hours. In addition, we need to be able to mobilize our members to volunteer on a much bigger scale than we have ever done. Five years ago, we decided that our union needed to increase its influence and effectiveness in electoral politics. That program has been amazingly successful. In a very short time, HTC has become one of the most effective and powerful unions in New York City and State politics – equaling or surpassing the political clout of unions much larger than ours. This happened because, through our rank-and-file mobilization program – which we call the H.E.A.T. System – our members now regularly turn out to canvass and campaign for the candidates we endorse, more enthusiastically and in much greater numbers than other unions. This has translated into more unionized hotels, because we have been able to use political leverage to persuade some employers not to resist our organizing efforts.

But we have to do much more. We need to hit the streets and shake City Hall and the State Capitol. We need thousands more of our members, their family members, and even their neighbors, to help elect our friends to public office. We need to be able to put up sustained all-day picket lines – of member/volunteers – in front of non-union hotels that violate their employees' legal rights. We need more members to volunteer their time to support organizing drives and the contract fights that follow. We need to greatly increase the union's organizing resources. If we do these things, we will win, our union will grow, our benefits will be safe and our contracts will continue to improve.

History is full of tragic chapters in which people collectively failed to recognize impending danger and act decisively to avert it, until it was too late. That is not going to

happen to us. This Industry-Wide Agreement you have in your hands is a 7-year contract. It expires on July 1, 2019. Your rights on the job, your wages, and your benefits are secure for the next 5 years. Therefore, we have 5 years to act – together – to overcome the tidal wave of new development that threatens to wipe out what we have built over the last 75 years. In the coming months and years, I will ask you to support our union's plan to meet this challenge. I will ask you to contribute more – for your union's future. Your Industry-Wide Agreement and your union are precious resources upon which you, your family and your co-workers depend. I have no doubt that you will do what is necessary to protect them.

In Solidarity,

Peter Ward
HTC President

(May, 2014)

AGREEMENT entered into so as to be effective July 1, 2012 between the HOTEL ASSOCIATION OF NEW YORK CITY, INC., in its own behalf and in behalf of the HANYC BARGAINING GROUP HOTELS* (hereinafter collectively referred to as the EMPLOYER or the ASSOCIATION), and the hotels and motels who are active members of the ASSOCIATION and with respect to whom the UNION (as herein below described) presently has contractual relations, and the hotels, motels, and concessionaires with respect to whom the UNION may be hereafter designated as sole collective bargaining agent for the employees of such hotels, motels, and concessionaires, and who shall become parties hereto by agreeing to this Agreement, each and every such hotel, motel, and concessionaire, including their owners, managers, and operators, respective affiliated and related entities,** successors and assigns being hereinafter referred to as the EMPLOYER, and the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its members, now employed or hereafter to be employed by the EMPLOYER.

## WITNESSETH:

WHEREAS, the ASSOCIATION is an organization whose active members are engaged in the hotel business in the City of New York and one of whose objects is to promote fair and harmonious labor relations between hotel keepers and their employees, and

WHEREAS, the parties hereto were signatories to a Collective Bargaining Agreement effective July 1, 2006 which Agreement, by its terms, expired on June 30, 2012;

WHEREAS, the parties hereto, desiring to cooperate to stabilize such labor relations by establishing general standards of wages, hours of service and other conditions of employment, and providing arbitral machinery whereby disputes and grievances between employers and employees may be adjusted without resort to strikes, lockouts or other interferences with the continued and smooth operation of the hotel business, have agreed, pursuant to the provisions of a Memorandum of Understanding dated January 26, 2012 (hereinafter referred to as the "2012 MOU"), to enter into an agreement so as to be effective July 1, 2012 (except as otherwise stated herein), on the terms and conditions hereinafter stated:

NOW, THEREFORE, the parties hereto agree as follows:

1. (A) (1) The term HOTEL as used throughout this Agreement shall include hotels, motels and affiliated facilities.

(2) The term CONCESSIONAIRE as used throughout this Agreement shall include all restaurants, lessees, and contractors operating within HOTELS that employ employees in job classifications covered by this Agreement.

---

*A list of HANYC Bargaining Group Hotels has been provided by the ASSOCIATION. The aforesaid list is current as of January 26, 2012 and is expected to increase on a continuing basis.*

**Employers who are bound to the 2006-2012 IWA as of January 26, 2012 but are not party to an agreement containing the phrase "affiliated and related entities" shall not be bound to such phrase in this Agreement (except Article 60) by virtue of its inclusion in the preamble. Nothing in this footnote shall alter the obligations of a successor, assign or transferee pursuant to Article 59.*

(3) The term EMPLOYER as used throughout this Agreement shall, unless expressly distinguished elsewhere, include all HOTELS, whether or not members of the ASSOCIATION, and all CONCESSIONAIRES operating within HOTELS.

(B) The UNION represents to the EMPLOYER that it represents a majority of the employees covered by this Agreement in each EMPLOYER'S hotel, motel and concessionaire.

(C) The UNION represents to the ASSOCIATION that it represents a majority of all the employees covered by this Agreement in the hotels comprising the Bargaining Group Hotels of the ASSOCIATION.

(D) The UNION is duly empowered to enter into this Agreement.

(E) The ASSOCIATION and the EMPLOYER hereby recognize the UNION as the sole collective bargaining agency for the employees covered by this Agreement.

(F) The UNION agrees that the employees of the EMPLOYER shall work for the EMPLOYER upon the terms and conditions set forth in this Agreement.

## EXCLUDED CATEGORIES

2. All employees (including bell captains, floor housekeepers and all white-collar administrative employees included in Schedule A for whom the UNION has been heretofore or shall be hereafter designated as the collective bargaining representative) shall be covered by this Agreement except the following classes of employees which shall be excluded from the provisions of this Agreement: executives, superintendents, department managers, assistant department managers, supervisors, assistant supervisors with executive status having the right to hire or fire or effectively to recommend hiring or firing, buyers, assistant buyers, and confidential secretaries. Also excluded are hotel house officers, bell captains, floor housekeepers and all white-collar employees included in Schedule A for whom the UNION has not been heretofore or is not hereafter designated as the collective bargaining representative. In hotels which have heretofore entered into collective bargaining agreements covering any white-collar employees the coverage and exclusion from coverage provided in such agreements shall continue in effect.

## UNION MEMBERSHIP

3. (A)  It shall be a condition of employment that all employees of the EMPLOYER covered by this Agreement who are members of the UNION in good standing on the date of this Agreement shall remain members in good standing and those who are not members on the date of this Agreement shall, on the thirtieth (30th) calendar day following the date of this Agreement, become and thereafter remain members in good standing in the UNION. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its date shall, on the thirtieth (30th) calendar day following the beginning of such employment, become and thereafter remain members in good standing. The UNION agrees to permit all employees to become and remain members of the UNION upon payment by them of initiation fees and periodic dues uniformly required as a condition of membership.

(B) Upon notice in writing from the UNION to the effect that an employee is not a member of the UNION in good standing, i.e., s/he has failed to pay the initiation fees and dues to the UNION required herein, the EMPLOYER shall, within five (5) days, discontinue its employment of such employee. The EMPLOYER and the UNION agree the foregoing discharge requirement shall only be applicable to the failure to pay dues and initiation fees uniformly required as a condition to acquiring or retaining membership in the UNION and shall have no applicability to the failure of an employee to pay authorized regular and/or special assessments which may from time to time be levied by the UNION in accordance with its Constitution and By-Laws.

(C) In the case of casual employees, the first date of employment shall be the date a casual employee is employed by a signatory or party to this Agreement and said employee shall, as a condition of employment by any EMPLOYER signatory or party to this Agreement, on the thirtieth (30th) working day following the beginning of such employment, become and thereafter remain a member in good standing in the UNION.

(D) This Article and the following Article "Union Dues" shall be construed and applied to effectuate the parties' written terms subject to applicable law.

## UNION DUES

4.   UNION dues, assessments, initiation and service fees, and defense fund assessments, during the term of this Agreement, shall not exceed the sums set forth in the memorandum to be furnished by the UNION to the ASSOCIATION and/or the EMPLOYER at the time of the execution of this Agreement. Notwithstanding the foregoing, the amount of UNION dues, assessments, initiation and service fees, and defense fund assessments is subject to change at the prerogative of the UNION. The UNION agrees to give the ASSOCIATION and/or the EMPLOYER thirty (30) days' written notice prior to the effective date of any such change.

5.   The UNION agrees to furnish the EMPLOYER with a memorandum showing the amount of dues, assessments, initiation and service fees, and defense fund assessments payable as members of the UNION and service fees payable as non-members of the UNION by each of the employees of the EMPLOYER covered by this Agreement. Upon receipt of written authorization, the EMPLOYER agrees to deduct such dues, assessments, initiation and service fees, and defense fund assessments from the wages or salaries of the respective employees weekly (initiation fees and defense fund assessments are to be deducted in two (2) monthly installments) and the EMPLOYER agrees to transmit on a monthly basis such sums collected by the EMPLOYER to the UNION in the month of collection. The EMPLOYER will retain in its file the dues authorization card of each employee from whom it makes such deductions. The EMPLOYER agrees to furnish to the UNION a list of the employees in its hotel covered by the Agreement and will from time to time furnish to the UNION the names of all such new employees who are to be covered by this Agreement, and also will notify the UNION of employees who have left the employ of the EMPLOYER. The EMPLOYER agrees that the UNION may examine the EMPLOYER'S payroll records for the purpose of checking compliance with this provision.

6.  (A) Probationary Period

A new employee shall work under the provisions of this Agreement, but shall be employed on a trial or "probationary" basis. The probationary period for new employees shall be sixty (60) days of work.

(B) Termination

(1) During the probationary period, the employee may be terminated with or without cause and without recourse to the grievance and arbitration machinery set forth in this Agreement; provided, however, that the EMPLOYER may not terminate the employee for the purpose of evading the Agreement or discriminating against UNION members. In the event the UNION claims a pattern exists that establishes that the turnover rate of employees of the EMPLOYER exceeds normal turnover rate from and after the thirty-first (31st) calendar day of employment and claims that such turnover is for the purposes of evading the Agreement or discriminating against UNION members, the UNION may grieve such termination in accordance with the grievance and arbitration machinery set forth in this Agreement.

(2) Probationary employees shall be paid not less than the new hire rate of pay during the probationary period. If, however, it is determined by the Impartial Chairperson that a probationary employee has been terminated by an EMPLOYER for purposes of evading the Agreement or discriminating against UNION members, the Impartial Chairperson shall reinstate such probationary employee with full back pay computed at the appropriate full contract rate of pay for all lost days retroactive to the employee's day of discharge up to and until the employee's reinstatement date. If upon reinstatement an employee is still in the probationary period, s/he shall be paid the applicable contract wage for probationary employees, as set forth in Article 6(C) below.

(C) Wages and Benefits

(1) New employees shall be paid not less than seventy-five percent (75%) of the wage rate for their job classification set forth in Schedule A, and as set forth in Article 14(B). This rate, as amended by subsequent wage increases during said employees' first and second years of employment, shall continue for two (2) years from the date of hire, after which time it shall be increased in accordance with Article 6(C)(2)(b). This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(2) New employees shall receive not less than eighty-five percent (85%) of the wage rate set forth in Schedule A of this Agreement as amended by subsequent wage increases during said employees' third and fourth years of employment from the date of hire, after which the rate shall be increased to the full rate then in effect for the job classification. This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(D) Contributions to Funds

No contributions shall be made to the Pension Fund, Prepaid Legal Fund or Training Fund or for the dental component of the Health Benefits Fund on behalf of any new employee until nine (9) months after the date of employment. This provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

## HOTEL CLASSIFICATION

7. For the purposes of this Agreement, the hotels in the City of New York have been grouped as follows:

> Transient
> Semi-Transient
> Residential

The EMPLOYER and the UNION agree that the grouping of the EMPLOYER'S hotel is that set forth opposite its name.

## PART-TIME WORK AND PREMIUM PAY; SUBSTITUTE AND EXTRA EMPLOYEES

8. (A) (1) Any EMPLOYER who shall change the hours of the work week of a part-time worker to the hours of the work week of a full-time worker shall pay to the employee, commencing at the time when his/her hours have been so increased, not less than the contractual wage rate for his/her classification (minimum wage rate plus wage increases) at the time of the change as set forth in Schedule A, irrespective of the hourly rate such employee previously received as a part-time employee, anything contained herein to the contrary notwithstanding.

(2) It is understood that where an EMPLOYER, for business reasons (e.g., "business reasons" include, but are not limited to, the elimination of a meal in an a la carte restaurant or the temporary closing of an a la carte restaurant, club or beverage outlet for a special banquet function), requires the temporary reduction in the work week of employees in any of its departments, it shall first give at least five (5) calendar days' written notice to and obtain the UNION'S written consent to such work week reduction, unless emergency circumstances prevent the EMPLOYER from giving such notice to and obtaining consent from the UNION. The consent of the UNION will not be unreasonably withheld or delayed.

(3) In the event a dispute arises between the UNION and EMPLOYER under the provisions of this Article 8(A), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(B) Casual employees and part-time employees shall be paid not less than one and one quarter (1-1/4) times the hourly wage rate at which an employee is required to be paid under Articles 12 and 14 for the first twenty (20) hours of work in categories where

*Industry-Wide Agreement* 5

the regular work week in the industry is forty (40) hours and for the first seventeen and one-half (17-1/2) hours of work in categories where the regular work week in the industry is thirty-five (35) hours, and for the remaining hours of work shall be paid not less than the hourly wage rate an employee is required to be paid pursuant to Articles 12 and 14.

#### (C) Substitute Employees

(1) New employees hired solely to substitute ("substitute employee") for an employee on leave of absence, illness or injury, or vacation, shall be considered casual employees and, pursuant to Article 23(A) of this Agreement, such employees will not accrue seniority during the period of their "substitute employment."

(2) At such time as the employee on leave of absence, illness or injury, or vacation returns to work, the substitute employee may be laid off by the EMPLOYER, and such layoff shall not prohibit the assignment of work on an overtime basis (or extra rooms in the case of housekeeping employees) to employees working in the same job classification as the substitute employee.

(3) In the event the substitute employee is laid off after the expiration of sixty (60) days of work, s/he shall retain recall rights in his/her classification for the length of his/her actual employment.

(4) In the event the substitute employee is laid off after the expiration of fifty-two (52) weeks, s/he shall have recall and all other rights in accordance with this Agreement.

#### (D) Extra Housekeeping and Banquet Employees

(1) The EMPLOYER shall be entitled to hire "extra" employees only in the job classifications of A.M. room attendant, P.M. room attendant, housekeeping attendant, banquet steward, banquet housekeeping attendants, and banquet cooks.

(2) In the case of A.M. room attendants, P.M. room attendants, housekeeping attendants, and banquet stewards, the number of "extra" employees permitted to be employed hereunder within each of the aforementioned job classifications shall not exceed fifteen percent (15%) of the then current number of full-time employees in each of the aforementioned job classifications or one (1) employee, whichever is greater. In the case of banquet housekeeping attendants and banquet cooks, the number of "extra" employees permitted to be employed as banquet housekeeping attendants or banquet cooks, respectively, shall not exceed fifteen percent (15%) of the then current number of full-time employees who work only as banquet housekeeping attendants or banquet cooks, respectively.

(3) Extra banquet housekeeping attendants may only be utilized after the EMPLOYER has offered the relevant shifts to all regular full and part-time banquet housekeeping attendants, even if it entails overtime work, and after doing so, shifts are still available.

(4) Extra banquet cooks may only be utilized after the EMPLOYER has offered the relevant shifts to all regular full and part-time cooks (including non-banquet cooks) even if it entails overtime work, and after doing so, shifts are still available.

(5) No employee on the EMPLOYER'S payroll on or before the effective date of this provision shall be converted to "extra" status.

(6) All "extra" employees will be subject to all terms and conditions of employment set forth in this Agreement with the following exceptions:

(a) The EMPLOYER shall be permitted to schedule and call in "extra" employees to work without five (5) days' written notice to such "extra" employees as required by Article 11 of this Agreement.

(b) The EMPLOYER will not be required to give such "extra" employees notice of: layoff, recall, reduced work week or schedule change as otherwise required by Article 11(C) and Article 23 of this Agreement.

(c) The EMPLOYER shall be required to pay "extra" employees time and one-quarter (1-1/4) premium pay for all hours worked unless, notwithstanding the provisions of Article 8(D)(6)(b), said employees receive a notice of schedule in accordance with this Agreement to work a full work week and are offered a full work week. In such case, the employees will be paid at straight time for the full work week.

(7) "Extra" employees will not be scheduled for, or called in to, work if any full-time or regular part-time employees in the aforementioned job classifications are on layoff or reduced work week. Notwithstanding the foregoing, "extra" employees may work on a day in a week in which an employee in the aforementioned classification is on reduced work week if: (i) all employees regularly scheduled to work on such day have been properly scheduled, in accordance with Article 11(C), to work on such day, and (ii) any other employee who is on reduced work week during such week is offered, with five (5) days' notice in accordance with Article 11(C), to work on such day.

(8) All "extra" employees shall accrue seniority and shall be scheduled for, and called in to, work on the basis of strict seniority.

(9) "Extra" employees shall be eligible to fill full-time or regular part-time job openings in their job classifications on the basis of strict seniority.

(10) The EMPLOYER will keep a record of all calls made for the purpose of scheduling and calling in "extra" employees to work using the below form entitled "Extra Call-In Sheet".

| EXTRA CALL-IN SHEET | | | | | | |
|---|---|---|---|---|---|---|
| HOTEL: | | | | DATE: | | |
| NAME | PHONE | TIME CALLED | SPOKE TO | RESULT ("agreed to come to work" or "did not agree to come to work." If no one was home, write what message was left or "no answer") | DELEGATE INITIALS | MANAGER INITIALS |
| | | a.m.<br>p.m. | | | | |
| | | a.m.<br>p.m. | | | | |
| | | a.m.<br>p.m. | | | | |

(1) The EMPLOYER acknowledges that due to the irregularity and uncertainty with which "extra" employees may be scheduled and called in to work, "extra" employees may be frequently unavailable or unable to work when requested to do so by the EMPLOYER. Such employees shall not be disciplined or otherwise suffer a loss of future job opportunities because of such inability or unavailability to work on request by the EMPLOYER. Notwithstanding the foregoing, the EMPLOYER shall be entitled to replace an "extra" employee when such Employee demonstrates his/her unavailability other than on a reasonable basis.

## EXTRA PAINTERS

9. (A) An extra painter is one whose employment terminates at any time within eighteen (18) weeks after the probationary period. An extra painter shall be paid not less than the rates established by Article 14 each week and, in addition, when his/her employment is terminated, shall be paid a lump sum equal to fifteen dollars ($15) for each week of his/her employment. An extra painter shall be paid for any of the holidays provided for in Article 29 of this Agreement which may occur during his/her period of employment, and shall receive prorated vacation pay.

(B) A painter who is employed for a period of more than eighteen (18) weeks after the probationary period shall not come within the provisions of Article 9(A) and shall attain the status of a regular permanent employee.

## HOUSING-MEALS

10. (A) In cases where the EMPLOYER furnishes housing accommodations to its employees, it shall be allowed two dollars and fifty cents ($2.50) per week for such housing accommodations.

(B) In cases where the EMPLOYER furnishes meals to its employees, it shall be allowed twenty-five cents ($0.25) per meal.

(C) In cases where the EMPLOYER furnishes housing accommodations and meals by the week, it shall be allowed seven dollars and seventy-five cents ($7.75) per week.

(D) If an EMPLOYER, who has heretofore furnished meals or housing accommodations, or both, as part of compensation, shall desire to discontinue same, it shall be obligated to negotiate with the UNION. Failing an agreement, either party may submit the issue to the Office of the Impartial Chairperson for final and binding resolution.

(E) If an EMPLOYER, who has not heretofore furnished meals and housing accommodations, or either, as part of compensation, shall desire to do so, and the EMPLOYER and the UNION cannot agree, the matter shall be submitted to the Impartial Chairperson for decision.

## WORKING HOURS, MEAL PERIOD, OVERTIME, ETC.

11. (A) Work Week

The working hours per week on which the minimum wage is predicated shall be forty (40) hours within five (5) days of the week for captains, greeters, and all tip clas-

...fications covered by this Agreement, and thirty-five (35) hours in five (5) days of the week for all non-tip classifications covered by this Agreement.

### (B) Call-in

In the event any employee who normally works a full work day is called in to work on any day, s/he shall be offered a full day of work.

### (C) Changes in Working Hours

The EMPLOYER shall be free to fix the daily working hours. The EMPLOYER agrees that it will give the affected employee at least five (5) calendar days' prior written notice of their work schedules, including notice of a change of an employee's work schedule. In the event of a change in schedule of daily working hours, seniority will be observed insofar as compatible with efficiency. Should the UNION claim that changes in the schedule of hours result in any abuses of the rights of employees, the claim shall be subject to the grievance and arbitration procedures set forth in Article 26.

### (D) Split Shifts

It is mutually agreed that the custom existing as of July 1, 2012 among certain EMPLOYERS of maintaining long and short watches and split shifts in certain categories of employees shall be permitted to continue, but shall not be extended. Any changes in the existing custom shall be made only by agreement between the UNION and the EMPLOYER. If they shall fail to agree on a proposed change, the same shall be submitted to the Impartial Chairperson as any other dispute arising under this Agreement.

### (E) Meal Period

All employees shall be entitled to one (1) hour per day for meals. Time out for meals shall not be considered working time.

### (F) Servers

Servers shall complete service on a guest notwithstanding the fact that the employee has reached his/her quitting time, and the first fifteen (15) minutes of such additional time shall not be deemed to be overtime.

### (G) Overtime

(1) Overtime at the rate of time and one-half shall be paid for all hours worked in excess of eight (8) hours per day or forty (40) hours per week in categories where the regular work week under this Agreement is forty (40) hours per week and for all hours worked in excess of seven (7) hours per day or thirty-five (35) hours per week in categories where the regular work week under this Agreement is thirty-five (35) hours per week.

(2) It is agreed that employees will work a reasonable amount of overtime and on the sixth (6th) day when requested to do so at the rates of pay set forth in this Agreement provided, however, that there shall be no scheduled overtime in any job classification if there are laid off employees in that job classification in the hotel and there shall be no scheduled extra rooms for room attendants if there are room atten-

dants laid off in the hotel until available work in the job classification in the hotel has been offered to employees laid off in that job classification, such offer to be made by reasonably available means of communication.

(3) The UNION and EMPLOYER agree that overtime pay shall be paid for all work performed on the sixth (6th) and seventh (7th) consecutive days of work unless such overtime work is occasioned by an EMPLOYER'S business needs and further provided prior written notice of same is given and written consent is obtained from the UNION, which consent will not be unreasonably withheld or delayed, unless emergency circumstances prevent the EMPLOYER from giving such notice to and obtaining consent from the UNION. In the event a dispute arises between the UNION and an EMPLOYER under the provisions of this Article 11(G)(3), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(4) Unless required by law, overtime shall not be paid where an employee or employees, subject to the written approval by the EMPLOYER, mutually agree in writing to change their schedule(s) or day(s) off under conditions which would otherwise result in overtime. This waiver shall also apply to any scheduling premiums or notice period under this Agreement if the change is mutually agreed upon pursuant to this provision.

(5) If one or more employee(s) refuse(s) to agree to the change in schedule or days off, and said change is nonetheless instituted by the EMPLOYER in accordance with the scheduling provisions of this Agreement, only the employee who did not agree to the change shall be paid overtime.

(6) No employee shall receive overtime pay unless such overtime work has been authorized or was performed with the actual or constructive knowledge of the EMPLOYER.

(7) Any employee who has heretofore been paid time and one-half after a shorter work day or shorter work week than specified under this Agreement shall continue to receive overtime pay after such shorter work day or shorter work week as heretofore.

(8) If the UNION feels that an industry-wide condition of unemployment exists in any job classification covered by this Agreement and that an excessive amount of overtime in such job classification or, in the case of room attendants, an excessive amount of extra rooms has been scheduled in any hotel, the UNION may raise the matter as a grievance under Article 26 and, if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder.

## MINIMUM WAGE

12. Each EMPLOYER shall pay not less than the minimum weekly wages for the total number of hours per week as set forth in the attached Schedule A, except as provided in Article 6(C).

**WAGES**

13. (A) General

(1) In the case of an ASSOCIATION member hotel, the minimum weekly wage rates set forth herein shall not be changed except by agreement between the ASSOCIATION and the UNION.

(2) In the case of all other EMPLOYERS, the minimum weekly wage rates set forth in this Agreement shall not be changed except by agreement between the EMPLOYER and the UNION.

(B) Prior Wages and Benefits

(1) No employee shall suffer a loss or reduction of hours, hourly or weekly wages, benefits or fringe benefits or any adverse effect on any other terms or conditions of employment on account of the execution, assignment, adoption or assumption of this Agreement.

(2) The minimum wage rates set forth in this Agreement, payable by the EMPLOYER, are applicable to a forty (40) hour work week for captains, greeters and all tip classifications and to a thirty-five (35) hour week for all other classifications.

(3) When a full-time employee works less than his/her regular work week the wage shall be prorated on an hourly basis for the number of hours or fractions thereof actually worked. However, when a full-time employee is changed to a part-time basis, such employee shall receive his/her wages in accordance with the applicable provisions of Article 8.

(C) EMPLOYERS may offer direct deposit of paychecks.  Where an EMPLOYER offers direct deposit, it may institute payment of wages by pay cards for those employees who elect not to take advantage of direct deposit under the following conditions:

(1) The pay cards must allow the employee to withdraw his/her pay in its entirety each week, without charge, penalty, or fee;

(2) Employees shall be entitled to use the pay card to obtain cash payment of wages during paid working time;

(3) The pay card must be available to all employees without background check, or proof of identity, address, social security number, or similar information;

(4) The pay card may not trigger or require any reporting or disclosure to any third party or governmental agency; and

(5) The EMPLOYER must continue to pay an employee in cash or check if the pay card provider refuses to issue him/her a pay card for any reason, including the employee's inability or unwillingness to provide information and/or documentation requested by the provider.

## WAGE INCREASES

14. (A) All employees in the employ of the EMPLOYER on the date of the signing of this Agreement shall receive the wage increases as set forth in Schedule 1, attached.

(B) All employees hired after the effective date of this Agreement shall receive the wage increases set forth in Schedule 1, attached, which are effective subsequent to the date of the employee's hiring, as follows:

(1) An employee who, during the twenty-four (24) months prior to his/her employment was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement, shall receive the wage increase, as set forth in Schedule 1, for his/her job classification.

(2) The length of time an employee shall receive seventy-five (75%) or eighty-five (85%) percent of the Schedule A minimum wage for his/her job classification shall be governed by Article 6(C).

(C) Extra meal servers shall receive the wage increases per meal and/or per day provided for in Schedule A.

(D) The minimum rates set forth in Schedule A-1 of the 2006 Agreement shall be increased by the wage increases provided for in Schedule 1.

(E) The minimum rates set forth in Schedule A of the 2006 Agreement shall be increased by the wage increases provided for in Schedule 1.

(F) The EMPLOYER and the UNION agree that, in accordance with past practice, the rate of the wage increases provided for in Schedule 1 shall be applicable to all wage-related items contained in this Agreement, e.g., extra room rates, night shift differential rates, banquet rates, porterage and group fees, etc.

## EXTRA ROOMS

15. The EMPLOYER shall have the right to require a room attendant to do extra rooms during the regular daily hours of work and shall pay the following amounts for each such extra room:

| | |
|---|---|
| Effective July 1, 2011, | $12.24 for each extra room |
| Effective July 1, 2012, | $12.67 for each extra room |
| Effective July 1, 2013, | $13.18 for each extra room |
| Effective July 1, 2014, | $13.71 for each extra room |
| Effective July 1, 2015, | $14.26 for each extra room |
| Effective July 1, 2016, | $14.76 for each extra room |
| Effective July 1, 2017, | $15.28 for each extra room |
| Effective July 1, 2018, | $15.81 for each extra room |

The above provisions are not intended to affect the overtime provisions set forth elsewhere in this Agreement.

**cots**

16. (A) Room attendants shall make up cots when assigned such work by the EMPLOYER and shall be paid the following sums for each cot made up after the room attendant's quota of rooms has been completed:

| | |
|---|---|
| Effective July 1, 2011, | $4.07 for each cot |
| Effective July 1, 2012, | $4.21 for each cot |
| Effective July 1, 2013, | $4.38 for each cot |
| Effective July 1, 2014, | $4.56 for each cot |
| Effective July 1, 2015, | $4.74 for each cot |
| Effective July 1, 2016, | $4.91 for each cot |
| Effective July 1, 2017, | $5.08 for each cot |
| Effective July 1, 2018, | $5.26 for each cot |

On any day during which a room attendant makes up cots, three (3) cots shall constitute a room and shall be credited towards the room attendant's quota of rooms for the day.

(B) Room attendants shall clean saunas when assigned such work by the EMPLOYER. On any day during which a room attendant cleans saunas, four (4) saunas shall constitute a room and shall be credited towards the room attendant's quota of rooms for the day.

## MAJOR STRUCTURAL ALTERATIONS

17. (A) Mechanics and maintenance employees shall perform the work heretofore performed by mechanics and maintenance employees in the hotels.

(B) All major structural alteration work on the premises of the EMPLOYER shall be performed by employees covered by this Agreement. Employees required to perform major structural alterations shall be paid the prevailing wages being paid to employees performing similar construction work in the City of New York.

(C) Any dispute as to whether work constitutes mechanical maintenance work or major structural work, or as to the wages to be paid therefor, shall be determined by arbitration, as any other dispute arising under this Agreement.

(D) The UNION shall be given at least thirty (30) days' notice by the EMPLOYER of its intention to effectuate major structural alterations. Upon receipt of said notice, the UNION shall have a right to call for a conference at the ASSOCIATION to discuss the matter. If, as a result of the conference, there is a dispute concerning the proposed major structural alteration, the matter shall be submitted to the Impartial Chairperson for his/her decision. Pending the conference, or if the matter is submitted to the Impartial Chairperson, pending his/her decision, the contract for such major structural alterations shall not be signed, nor shall the EMPLOYER commence said alterations.

## EMPLOYER RULES AND REGULATIONS

18. The EMPLOYER may continue, and from time to time may change, such rules and regulations as it may deem necessary and proper for the conduct of its business, pro-

vided that the same are not inconsistent with any of the provisions of this Agreement. All such rules and regulations shall be observed by the employees. The UNION may raise as a grievance any new or changed rule or regulation under Article 26 and, if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder.

## DUTIES OF EXCLUDED CATEGORIES

19. Nothing herein contained shall prevent employees in the excluded categories from performing the duties that they performed heretofore in the same manner and amount as heretofore, provided no employee in the affected classification is on layoff, reduced work week, or otherwise adversely affected, and provided further the work is not of a sufficient amount to justify hiring an additional full or regular part time bargaining unit employee.

## RELIEF EMPLOYEES

20. Employees may be assigned for no more than one and one-half (1-1/2) hours in any one day to relieve other employees in other positions for meal and rest periods, without additional compensation. An employee relieving other employees for more than one and one-half (1-1/2) hours in any one day shall be paid his/her regular rate of pay or the contractual wage rate (minimum wage rate plus applicable wage increases) for the classification of the employee relieved, as set forth in Schedule A, whichever is higher.

## HIRING

21. (A)  (1) New employees shall be hired in the following manner: A joint UNION-HOTEL ASSOCIATION employment office shall be opened immediately for the hiring of all employees in categories covered by this Agreement, except banquet servers and banquet captains, who are covered by the provisions of Article 47.

(2) The following principles shall govern the operation of the joint employment office:

(a)  The UNION and the ASSOCIATION will jointly establish a central registration office. The ASSOCIATION and the UNION will each establish a branch office for the dispatching of job applicants. The central registration office shall be administered jointly by the ASSOCIATION and the UNION.

(b)  Any person, whether or not a member of the UNION, and whether or not previously employed in the hotel industry, seeking to obtain employment in any job category covered by this Agreement, shall fill out a registration form at the central registration office. Each registration form shall contain, among other things, the following information: name, address, occupation, personal references, special qualifications, employment history, including the names of hotel EMPLOYERS and periods of employment in the hotel industry, and other such information as may be required. A copy of all registration forms and a master list of all registered applicants shall be maintained at the UNION branch and at the ASSOCIATION branch or the joint employment office.

(c) Each EMPLOYER party to this Agreement desiring to employ a new employee in any job category covered by this Agreement in its hotel or concession, must apply for such employee to either the UNION branch or the ASSOCIATION branch of the joint employment office. The branch applied to shall select, from the file of registered applicants, one or more applicants for the job opening. Preference in referring applicants and in employment shall be given to persons who have been previously employed in the hotel industry in New York City, and among such persons first preference shall be given to employees whose employment was terminated by reason of the closing of hotels covered by this Agreement and thereafter to other hotel employees who are on permanent layoff status from hotels covered by this Agreement.

(d) Unless an applicant satisfactory to the EMPLOYER shall be referred by 4:00 P.M. of the second business day following the day when the request was made, the EMPLOYER shall be free to fill in the vacancy from any source. An EMPLOYER application for an employee filed after 2:00 P.M. shall be considered as placed on the next business day. The foregoing time limitation shall not apply to emergency extras required by the EMPLOYER. In the case of an emergency extra, unless an applicant satisfactory to the EMPLOYER shall be referred within one (1) hour after the request is made, the EMPLOYER shall be free to hire such emergency extra from any source.

(e) The expenses of the ASSOCIATION branch shall be borne by the AS-SOCIATION. The expenses of the UNION branch shall be borne by the UNION. The expenses of the central registration office shall be borne equally by the UNION and the ASSOCIATION.

(f) The records of both branches and of the central registration office shall at all times be open to the inspection of both the UNION and the ASSOCIATION, and there shall be a daily interchange of information regarding persons dispatched to jobs and any and all pertinent data.

(g) No charge or fee whatsoever shall be requested of or charged to any registrant, job applicant or hotel.

(h) The service of the joint employment office shall be available to all members of the ASSOCIATION, whether or not they are under contract with the UNION.

(i) It is recognized that an EMPLOYER may fill a vacancy from among its employees, including employees in other hotels of the EMPLOYER'S chain.

(j) Any question or dispute concerning the operation of the joint employment office shall be subject to the grievance and arbitration procedure set forth in Article 26.

(k) The UNION and the ASSOCIATION acknowledge that they have not established the Central Registration Office nor the branch offices for the dispatching of job applicants, as provided in this Article, but have been using the services of the New York State Employment Service.

(l) If at any time during the life of this Agreement either the ASSOCIATION or the UNION requests full compliance with the provisions of this Article 21, such full compliance shall be effectuated by all parties.

(m) Upon the request of either party hereto, the Joint Advisory Committee, consisting of three (3) members appointed by the ASSOCIATION and three (3) members appointed by the UNION, shall convene to promulgate rules for the management of the joint employment office.

(B) (1) Upon a finding by the Impartial Chairperson that an EMPLOYER has a pattern of intentional and/or bad faith violation of the provisions of the Industry Wide Agreement with respect to the hiring of new employees, by and amongst other things discriminating against members of the UNION, whether they are actively employed or on layoff status, who are otherwise satisfactory to the EMPLOYER, the Impartial Chairperson may, in addition to ordering the termination of the employee unlawfully hired by the EMPLOYER and the hiring of the employee discriminated against by the EMPLOYER, grant such other remedy or relief as the Impartial Chairperson deems appropriate, including but not limited to the assessment of one (1) week's pay for every day the EMPLOYER is found to be in violation of the Agreement, up to a maximum of five (5) weeks' pay.

(2) In the event it is found that the UNION knew of the EMPLOYER'S violation of the Industry Wide Agreement and intentionally failed or delayed in acting on same, the Impartial Chairperson shall also assess against the UNION, a like penalty.

(3) All monies assessed for a violation of this Agreement shall be paid to the Employee Benefits Funds for distribution in proportionate amounts to the various funds.

(4) The parties agree, notwithstanding the provisions of this Article 21(B) seemingly to the contrary, that the UNION may, in its sole discretion, upon good cause shown by the ASSOCIATION, agree in writing, to waive, in full or in part, the provisions of this Article 21(B) and the provisions of Article 6(C) and (D) of the Industry Wide Agreement with respect to the wages and benefits of new employees, including contributions made to the industry wide funds on behalf of such new employees having prior work experience in the hotel industry.

(C) The EMPLOYER shall post all permanent job openings in the Hotel in order to permit current employees to apply.

(D) The EMPLOYER shall notify the UNION of the name, date of hire, and position of each person hired when requested and with the monthly submission of electronic information to the UNION.

(E) The EMPLOYER shall promptly notify the UNION of all job openings for any job category covered by this Agreement and of the cancellation of any job openings.

(F)  Study Committee

The parties acknowledge their mutual interest in creating a computerized system for all employees where job openings are posted electronically and applicants from closed shops and other EMPLOYERS (as said term is defined in Article 1 of the Agreement) will be able to apply electronically when a job is electronically posted. The parties also acknowledge their mutual interest in establishing a uniform system of referrals and compliance monitoring. The parties agree to convene, within sixty (60) days of the effective date of this Agreement, a Study Committee consisting of an equal number of repre-

sentatives of the UNION and of the ASSOCIATION to negotiate over the foregoing. The recommendations of the Study Committee shall only be adopted with the agreement of both the UNION and the ASSOCIATION, and shall not be subject to arbitration.

## MANAGEMENT RIGHTS

22. (A)  The EMPLOYER shall have the right to direct and control its employees. The EMPLOYER shall have the right to lay off, promote, or transfer any employee. Promotions shall not be subject to contest or review. The UNION shall, by representatives designated by it, have the right to confer with the EMPLOYER on behalf of any laid off or transferred employee. If the UNION claims that a layoff or transfer results in any abuse of the rights of employees, the grievance shall be subject to the grievance and arbitration provisions of Article 26 of this Agreement.

(B)  The EMPLOYER shall have the right to establish combination jobs within the classifications set forth in Schedule A of this Agreement. Upon the implementation of such job changes, the employee(s) affected shall be paid the rate of the higher rated job as set forth in Schedule A, except that in addition to the rate of the higher rated job, front office, food preparation and engineering and maintenance department employees shall receive ten dollars ($10) per week. No employee currently employed shall be laid off as a result of the job change. Employees shall be paid the combination rate for an entire week, except where the combination job results from an employee having to cover for another employee who fails to report to work as scheduled with no or less than twelve (12) hours' notice prior to the shift, the combination pay shall be the higher rate for the day, in addition to any applicable premium.

## SENIORITY

23. (A)  Layoff – General

In the event of a layoff in any department, departmental seniority will be observed insofar as compatible with efficiency. In general, the last person hired in a job classification within a department will be the first laid off in such classification and the employee with the greatest seniority in the job classification in the department will be the last laid off in such job classification. The EMPLOYER shall give the UNION not less than five (5) calendar days' prior written notice of layoff of an employee. Each week, the EMPLOYER shall further provide the UNION written notice of any employees who were recalled from layoff in the previous pay week. Except as otherwise provided in this Agreement, casual employees do not have seniority rights.

(B)  Layoff – Recall

(1)  The EMPLOYER shall keep a list of names of all employees laid off during the term of this Agreement and shall furnish the UNION with a copy thereof; and in the event of rehiring, it shall give preference to the persons on said list in order of seniority, provided that it shall not be required to rehire any person from said list unless such person, before being laid off, performed identical tasks in the same department from which s/he was laid off.

(2) In the case of an employee who is recalled to work from a layoff by an EMPLOYER, the EMPLOYER shall, if it intends to again lay off the affected employee, give the UNION at least three (3) calendar days' prior written notice of said second layoff. Notwithstanding the previous sentence, when a recall for a particular shift on a given day is occasioned by ten percent (10%) or more of the employees in a classification scheduled to work such shift failing to report to work with no or less than twelve (12) hours notice prior to the shift ("called out"), the EMPLOYER need give two (2) rather than three (3) calendar days' prior written notice of a second layoff for those employees recalled to replace employees who called out. Within three (3) business days of the recall referred to in the previous sentence, the EMPLOYER must provide the UNION, in writing, with the following: the date of the recall, the number of employees scheduled to work such shift, the names of the employees who called out, and the names of the employees recalled. In addition, when ten percent (10%) or more of the employees in a classification scheduled to work a particular shift on a given day call out, the EMPLOYER may use "extra" employees pursuant to Article 8 during such shift, if each employee who is on reduced work week or layoff either works such shift or declines to be recalled and there are still an insufficient number of employees in the classification, provided such "extra" employees must be provided with two (2) consecutive days of work. It is agreed that the requirement to give five (5) days' notice of change of schedule as provided in Article 11(C) shall not apply to recalls covered by this Article 23(B)(2).

(3) The UNION and the EMPLOYER further agree that the EMPLOYER may not lay off an employee more than three (3) times in any one calendar month and further, the EMPLOYER shall, during any such recall, pay premium pay to the affected employee(s) in accordance with the provisions of Article 8.

(4) An employee absent from work because of sickness or injury for not more than fifty-two (52) weeks shall be reinstated to his/her former job with all job rights and seniority provided the employee is physically capable of performing the duties of the job. The employee shall give the EMPLOYER one (1) week's notice of his/her intention to return to work.

(5) An employee absent from work because of sickness or injury for more than fifty-two (52) weeks but not more than two hundred and eight (208) weeks shall be placed upon a rehiring list and shall be offered the first available job opening in his/her job classification, provided that at the time the job opening becomes available the employee is physically capable of performing the duties of the job. Upon rehiring, the employee shall be restored to all his/her job rights and seniority. If not rehired by the expiration of the two hundred and eight (208) week period, the employee shall lose his/her seniority rights.

(6) In either case the EMPLOYER may require satisfactory proof of sickness or injury and recovery. If the employee presents a statement by the Health Center or another appropriate health care professional that the employee is able to return to work and if the EMPLOYER challenges said certification, the dispute may be submitted to an impartial physician designated by the EMPLOYER and the UNION, or if they are unable to agree, designated by the Impartial Chairperson, and the UNION and EMPLOYER agree to be bound by the decision of said physician.

(C) Layoff — Delegates and Assistant Delegates

(1) In the case of ASSOCIATION Labor Relations Group member EMPLOYERS: if a hotel intends to lay off a delegate or assistant delegate the hotel shall, prior to effectuating such layoff, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the hotel shall consult the office of the ASSOCIATION and an immediate conference with the UNION will be arranged at the office of the ASSOCIATION to discuss the matter. The conference held at the ASSOCIATION will constitute the conference provided for in this Article. Pending the result of the conference at the office of the ASSOCIATION and until a hearing is held at the Office of the Impartial Chairperson, if such hearing is necessary, the delegate or assistant delegate shall remain on the job. In accordance with existing practices, accredited UNION delegates shall have top seniority in their job classifications.

(2) In the case of all other EMPLOYERS: if an EMPLOYER intends to lay off a delegate or assistant delegate, the EMPLOYER shall, prior to effectuating such layoff, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the EMPLOYER shall immediately notify the Office of the Impartial Chairperson and request a hearing. Pending the hearing before the Impartial Chairperson, the delegate or assistant delegate shall remain on the job. In accordance with existing practices, accredited UNION delegates shall have top seniority in their job classifications.

(D) Notification of Delegates

The UNION will furnish a written list of delegates to each hotel upon written request by the hotel, and the UNION will notify the hotel in writing of any change in the list of delegates within ten (10) days of the making of such change.

## UNION ACTIVITY

24. (A) No employee shall be discharged or laid off because of UNION activities. In the event of a claim being made that an employee has been discharged or laid off because of UNION activities, such claim must be filed with the Labor Manager within one (1) week and disposed of by him within three (3) days thereafter. If the controversy cannot be satisfactorily adjusted between the UNION and the Labor Manager, the same shall be promptly referred to the Impartial Chairperson, who shall render his/her decision within a reasonable time after receiving the claim.

(B) In cases involving non-ASSOCIATION EMPLOYERS, all such claims which cannot be satisfactorily adjusted between the EMPLOYER and an officer or business agent of the UNION shall be promptly referred to the Impartial Chairperson for adjustment.

## NO DISCRIMINATION

25. The opportunity to give and obtain employment and maintain employment without discrimination or harassment because of race, color, creed, sex, age, national origin,

citizenship status, religion, disability, sexual orientation, union activity or any factor illegal under federal, state or city law is hereby recognized by the parties to this Agreement.

## COMPLAINTS, GRIEVANCES AND ARBITRATION

26. (A) All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto.  Any questions regarding arbitrability, substantive, procedural, or otherwise, or regarding the Impartial Chairperson's jurisdiction or authority, shall be submitted to the Impartial Chairperson in accordance with this Article. Any such complaint, dispute or grievance involving an EMPLOYER member of the ASSOCIATION shall, in the first instance, be submitted to the Labor Manager who will be appointed and employed by the ASSOCIATION, to consider and adjust with a duly accredited representative of the UNION, for their joint consideration and adjustment; if they agree, such decision shall be binding on the parties hereto.  The meeting before the Labor Manager shall, at the request of either party, be scheduled for the first mediation date following the earlier of a hotel level meeting, or the expiration of a period of five (5) business days after the request for a hotel level meeting by either party. Should the matter not be resolved by the Labor Manager and the representative of the UNION, it shall then be referred to the Impartial Chairperson as aforesaid.

(B)  In the event of a willful default by either party in appearing before the Impartial Chairperson, after due written notice shall have been given to the said party, the Impartial Chairperson is hereby authorized to render a decision upon the testimony of the party appearing.

(C)  Non-ASSOCIATION member hotel and concessionaire EMPLOYER complaints, disputes, or grievances are to be taken directly to the Impartial Chairperson.

(D)  If any EMPLOYER experiences an unanticipated emergency which justifies relief from the provisions of Article 45(B) the matter—if unresolved between the EMPLOYER and the UNION—may be submitted to the Impartial Chairperson who may grant such relief as s/he deems proper. If relief is granted, the Impartial Chairperson may make such provisions for the employees involved as s/he deems appropriate. The Impartial Chairperson may not grant relief predicated solely upon economic factors.

(E)  The parties consent that any papers, notices or process, including subpoenas, necessary or appropriate to initiate or continue an arbitration hereunder or to enforce or confirm an award, may be served by ordinary mail directed to the last known address of the parties or their attorneys, or when authorized by the Impartial Chairperson, by telegram, fax, e-mail or telephone.

(F)  The parties consent that all arbitration hearings shall be heard at the Office of the Impartial Chairperson located at 321 West 44th Street in the City of New York, or at such other place as the Impartial Chairperson may designate.

(G) The Impartial Chairperson may call such arbitration hearing on giving five (5) days' notice to all of the interested parties. The Impartial Chairperson, however, may call a hearing on shorter notice if s/he deems it appropriate.

(H) The parties hereby expressly waive the requirements regarding the Arbitrator's oath and the manner and time for the service of notice of hearing contained in the Civil Practice Law and Rules of the State of New York and agree and consent that the Impartial Chairperson may proceed with the hearing.

(I) The compensation of the Impartial Chairperson and his/her proper and necessary expenses shall be shared and paid equally by the ASSOCIATION and the UNION.

(J) Should the Impartial Chairperson resign, refuse to act, or be incapable of acting, or should the office become vacant for any reason, the ASSOCIATION and the UNION shall immediately and within five (5) days after the occurrence of such vacancy, designate another person to act as such Impartial Chairperson. If they fail to agree, the United States District Court, Southern District of New York, shall, upon application of either party, on due notice to the other, summarily make such appointment.

(K) The decision rendered by the Impartial Chairperson shall have the effect of a judgment entered upon an award made, as provided by the Arbitration Laws of the State of New York, entitling the entry of a judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by such decision.

(L) Effective for instances which arise after the effective date of this Agreement, an EMPLOYER found by the Impartial Chairperson to have (1) shown a pattern of repeated violations of a similar type and nature which supports a finding of an intentional and bad faith contractual violation; or (2) willfully violated a clearly defined contractual provision or hotel-specific established practice relating to scheduling, layoff, recall, wage or a wage-related provision, and that in either case above, i.e., (1) or (2), where such violation has resulted in a monetary award to the affected employees the Impartial Chairperson shall award to such employees an additional amount equal to fifteen percent (15%) of the awarded amount. It is understood that this provision shall not apply to situations where the Impartial Chairperson finds that the EMPLOYER has relied upon a reasonable good faith interpretation of the Agreement(s).

## DISCHARGE AND DISCIPLINE

27. (A) General

(1) The EMPLOYER shall have the right to discharge or discipline any employee. The UNION may question whether an employee's discharge or discipline was for just cause.

(2) In the case of ASSOCIATION Labor Relations Group member EMPLOYERS, the UNION shall submit the matter to the Labor Manager within ten (10) days after a discharge and, should the matter not be adjusted by the Labor Manager under the procedure set forth in Article 26, the UNION may submit the matter to the Impartial Chairperson within ten (10) days after the conference before the Labor Manager for decision as any other dispute under this Agreement. In the case of non-ASSOCIATION Labor Relations Group member EMPLOYERS, the UNION shall submit the

matter directly to the Impartial Chairperson. The Impartial Chairperson may uphold the discharge or reinstate the employee with or without back pay.

(3) The Impartial Chairperson shall not require that an employee who is discharged or suspended mitigate his/her damages where said employee registers with the Article 21 job referral office for his/her same or similar position and shift, within seven (7) days following termination or suspension and applies within forty-eight (48) hours for positions referred by the Article 21 job referral office which are the same or similar to the position held by the employee. In the absence of compliance with the foregoing by the employee, the Impartial Chairperson shall require mitigation of the employee. The job referral office and the employee shall provide the EMPLOYER with any relevant information in connection with the foregoing upon request.

### (B) Discharges/Suspensions - Delegates and Assistant Delegates

(1) In the case of ASSOCIATION Labor Relations Group member EMPLOYERS: if a hotel intends to suspend or discharge a delegate or assistant delegate the hotel shall, prior to effectuating such suspension or discharge, consult with an officer or business agent of the UNION. The UNION shall meet with the EMPLOYER within five (5) business days of request by the EMPLOYER. If no meeting takes place within that period, the grievance shall be scheduled for mediation for the hearing date immediately following the expiration of the aforesaid five (5) day period. Thereafter, the matter shall be filed at the Office of the Impartial Chairperson, which shall hear the matter within five (5) business days from the date of the filing and issue an award within five (5) business days from the close of the hearing. Until an award removing the delegate or assistant delegate from property is issued by the Impartial Chairperson, the delegate or assistant delegate shall remain on the job in all cases except theft, physical fighting, workplace violence or on the job drug/alcohol abuse, or such related charges.

(2) In the case of all other EMPLOYERS: if an EMPLOYER intends to suspend or discharge a delegate or assistant delegate, the EMPLOYER shall, prior to effectuating such suspension or discharge, consult with an officer or business agent of the UNION. If, after five (5) business days, the parties are unable to resolve the problem, the EMPLOYER shall immediately notify the Office of the Impartial Chairperson and request a hearing. The delegate or assistant delegate shall remain on the job pending an award by the Impartial Chairperson removing the delegate or assistant delegate from property.

### (C) Sunset

#### (1) Discipline Other than Attendance Discipline

Any discipline for a "non-serious offense," i.e., an offense other than a "serious offense" (defined below), shall be deemed null and void for disciplinary purposes after a twenty-four (24) month period, provided the employee has not received any further discipline during such twenty-four (24) month period.

#### (2) Discipline Related to Attendance, Tardiness, or Absence

Any discipline issued as the result of attendance, tardiness or absence ("Attendance Discipline") shall not be considered discipline for purposes of Article

27(C)(1). Any Attendance Discipline shall be deemed null and void for disciplinary purposes after a twenty-four (24) month period, provided the employee has not received any further Attendance Discipline during such twenty-four (24) month period.

#### (3) General

(a) "Serious offenses" shall be defined to be fighting, theft, threats of violence, workplace violence, harassment, use or possession of drugs or alcohol on the job.

(b) Discipline for a serious offense shall not be subject to the provisions of Article 27(C)(1).

(c) The failure of the UNION to challenge a warning at the time it is issued shall not preclude it from challenging same if the warning is later relied upon by the EMPLOYER to justify subsequent discipline, provided that the UNION must, within a reasonable time after the issuance of a written warning to the affected employee, notify the EMPLOYER in writing of a basis for its contest of, or disagreement with, said written warning.

## VACATIONS

28. (A) Entitlement - General

(1) All employees covered by this Agreement who shall have been employed continuously for the period specified below shall receive the following annual vacations with pay:

One (1) year but less than two (2) years............................. One (1) week
Two (2) years but less than five (5) years ..........................Two (2) weeks
Five (5) years but less than seven (7) years...................Twelve (12) days
Seven (7) years but less than fifteen (15) years ..............Three (3) weeks
Fifteen (15) years but less than twenty (20) years............Four (4) weeks
Twenty (20) years or more................................................ Five (5) weeks

(2) Tip employees shall receive the foregoing vacations and their vacation pay shall be twice their regular weekly rate of pay including night shift differential and premium pay, if any.

(3) Banquet employees shall receive their vacations as set forth in Schedule A-1 annexed hereto.

(4) Checkroom employees shall receive their vacations as set forth in Schedule A-2 annexed hereto.

(5) Steady extra banquet bartenders shall receive their vacations as set forth in Schedule A-3 annexed hereto.

#### (B) Proration

(1) Permanent, regularly scheduled part-time employees shall receive their vacations prorated in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Article 8(B) of this Agreement.

(2) In the event an employee is absent due to layoff, illness or injury, closing or excused absence for a period aggregating more than sixty (60) days in any employment year or such longer period as may be granted in writing by the EMPLOYER, the employee's vacation pay shall be prorated in proportion to the number of weeks actually worked during said employment year.

(3) Except as provided in Article 28(B)(2), an employee who has been employed for one (1) year or more whose employment terminates within one hundred eighty (180) days prior to the end of his/her employment year shall receive vacation pay prorated in proportion to the number of weeks the employee actually worked during said year. An employee employed for less than one (1) year shall receive vacation pay prorated in proportion to the number of weeks actually worked since his/her date of employment, provided his/her employment terminated within one hundred twenty (120) days prior to the end of his/her employment year.

Subject to Article 28(B)(2), if an employee's employment is terminated by reason of the closing of a hotel or concessionaire, the employee shall receive vacation pay prorated in proportion to the number of weeks the employee actually worked since the beginning of his/her current employment year.

(4) After service breaks aggregating more than twenty-six (26) weeks in an employment year, accrual of vacation entitlement pursuant to Article 28(A) shall toll.

(C) Payment

Vacations shall be given as soon as practical after the employee's completion of the required continuous employment. If deductions for meals were made during the year from the wages of the employee, the vacation pay shall be the full wages without meal deductions, providing the employee does not take meals at the hotel during the vacation period. The vacation pay shall be given to the employee at the end of the week preceding the vacation week.

(D) Scheduling

The EMPLOYER shall fix the time or period when such vacation may be taken and it shall give the UNION at least four (4) weeks' notice of the vacation schedule. Such schedule must provide for sufficient vacation periods to accommodate every employee's full vacation entitlement pursuant to the following conditions:

(1) Vacation requests received prior to January 15th of each year will be scheduled in accordance with seniority and approved or denied within two (2) weeks after the January 15th deadline. Employees who have not handed in a request by January 15th will have a final opportunity to turn in a vacation request by May 1st for any remaining weeks available and will be scheduled in accordance with seniority and approved or denied within two (2) weeks after the May 1st deadline. Vacation requests received after the May 1st deadline will be scheduled by the Hotel on a "first come, first served" basis for any remaining vacation weeks available. All vacation requests must be submitted in writing and will be responded to in writing and shall be determined by the Hotel based on business demands.

(2) Any request for unpaid leave shall be made in writing by the employee and will be responded to as soon as practicable.

### (E) Termination of Employment

An employee who has completed the required period of employment shall, in the event his/her employment is terminated prior to receiving his/her vacation, be entitled to receive his/her vacation pay.

## HOLIDAYS

29. (A) Entitlement - General

The EMPLOYER shall grant to all non-probationary employees covered by this Agreement the holidays listed below with pay:

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Jr.'s Birthday | Thanksgiving Day |
| Presidents' Day | December 24th |
| Memorial Day | Christmas Day |
| July Fourth | |

The EMPLOYER shall grant to all employees covered by this Agreement the personal days listed below with pay:

Employee's Birthday
Employee's Anniversary Date of Employment

One (1) personal day in each contract year to be scheduled by arrangement between the employee and the EMPLOYER not less than two (2) weeks prior to said day off.

Permanent, regularly scheduled part-time employees shall receive holidays and personal days prorated in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Article 8(B) of this Agreement.

### (B) Layoff

When an employee is laid off because of lack of work on any of the above enumerated holidays, s/he shall be paid for such holiday, provided the holiday occurs within twenty (20) working days following the beginning of such layoff, and also provided the laid off employee does not receive pay for the holiday from another hotel EMPLOYER.

### (C) Sickness

When an employee is absent because of sickness or injury on any of the above holidays s/he shall be paid for such holiday provided s/he has not been replaced by another employee who also receives pay for such holiday. The EMPLOYER may require satisfactory proof of sickness.

(D) Payment

(1) Should it be necessary for an employee in a non-tip classification to work on any of the above holidays s/he shall receive his/her regular straight time pay including night shift differential and regular premium overtime pay, if any, in addition to the holiday pay. Employees shall be notified five (5) days in advance as to whether it will be necessary for them to work on the holiday.

(2) An employee in a tip classification (except for banquet servers and banquet bartenders, who shall receive holiday pay as provided in Schedule A-1 or A-3) shall receive twice his/her regular daily rate of pay as holiday pay including night shift differential and regular premium overtime pay, if any. Notwithstanding the foregoing, should said tip employee work on the holiday, s/he shall receive an additional one-half (1/2) day's pay for a total of two and one-half (2-1/2) days' pay.

(3) All employees shall receive not less than a normal week's pay in any week during which a holiday falls.

### (E)  Work on Holidays

(1) If the EMPLOYER requires an employee to work on a holiday, the EMPLOYER may not require the employee to take another day off in lieu of the holiday. If a holiday falls on an employee's regular day off, the EMPLOYER may give the employee another day off in lieu of the holiday, which day off shall be the employee's regular work day immediately preceding or immediately following the holiday. Should a holiday fall during an employee's vacation, the EMPLOYER may grant the employee an additional day's vacation in lieu thereof which shall be the day immediately before or the work day immediately following the vacation.

(2) The UNION and the EMPLOYER agree, notwithstanding the provisions of Article 29(E)(1) above, that if a Hotel (i) requires an employee to work on a holiday, or (ii) if a holiday falls on an employee's regular day off or (iii) if a holiday falls during an employee's vacation, an employee may voluntarily take a day off, with pay, in lieu of receiving holiday pay, which day off with pay shall be scheduled within thirty (30) days before or after the holiday, provided prior written notice together with written consent by the employee is given to the UNION, which consent will not be unreasonably withheld or delayed.

In the event a dispute arises between the UNION and an EMPLOYER under the provision of this Article 29(E)(2), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration cause a delay in the foregoing.

(3) Employees in departments which are closed for the summer shall be paid for any of the above holidays which occur during such closing providing the employee returns to work when recalled to work.

30. (A) Entitlement - New Hires

(1) In order to be eligible for his/her paid personal days, an employee not previously employed in the hotel industry must be in the employ of the hotel for not less than sixty (60) working days.

(2) An employee whose birthday falls within the first fifteen (15) days of his/her employment shall receive his/her birthday personal day between the thirty-first (31st) day of employment and the ninetieth (90th) day of employment. In the event an employee's birthday falls subsequent to the first fifteen (15) days of his/her employment, s/he shall receive same on the day it falls.

(3) An employee who is severed from his/her employment prior to completion of the ninetieth (90th) day of employment but whose birthday occurred prior to his/her severance from employment, shall receive pay for his/her birthday personal day provided the birthday occurred after not less than fifteen (15) days of employment.

(B) Entitlement - Regular Full-Time and Regular Part-Time Employees

(1) Subject to the provisions set forth herein, all regular full-time employees of the EMPLOYER shall be eligible for three (3) personal days off with pay during each year of this Agreement. Permanently regularly scheduled part-time employees shall receive personal days pro rata in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Article 8(B) of this Agreement.

(2) The personal days off to which employees are entitled shall be compensated at the rate of one (1) day's pay at straight time, except for tip employees, who shall be compensated at twice the regular daily rate of pay at straight time.

(3) If a non-tip employee is required by the EMPLOYER to work on any of his/her personal days, s/he shall receive an additional day's pay at regular straight time pay including night shift differential and regular premium overtime pay, if any. In the event a tip employee works on his/her personal day, said employee shall receive one and one-half (1-1/2) days' pay at regular straight time pay, including night shift differential and regular premium overtime pay, if any, in addition to his/her normal daily wages.

(C) Banquet Personnel

(1) Banquet servers, banquet captains and banquet bartenders on a hotel steady rotation list, and checkroom and washroom attendants, shall receive personal days based upon the same eligibility applicable to regular employees. The amount of pay for their personal days: (i) for the said banquet servers and banquet captains shall be the amount payable to an a la carte server or an a la carte captain under the wage schedule set forth in Schedule A; (ii) for the said checkroom and washroom attendants shall be the amount payable under the wage schedule set forth in Schedule A-2.

(2) Should it be necessary for banquet servers to work on any of the personal days, pay for said personal days shall be at one and one-half (1-1/2) times the amount

payable to a la carte servers under the wage schedule set forth in schedule A, in addition to the wages paid for each banquet function or functions.

(3) Should it be necessary for banquet captains or banquet bartenders to work on any of the personal days, pay for said personal days shall be at the rate of one (1) day's pay for a la carte captains in the case of banquet captains and for service bartenders in the case of banquet bartenders, in addition to the wages paid for each banquet function or functions.

(4) In the event a personal day falls within the summer months during which such banquet and/or checkroom employees are not working, they shall nonetheless receive such personal days, or payment in lieu thereof, in accordance with arrangements to be agreed upon between the Hotel and the said employee.

### (D) General

The following rules shall be applicable to the three (3) personal days:

(1) In the event an EMPLOYER has a group of employees whose anniversary date with the EMPLOYER is the same, said employees shall enjoy such personal day off thirty (30) calendar days after their birthdays.

(2) If an employee's authorized personal day off falls on either his/her regular day off, during vacation, or on a holiday, the EMPLOYER shall have the option of granting another day off with pay by arrangement, or paying said employee for the personal day.

(3) If an employee's authorized personal day off falls while s/he is absent due to sickness or injury on the job, said employee shall be paid for such personal day upon return to regular employment or shall receive another day off with pay by arrangement with the EMPLOYER.

(4) Notwithstanding the above, nothing contained herein shall prevent the employee from applying all or a portion of his/her authorized personal days off to other than the reasons specified as a result of an unusual and/or sudden occurrence.

## JURY DUTY

31. All employees who have been employed for not less than one (1) consecutive year and who are summoned to serve jury duty will be paid for every second year of such service by the EMPLOYER the difference between their per diem jury pay and their regular rate of pay, provided that such payment shall be made for a period of no more than two (2) weeks (or such shorter period as the employee shall be on jury duty). To receive pay for jury duty, the employee must present to his/her EMPLOYER written evidence of his/her call to jury service together with a copy of receipt for payment for his/her jury duty. Tip classification employees shall be paid the difference between their per diem jury pay and twice their regular rate of pay.

**BEREAVEMENT PAY**

32. (A) Entitlement

(1) All employees who have been employed for not less than one (1) continuous year shall be granted bereavement pay in the event of a death in his/her immediate family.

(2) The term "immediate family" is defined as the employee's father, mother, sister, brother, spouse, domestic partner (as verified by the Health Benefits Fund), or children.

(B) Payment and Calculation

(1) Bereavement pay for the death of the employee's immediate family shall be paid for the day before, the day of, and the day following the funeral providing each of these days falls on days the employee was scheduled to work. In the event any of these three (3) days falls on days when the employee was not scheduled to work, the employee shall receive pay only for those days on which s/he was scheduled to work. No employee, however, shall receive bereavement pay more than once during any twelve (12) month period within the term of this Agreement.

(2) The bereavement days off to which employees are entitled shall be compensated at the rate of one (1) day's pay at straight time except for tip classification employees, who shall be compensated at twice the regular daily rate of pay at straight time including, for both non-tip and tip employees, night shift differential and regular premium overtime pay, if any.

(3) No bereavement pay will be granted unless the employee requests same from the EMPLOYER in advance of taking same. At its sole discretion, the EMPLOYER may require evidence of death and kinship.

## HEALTH BENEFITS FUND

33. The EMPLOYER agrees to contribute sums of money equal to stated percentages of its payroll to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund, all as provided herein, in Article 6(D) and Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference. Should government or other funds be appropriated on behalf of the dental program hereunder, the EMPLOYER'S contribution shall be reduced accordingly.

## 401(k) PLAN

34. The parties hereto have agreed to a non-EMPLOYER contributory 401(k) Plan, known as the New York Hotel Trades Council and Hotel Association of New York City, Inc., 401(k) Savings Plan and Trust, which has been established in accordance with applicable law for the benefit of employees covered by this Agreement, all as provided herein and in Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference. Employee contributions into said 401(k) Plan shall be made by employees on a voluntary basis. Any and all costs attendant to the establishment, implementation and administration of said 401(k) Plan, other than costs of deducting and

withholding from employee wages and transmitting same to the Plan, shall be paid out of the employee elective deferral contributions.

## PENSION FUND

35. The EMPLOYER agrees to contribute to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, all as provided herein, in Article 6(D) and Schedule B annexed hereto, the terms and provisions of Schedule B being specifically incorporated herein by reference.

## TRAINING AND SCHOLARSHIP FUND

36. (A) The ASSOCIATION and the UNION have established a program to train employees for promotion and advancement. Said program is known as and operated by the New York Hotel Trades Council and Hotel Association of New York City, Inc., Industry Training and Scholarship Fund established by an Agreement and Declaration of Trust which provides, among other things, for equal representation upon the Board of Trustees of the Trust Fund of ASSOCIATION and UNION representatives. The Impartial Chairperson designated under this Agreement shall act as Impartial Chairperson of said Trust Fund.

(B) The EMPLOYER agrees to contribute to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Training and Scholarship Fund, all as provided herein, in Article 6(D) and in Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference.

(C) No new training programs, other than those organized by the Trustees of the Fund, shall be instituted.

(D) Should government or other funds be appropriated on behalf of the training program hereunder, the EMPLOYER'S contribution shall be reduced accordingly.

(E) The parties agree to jointly study the Industry Training Program ("ITP") in order to meet the EMPLOYER'S concerns that the program(s) be revised to (1) more accurately meet the employment needs of hotels, (2) provide training in skills that employees will need in order to fulfill hotel employment requirements and (3) that the ITP's administrative offices, programs and facilities be combined with the joint employment office in order to effectuate savings, if possible, and to more closely align the purposes of ITP's benefit programs with the purpose of the joint employment office to better service EMPLOYERS and their employees and to effectuate the UNION'S request that graduates of the ITP be granted preferential hiring and promotion opportunities on an industry-wide basis.

(F)  Culinary Training

(1) The ITP shall establish a training course to help employees/applicants who are eligible to enroll in ITP to acquire the culinary skills necessary to obtain eligibility for employment.

(2) Training opportunities shall be provided in the order of "first come, first served" basis. Applicants who successfully complete the ITP culinary training course and obtain certification shall be permitted to apply for culinary job openings.

(3) The EMPLOYER shall immediately notify the UNION of, and post in a visible location, any culinary job openings.

(4) The UNION shall transmit to the EMPLOYER all applications for its job opening(s) which were submitted by employees/applicants who are ITP-certified as eligible.

(5) The EMPLOYER shall interview every employee/applicant certified as eligible who is referred for a job opening. The EMPLOYER shall decide which applicant to hire and shall notify the UNION in writing of the identity of the person hired three (3) days prior to hiring said applicant. Once an EMPLOYER interviews an employee/ applicant ITP-certified as eligible, the EMPLOYER is not required to re-interview said person for future job openings for twelve (12) months.

(6) The ITP shall promptly notify EMPLOYERS of the identity of applicants who are ITP-certified as eligible to be utilized as banquet culinary.

(G) The parties agree to form a joint study committee to review advancement opportunities in the New York City hotel industry for employees in other classifications who attain ITP certification.

## LEGAL FUND

37. The EMPLOYER agrees to contribute to the jointly trusteed New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund, all as provided herein, in Article 6(D) and Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference.

## STRIKES AND LOCKOUTS

38. (A)  Both the UNION and the EMPLOYER recognize the service nature of the hotel business and the duty of the hotel operator to render continuous and hospitable service to the public in the way of lodging, food and other necessary hotel accommodation. Therefore, the UNION agrees that it will not call, engage in, participate in, or sanction any strike, sympathy strike, stoppage of work, picketing of the hotel, sit-down, sit-in, boycott, refusal to handle merchandise, or any other interference with the conduct of the EMPLOYER'S business, for any reason whatsoever; nor will it interfere with any guest or tenant at the hotel, while s/he is a guest or tenant occupying a room or space, who sells or exhibits non-union-made merchandise or employs non-union help. The EMPLOYER agrees that it shall not lock out its employees or any part of its employees.

(B)  The UNION and the employees agree that they will not, at any time, either directly or indirectly, interfere with or prevent the EMPLOYER from purchasing merchandise or any service requirements which it may desire from any source whatsoever because of the employment by the said source of non-members of a union or non-union workers, and the UNION and the employees further agree that they will not refuse to handle, sell, deliver or work on any such merchandise which may be so purchased.

(C) The UNION and the employees further agree that they will not call, participate in or sanction any sympathy strike of the employees because the EMPLOYERS purchase any merchandise manufactured by or any service requirements supplied by non-members of a union or by EMPLOYERS of non-union workers or because it has such merchandise manufactured for it by non-members of a union or employers of non-union workers. Such a strike shall be in violation of this Agreement.

(D) The UNION and the employees further agree that they will not call upon the EMPLOYER to participate or assist in the enforcement of any public or silent boycott against any product sold or offered for sale, or used by the EMPLOYER.

(E) Any such act shall be a violation of this Agreement, and the same, including any and all disputes in reference thereto or with respect to any of the foregoing provisions, shall be submitted to the Impartial Chairperson as any other dispute under this Agreement.

(F) During the term of this Agreement there shall be no lockout, strike or stoppage of any kind pending the determination of any complaint or grievance and for a period of ten (10) days thereafter, and then only for the refusal of either party to abide by such determination.

## CONTRACT WITH NON-MEMBER HOTELS

39. (A) The UNION obligates itself to enter into no contract whereby any person, firm or corporation operating a hotel in the City of New York shall receive any benefit or aid not accorded to the HANYC Bargaining Group EMPLOYERS pursuant to the terms of this Agreement.

(B) The UNION agrees to insert a clause in all its Agreements with hotel and concessionaire EMPLOYERS who are not HANYC Bargaining Group members or hotel and concessionaire EMPLOYERS which cease to be HANYC Bargaining Group members to the effect that such EMPLOYER shall submit to the plan of adjustment and arbitration herein provided for. Not later than two weeks after the effective date of this Agreement, all non-labor relations member hotel and concessionaire EMPLOYERS shall deposit with the Impartial Chairperson the following sums of money as security for the EMPLOYERS' payment of the assessment of the Office of the Impartial Chairperson:

In the case of a hotel EMPLOYER with less than three hundred (300) rooms - the sum of one thousand dollars ($1,000).

In the case of a hotel EMPLOYER with three hundred (300) or more but less than nine hundred (900) rooms - the sum of one thousand, three hundred and fifty dollars ($1,350).

In the case of a hotel EMPLOYER with nine hundred (900) or more rooms but less than one thousand (1,000) rooms - the sum of two thousand dollars ($2,000).

In the case of a hotel EMPLOYER with one thousand (1,000) or more rooms - the sum of two thousand, five hundred dollars ($2,500).

In the case of a concessionaire EMPLOYER - the sum of one thousand dollars ($1,000).

(C) The UNION and the HANYC reserve the right to jointly increase the above amounts from time to time.

(D) The Impartial Chairperson shall assess each non-labor relations member hotel of the HANYC and concessionaire EMPLOYER on each occasion said EMPLOYER is required to appear for a hearing, whether or not said hearing is held, an amount equal to its deposit.

(E) In the event a non-labor relations member hotel of the HANYC or concessionaire EMPLOYER fails to pay the assessment levied by the Impartial Chairperson to the arbitration fund as herein above set forth, the monies due the arbitration fund shall be deducted from the monies deposited with the Impartial Chairperson as aforesaid and the said non-labor relations member hotel of the HANYC or concessionaire EMPLOYER shall be required to replace forthwith any monies so deducted. The Impartial Chairperson may institute a lawsuit to recover any monies due hereunder.

(F) Contracts with such other EMPLOYERS, who are not HANYC Hotels, shall not run longer than the period of this Agreement.

## STATUS QUO AGREEMENT OF MARCH 23, 1938

40. (A) Any hotel for whose employees the UNION has been designated as the exclusive collective bargaining agent, and which does not become a party to this Agreement by signing the same, shall not have any of the rights, benefits, or privileges of this Agreement.

(B) Irrespective of any increase in wages made prior to the execution of this Agreement by an EMPLOYER who has not been previously in contractual relationship with the UNION with respect to any appropriate collective bargaining unit, such EMPLOYER shall nevertheless be required to increase the wages of all employees by the amount of increases set forth in Schedule 1 for the respective job classifications (but such increase shall not be retroactive), in order to obtain the benefits and privileges of this Agreement, for such collective bargaining unit.

## MODIFICATION OF THIS AGREEMENT

41. No EMPLOYER and no worker or group of workers shall have the right to modify or waive any provision of this Agreement.

## VISITATION CLAUSE

42. (A) Authorized representatives of the UNION shall have admission to the establishments of the EMPLOYERS but such representatives shall make arrangements with the management as to time of making such visits.

(B) It is further agreed that conferences held between UNION representatives and the employees shall not be held during the employees' working time; and if held on the premises, said conference must be within a place arranged for with the management.

43. The EMPLOYER shall permit the UNION to post announcements of meetings and functions on bulletin boards to be provided by the EMPLOYER and placed in convenient positions in the hotel to be designated and provided by the EMPLOYER.

## COST OF LIVING

44. Notwithstanding any other provision of this Agreement seemingly to the contrary, the parties agree that in the event the aggregate increases paid by the EMPLOYER for the period ending June 30, 2018 is exceeded by the cost of living (based on New York City Consumer Price Index) for the period ending June 30, 2018, the UNION shall have the right to request that a joint study committee be formed to examine and discuss the impact of said increase on the employees and the need, if any, for a wage review. In the event the parties fail to agree on what action to take, either party may submit the matter to the Impartial Chairperson, who shall be empowered to make a final decision with regard to said matter.

## AREA STANDARDS AND WORK PRESERVATION

45. (A) Any contract, lease or agreement entered into between a hotel and a concessionaire which employs employees in job classifications covered by this Agreement must contain a provision that the concessionaire agrees that the persons employed in the job classifications covered by this Agreement will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement, including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, training and scholarship, and/or any other economic benefits required by this Agreement or their equivalent and that said concessionaire or lessee further agrees to submit any question concerning compliance with the foregoing to the Impartial Chairperson designated under Article 26 herein for determination. Any party affected may institute such arbitration.

(B) All work performed on the EMPLOYER'S premises and all products produced on the EMPLOYER'S premises by employees covered by this Agreement as of the effective date of this Agreement shall not be performed or produced by persons not covered by this Agreement, provided that an EMPLOYER or a group of EMPLOYERS may arrange to have products and/or work presently produced and performed on its premises to be performed by persons employed in job classifications covered by this Agreement provided that such persons work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement, including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, training and scholarship, and/or any other economic benefits required by this Agreement or their equivalent and further provided that the employment of those employed by the EMPLOYER or group of EMPLOYERS at the time of the arrangement shall not be adversely affected thereby.

(C) With regard to any contract, lease or agreement entered into on or after July 1, 1995, between an EMPLOYER and a Concessionaire, the EMPLOYER and Concessionaire will be considered a joint EMPLOYER for the purposes of this Agreement. The EMPLOYER shall at all times hold and exercise full control of the terms and conditions

of employment of employees of the joint EMPLOYER for labor relations purposes with regard to the schedule of hours, wages and economic benefits provided in this Agreement, including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, training and scholarship, and/or any other economic benefits required by this Agreement. The EMPLOYER'S liability shall be limited as provided for in Article 46 of this Agreement. Employees of the joint EMPLOYER shall be members of the bargaining unit, as set forth in Article 2 of this Agreement.

## FURNISHING SECURITY

46. (A)  In order to ensure the faithful performance of the obligations contained in this Agreement, every concessionaire shall be required to furnish security in the form of cash or bond in the amount of three (3) months' wages prior to entering into its operation, or at any time thereafter, upon demand by the UNION or hotel. Failure to demand security shall not be deemed to be a waiver of a concessionaire's obligations hereunder.

(B)  The cash or bond shall be deposited with the Impartial Chairperson. In the event the Impartial Chairperson finds that a default has occurred in the payment of wages or economic benefits provided in this Agreement, including vacation, holiday, premiums, overtime, insurance, pension, medical, training and scholarship, legal, dental benefits, severance pay, and/or any other economic benefits required by this Agreement or UNION dues, fees or assessments, s/he shall order said payments to be made from the cash or bond on deposit with him/her and shall further order that the cash or bond be restored to its original amount.

(C)  In the event a concessionaire who is required to post cash or bond hereunder fails to do so, the hotel shall be responsible for any defaults.

(D)  At the termination of any contract, concession or lease the Impartial Chairperson shall return the cash or bond, upon being satisfied that there are no unpaid wages or economic benefits provided in this Agreement, including vacation, holiday, premiums, overtime, insurance, pension, medical, training and scholarship, legal, dental benefits, severance pay, and/or any other economic benefits required by this Agreement or union dues, fees or assessments.

(E)  The form of the bond to be posted shall be subject to the approval of the ASSOCIATION and the UNION, or, in the case of a non-ASSOCIATION hotel, the hotel and the UNION, and if they fail to agree, the form of the bond shall be determined by the Impartial Chairperson.

## BANQUET DEPARTMENT

47. (A)  (1) The EMPLOYER shall furnish the UNION with a list of banquet servers now employed by, or on the EMPLOYER'S A and B-Lists for such employment; such servers as are not members of the UNION at the time of the execution of this Agreement by the EMPLOYER shall become members of the UNION within thirty (30) days from the execution of this Agreement by the EMPLOYER, and the UNION shall accept banquet servers as members upon the same terms and conditions as other members. Banquet servers other than those now employed or on the EMPLOYER'S steady A and B-Lists shall be procured as set forth below.

(2) The UNION agrees that all individuals who register with it as applicants for jobs as banquet servers shall be referred to jobs on a non-discriminatory basis and selection of applicants shall not be based on, or in any way affected by, UNION membership, the UNION'S by-laws, rules or regulations, constitutional provisions, or any other aspect or obligation of UNION membership, policies or requirements.

(3) Notice of the provisions of this Article and the functioning of job referrals and hiring arrangements shall be posted on bulletin boards in hotels and in the UNION where applicants apply for jobs.

(4) The classification of meals, hours, wages and working conditions of banquet servers and banquet captains are contained in Schedule A-1 annexed hereto and made a part of this Agreement.

(5) Each hotel shall establish a B-List, on an individual hotel basis, provided that said B-List shall not exceed sixty percent (60%) of the hotel's A-List.

#### (B) Extra Banquet Work

(1) <u>Protection of Rights of Current Roll Call Employees</u>

(a) All persons registered with Roll Call on or before July 1, 2001 ("current Roll Call employees") shall continue in such status, subject to annual re-registration, and shall continue to enjoy the same right to be offered extra banquet work.

(b) In order to provide current Roll Call employees with greater opportunity to obtain extra banquet work, as of July 1, 2001, the Roll Call list shall be "frozen" and no other person will be added to the Roll Call list.

(2) <u>Banquet Job Opportunities for Non-Banquet Personnel</u>

(a) In order to provide equal employment opportunity for advancement to all hotel employees working in the industry, the EMPLOYER shall be permitted to establish a banquet C-List.

(b) The banquet C-List shall consist only of employees covered by this Agreement and working for the EMPLOYER in job classifications (other than banquet servers) who desire to work as extra banquet servers.

(c) The number of C-List servers shall not exceed one hundred and twenty-five percent (125%) of the EMPLOYER'S B-List. In the event the number of C-List servers is insufficient, the EMPLOYER shall notify the UNION and the parties shall meet to discuss an increase. In order to seek an increase of the C-List, the EMPLOYER must have a B-List which is sixty percent (60%) of its A-List.

(d) In the event, after the EMPLOYER'S utilization of its A-List, B-List and Roll Call referred servers, there is not a sufficient number of servers to staff a banquet function, all remaining banquet server work for the function shall be staffed from the EMPLOYER'S C-List. Provided the EMPLOYER has fully staffed A, B, and C-Lists, if the EMPLOYER exhausts its available A-List, B-List, Roll Call, and C-List, where applicable, for a particular function, it may seek additional banquet servers from any source.

(e) Banquet server work shall be offered to the C-List on a rotation basis as is customary and standard in the industry.

(f) The UNION and the EMPLOYER shall mutually agree upon reasonable and fair procedures for notifying C-List servers of available extra banquet work and for offering such work to members of the C-List.

(g) The EMPLOYER shall notify the UNION in writing that an employee has been added to its C-List not less than five (5) business days prior to scheduling said employee to work any banquet function.

(h) No employee of the EMPLOYER shall be compelled to register to work as a C-List employee.

(i) Assignment of C-List servers to work any banquet function shall be voluntary.

(j) The EMPLOYER is not required to offer extra banquet work where overtime or premium pay would be incurred or where the offer conflicts with the employee's regular schedule.

#### (C) Steady Banquet Job Openings

The following shall pertain to Steady Banquet Job Openings:

##### (1) Hiring Procedure

All openings for banquet B-List jobs, and in the case of hotels which do not have a banquet B-List, openings for banquet A-List jobs, henceforth to be collectively referred to as "steady banquet job openings," shall be filled in accordance with the following procedure:

(a) Open A-List jobs shall be filled from the B-List in accordance with seniority.

(b) The EMPLOYER shall immediately notify the UNION of and post in visible location any such job openings and the UNION shall post notice of such job openings on a dedicated bulletin board at the UNION'S headquarters.

(c) Employees/applicants who are certified as eligible to apply for such job openings, in accordance with the rules set forth in Article 47(C)(2), shall submit their applications to the UNION no later than one (1) week after said job opening has been posted by the UNION.

(d) The UNION shall transmit to the EMPLOYER all applications for the job opening which were submitted by employees/applicants who are certified eligible in accordance with the rules set forth in Article 47(C)(2).

(e) The EMPLOYER shall interview every employee/applicant certified as eligible who is referred for a job opening. The EMPLOYER shall decide which applicant to hire and shall notify the UNION in writing of the identity of the person hired three (3) days prior to hiring said applicant. Once an EMPLOYER interviews an employee/applicant certified as eligible, the EMPLOYER is not required to reinterview said person for future job openings for twelve (12) months.

(2) Certification of Eligibility to Apply

(a) All employees registered with Roll Call prior to the effective date of this Agreement shall be deemed certified as eligible to apply for steady banquet job openings.

(b) Except as provided in Article 47(C)(2)(a), any person who (during the five (5) year period prior to the posting of the opening) does not have at least one (1) year of experience working in a position covered by this Agreement for an EMPLOYER signatory to this Agreement, shall not be certified as eligible to apply for any steady banquet job opening.

(c) A list of current Roll Call servers who are deemed certified under this provision has been provided by the UNION.

(d) The Industry Training Program ("ITP") shall certify as eligible all applicants who the ITP determines possess the requisite skills and ability.

(3) Banquet Training

(a) The ITP shall screen, examine and certify applicants in accordance with reasonable, objective, uniformly applied, non-discriminatory criteria, procedures and standards which the ITP shall establish.

(b) The ITP shall establish a training course to help employees/applicants who are eligible to enroll in ITP to acquire the banquet service skills needed to obtain eligibility for employment.

(c) Applicants who have not been certified as eligible to apply for steady banquet job openings in accordance with the rules set forth in Article 47(C)(2) and who are eligible to enroll in ITP may register for said banquet training course.

(d) Training opportunities shall be provided in the order of registration on a "first come, first served" basis. Applicants who successfully complete the ITP banquet training course and obtain certification shall be permitted to apply for steady banquet job openings.

(4) Eligibility Notification

The Industry Training Program shall promptly notify Hotels of the identity of applicants who are certified as eligible to be utilized as banquet servers.

(5) Limitation on Number of Positions Held by Banquet Servers

(a) No banquet server may simultaneously hold in New York City more than two (2) A or B-List banquet server positions. Banquet servers who simultaneously hold two (2) such positions may hold (a) one (1) Banquet A-List and one (1) Banquet B-List position, or (b) two (2) Banquet B-List positions; but may not hold two (2) A-List positions.

(b) Banquet servers who held a greater number of positions than permitted in Article 47(C)(5)(a) as of September 1, 2004 shall be red circled and may retain the positions held as of that date. Such red circled banquet servers may not obtain

additional positions or substitute a new position for an existing one, unless s/he can do so in compliance with Article 47(C)(5)(a).

(c) A banquet server who has met the limitations set forth in Article 47(C)(5)(a) may nonetheless apply for a new banquet server position, provided s/he:

(i) Discloses in his/her application to the prospective employer the banquet server positions held at the time of the application;

(ii) After accepting an offer of employment as a banquet server but prior to the first day of work in such position, resigns appropriate banquet server position(s) such that s/he is in compliance with Article 47(C)(5)(a); and

(iii) Provides written notice of such resignation(s) to the new employer prior to commencing such new banquet server position.

(d) EMPLOYERS shall include on applications for any A or B-List server position a section to be completed by the applicant (i) certifying that s/he is eligible for the position in accordance with Article 47(C)(5)(a) ("Representations"), and (ii) informing the applicant that s/he will be disqualified from continued employment as a banquet server with the employer if s/he fails to remain in compliance with Article 47(C)(5)(a) while employed by the employer. A misrepresentation on the Representation or failure to remain in compliance with Article 47(C)(5)(a) shall constitute just cause for summary termination from the banquet server position(s) most recently obtained with employer(s) signatory to or bound by this Agreement with which continued employment creates a violation of Article 47(C)(5)(a) and for discipline by any employer signatory to or bound by this Agreement with which the offending employee holds other banquet server jobs. The employer(s) signatory to or bound by this Agreement which most recently hired the offending banquet server and with which continued employment creates a violation of Article 47(C)(5)(a) shall be liable for back pay, but only if said employer(s) hired, or continued to employ, the banquet server knowing s/he was not in compliance with Article 47(C)(5)(a).

(e) Notwithstanding anything apparently to the contrary in Articles 47(C)(5)(c) and (d), those Articles shall also apply to internal promotions from B-List to A-List positions, as provided for in Article 47(C)(1)(a).

### (D)  Gratuities

(1) Effective July 1, 1995, except as otherwise provided herein, the UNION and the EMPLOYER agree that with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%) shall be paid to tip category employees (banquet servers and captains) working said functions, pursuant to established practice in each hotel as of July 1, 1995.

If, however, any EMPLOYER signatory hereto is currently paying its employees banquet gratuity amounts which would require that EMPLOYER to increase its current gratuity rate by more than one percent (1%) during the first year of this Agreement, the EMPLOYER shall increase the gratuity required hereunder in two (2) equal increases in each of the first two years of this Agreement.

(2) The foregoing notwithstanding, the UNION and EMPLOYER agree that, in the case of hotels (other than the traditional large banquet hotels, such as the New York Hilton, Waldorf=Astoria, Sheraton New York, Plaza, Pierre, St. Regis and other like hotels), which other hotels for purposes of this provision shall be called "small banquet hotels," a minimum gratuity equal to fourteen percent (14%) shall be paid to tip category employees (banquet servers and captains) working said functions, pursuant to established practice in each hotel. The UNION and EMPLOYER also agree, however, that if at any time during the term of this Agreement any such small banquet hotel increases its July 1, 1995 gratuity or service charge to its banquet customers, the aforesaid minimum gratuity payable hereunder to tip category employees (banquet servers and captains) working said functions shall be increased from fourteen percent (14%) to fifteen percent (15%), pursuant to established practice in each such hotel as of July 1, 1995.

(3) The EMPLOYER and UNION agree that where an EMPLOYER does not utilize the services of a captain, all of the gratuity amounts payable hereunder shall be paid to the banquet servers.

## RELIEF APPEALS

48. (A) Whenever, upon a written application of an EMPLOYER, it shall appear to the Impartial Chairperson that the factual situation with respect to a particular EMPLOYER is such that the wage and hour scales provided in this Agreement will work unusual hardship on such EMPLOYER, and affect adversely the interest of the workers therein, such wage and hour scales may be modified, in the case of such EMPLOYER, to the extent approved by the Impartial Chairperson.

(B) An EMPLOYER that intends to make such application in connection with the wage increases under the Collective Bargaining Agreement shall make such application within ninety (90) days before the effective date of each wage increase under this Agreement. In all instances, the wage increase shall go into effect on the scheduled date unless the Impartial Chairperson awards otherwise. If application for relief is not made within the ninety (90) days, the increases shall be put into effect, provided, however, that this shall not preclude an EMPLOYER from making application for relief thereafter.

## UNIFORMS AND EMPLOYEE FACILITIES

49. (A) The EMPLOYER agrees that whenever it requires employees to wear special uniforms, such uniforms shall be supplied and shall be laundered at the expense of the EMPLOYER. The EMPLOYER agrees to supply cooks with uniforms. A cook's uniform is defined as jacket, cap, apron, kerchief and pants.

(B) Uniforms shall be designed and maintained in such a manner as to account for the conditions in which employees work, the tasks they perform, and safety and health issues.

(C) The EMPLOYER agrees to provide adequate locker space for employees customarily provided with locker space. The EMPLOYER shall provide safe, clean and sanitary places for eating and changing clothes and washroom facilities.

**GROUPS AND PORTERAGE**

50. (A) For all tour parties and groups ("Groups"), as hereinafter defined, which are booked after the effective date of this Agreement, the EMPLOYER shall be required to pay porterage fees pursuant to Article 50(B) for groups which satisfy all of the following criteria:

(1) The Group includes a minimum of ten (10) room reservations;

(2) There is a common arrival date and time and a common departure date;

(3) The entire Group is a "group booking" on a master account; and

(4) Bellpersons shall be available to receive and take charge of Group luggage and deliver luggage directly to the rooms on arrival.

(B) In case of Groups, bellpersons shall be paid porterage fees in the amount of two dollars and forty eight cents ($2.48) per bag in and two dollars and forty eight cents ($2.48) per bag out and doorpersons shall be paid a porterage fee equal to one dollar and twenty four cents ($1.24) per bag in and one dollar and twenty four cents ($1.24) per bag out, provided that no porterage will be paid on any bags in excess of two (2) for any one guest. Doorpersons will assist in the handling of the baggage and those hotels not employing doorpersons will not be subject to this porterage payment to doorpersons.

(C) Bellpersons shall receive one dollar twenty four cents ($1.24) for each person coming into a hotel to occupy a room which is one of a block of rooms rented or set aside on a permanent basis to an airline or trucking company. Bellpersons shall receive, in addition, one dollar twenty four cents ($1.24) for each such person on leaving the hotel.

(D) The rates set forth in this Article shall be subject to annual contractual wage increases. In addition to annual contractual wage increases, the rates set forth in Article 50(B) shall be increased by an additional four percent (4%) on January 1, 2014.

(E) No existing rates, terms, or conditions shall be reduced as a result of this Article.

(F) In the case of all Groups, where meals are included, adult as well as youth, servers shall receive thirty-one cents ($0.31) per meal per person or fifteen percent (15%) of the price of the meal, whichever is greater.

(G) Where the rooming arrangements for professional athletic teams do not permit bellpersons to earn tips, such rooming shall be considered a Group, except that where other tip arrangements have been in effect, they shall continue.

(H) Wage Increases:

(1) Bellpersons (or any combination position inclusive thereof) shall receive the following wage increases to their actual base hourly rate(s) of pay and the IWA Schedule A rate shall be increased:

January 1, 2014: .............................................................. $1.00 per hour

January 1, 2015: .............................................................. $0.50 per hour

January 1, 2017: .............................................................. $0.50 per hour

January 1, 2018: .............................................................. $0.50 per hour

Such increases shall be subject to IWA increases to wages and wage related items.

(2) Doorpersons shall receive the following wage increase to their actual base hourly rate(s) of pay and the IWA Schedule A wage rate shall be increased:

January 1, 2014: ............................................................. $1.00 per hour

January 1, 2015: .............................................................. $0.50 per hour

January 1, 2016: ............................................................. $0.50 per hour

January 1, 2017: .............................................................. $0.50 per hour

Such increases shall be subject to IWA increases to wages and wage related items.

(3) This Sub-paragraph 50(H) shall not apply to Employers bound to the IWA as of July 1, 2013 whose Bellpersons and Doorpersons do not regularly receive porterage and are paid no less than the IWA Elevator Operator, Passenger rate.

(4) Bellpersons and Doorpersons shall receive paid benefit time predicated on the Schedule A benefit day rate, without reference to the increases contained in Article 50(H)(1) and (2).

(I) All Employer porterage practices at each Hotel bound to this Agreement on or before July 1, 2013 relating to Article 50(A)(2) and (3) shall be maintained and preserved as binding past practices. Such practices as they existed at each such hotel as of July 1, 2013 may not be challenged as violative of Article 50(A)(2) or (3). Nothing herein shall affect claims of alleged non-compliance with such practices nor disputes as to what such practices were as of July 1, 2013.

## NIGHT SHIFT DIFFERENTIAL

51. (A)  General

Night shift differential shall apply to all employees covered by this Agreement except those listed in Schedule A-1.

(B)  Payment - Rate

The night shift differential shall be paid for all hours worked after 8:00 P.M. in the evening and before 6:00 A.M. the next morning. Each employee employed during the hours stated above shall receive, in addition to his/her regular wages, one dollar and nine cents ($1.09) per hour for each hour worked during said period. Effective July 1, 2012, 2013, 2014, 2015, 2016, 2017, and 2018 said rate shall be increased to one dollar and thirteen cents ($1.13), one dollar and eighteen cents ($1.18), one dollar and twenty-three cents ($1.23), one dollar and twenty-eight cents ($1.28), one dollar and

thirty-two cents ($1.32), one dollar and thirty-seven cents ($1.37). and one dollar and forty-two cents ($1.42) respectively.

### (C) Calculation

(1) The wage rate on the basis of which overtime compensation is to be calculated shall not include the night shift differential. Although the night shift differential shall not be added to the regular rate for the purpose of calculating overtime compensation, the amount of the agreed upon night shift differential shall be paid for each hour of work of an employee during the night hours to which such night shift differential payment is applicable.

(2) Vacation, sick days, personal days, bereavement, jury duty pay and holiday pay shall include the night shift differential, provided, however, that this applies only to regular and full-time employees who are regularly scheduled for work during the hours for which the night shift differential is paid.

## SEVERANCE PAY

52. (A) In the event of termination resulting from the closing of a hotel or a restaurant therein or a department thereof, or a concession, or from (1) the conversion of the elevators to self service elevators or (2) the conversion of telephone department equipment or (3) the conversion of hotels to cooperatives, severance pay shall be paid as a result of any of the foregoing.

(B) For the purpose of calculating severance pay, the EMPLOYER shall pay over to the UNION for distribution by the UNION to the employees affected an amount equal to four (4) days of regular wages for each year of service for each affected employee provided the employee was employed for not less than six (6) months' service. Tip employees shall receive twice the amount of severance pay calculated in accordance with the above formula. Unless otherwise proven, all employees laid off within one (1) year of a permanent closing shall be presumed to have been terminated as a result of the closing and shall be therefore eligible for severance pay. In connection with the foregoing, the EMPLOYER shall issue, and send to the UNION for distribution, checks made payable to the individual employees entitled to severance pay in accordance with the foregoing formula. The EMPLOYER agrees to make all statutory tax withholdings prior to transmittal of the checks to the UNION for distribution. In addition, unless as otherwise agreed by the ASSOCIATION and the UNION, a further payment equal to twenty-five percent (25%) of such amount shall be paid to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Funds, and said monies shall be allocated among the Funds in such proportions as the ASSOCIATION and the UNION shall agree. Payment shall be computed to the nearest quarter year.

## TECHNOLOGICAL CHANGE

53. (A) The UNION has long cooperated with EMPLOYERS in the introduction of new equipment, changes in operating techniques and technological improvements (all three (3) herein referred to as "modifications") in the various departments of the hotels. Accordingly, in the event the EMPLOYER intends to introduce modification in its hotel, it shall meet

with the UNION at least thirty (30) days in advance of its intention to implement same, to discuss the ramifications.

(B) If the parties agree to said modifications and, as a result, job terminations or job changes occur, the parties shall discuss severance pay for employees who are terminated. If severance pay is required, the formula set forth in Article 52(B) shall be applied. Such job changes and terminations are not those referred to in Article 22(B).

(C) It is agreed that the introduction of new technology or equipment or certain modifications which may broaden job skills, duties or responsibilities does not automatically require additional compensation or an adjustment in the wage rate of the affected employees.

(D) If the parties fail to agree on the EMPLOYER'S program after meeting to discuss same as provided in Article 53(A) above, the UNION shall have the right to call for a conference at the ASSOCIATION to discuss the matter. If as a result of the conference there is a dispute concerning the proposed modification(s) the matter shall be submitted to the Impartial Chairperson for his/her decision. In no event shall submission to the Impartial Chairperson's office delay implementation of the EMPLOYER'S modification(s).

## SICK LEAVE

54. (A) Entitlement

(1) All employees covered by this Agreement who have been continuously employed by the EMPLOYER for a period of at least one (1) year shall be entitled to seven (7) days' sick leave with pay for each calendar year. Subject to Article 54(A)(6), effective with the second payroll week of December of each year of this Agreement, each eligible employee who has not used all his/her sick leave shall receive one day's pay for each unused sick day.

(2) Effective on July 1, 2010, the number of paid sick days to which employees shall be entitled under the provisions of Article 54(A) shall be increased to eight (8) paid sick days.

(3) Sick leave pay shall be prorated after an employee's first year of continuous employment from his/her date of hire to December 31st in accordance with the number of months worked during that calendar year. Beginning with the first calendar year following thereafter, and for each full year of employment, the employee shall be entitled to full entitlement pursuant to the provisions hereof. Where an employee is hired after January 1st, his/her anniversary date shall control for proration of sick leave pay.

(4) Subject to Article 54(A)(6), sick leave benefits shall accumulate from one year to the next.

(5) Payment of sick leave is intended solely to provide compensation to employees who are absent from work because of illness or injury. An employee who abuses sick leave benefits shall be subject to disciplinary action.

The UNION agrees to cooperate in preventing and correcting abuses of these sick leave benefits.

(6) In lieu of receiving one day's pay for each unused sick day in December of each year, each employee shall have the option to carry over unused sick days from year to year, provided that no employee shall be permitted to accumulate more than fifteen (15) unused sick days at any time. If in January of any calendar year, an employee's entitlement to sick days for that year would result in an accumulation of more than fifteen (15), the EMPLOYER shall pay to the employee in the second payroll week of the preceding December the number of sick days to reduce the accumulation to fifteen (15) in January at the employee's then current rate of pay. An employee may elect to receive a pay-out of his/her accumulated sick days during the second payroll week of December by providing the EMPLOYER with two (2) weeks' advance written notice. Upon an employee's termination of employment, the EMPLOYER shall pay the employee for any unused sick days accrued by the employee, at the employee's then current rate of pay.

### (B) Calculation and Payment

(1) Sick leave pay shall be calculated in the same manner as holiday pay.

(2) Sick leave pay shall not be paid on the employee's scheduled day off, holiday, vacations, or any other day on which the employee is drawing pay for time not worked, or would not have otherwise worked.

### (C) Absence

An employee absent from work due to illness on a scheduled workday immediately before and/or on the scheduled workday immediately after a holiday or vacation period shall not be eligible for sick pay for said absent workday or workdays.

## LEAVE OF ABSENCE

55. (A) An employee who has been employed by an EMPLOYER for five (5) years or more shall be entitled to one (1) leave of absence without pay not to exceed sixty (60) days upon giving two (2) weeks' written notice of request for leave of absence to the EMPLOYER and the UNION. The EMPLOYER shall not be required to allow more than one (1) employee in a job classification to be on leave of absence at the same time. If more than one (1) employee in a job classification requests a leave of absence at the same time, preference shall be given to the employee with greater seniority.

(B) The EMPLOYER may for good cause defer the time of the commencement of the requested leave of absence.

(C) An employee on leave of absence hereunder shall not take other employment during such leave without the prior written consent of the EMPLOYER.

(D) Leaves of absence under this provision shall not affect seniority rights but the EMPLOYER shall not be obliged to pay the employee on leave of absence for any holidays which fall during the period of such leave.

56. The EMPLOYER agrees to deduct from the paycheck of its participating employees voluntary authorized contributions to the UNION's Political Action Committee. The contribution deduction shall be made once for each month during which the employee has performed compensated services. The contribution amounts as authorized shall be deducted at the same time and in the same manner as deductions made for employees' UNION membership dues. Said contributions shall be remitted to the UNION's Political Action Committee and sent care of the UNION's Controller, at the same time as UNION membership dues payments are remitted to the UNION after the last day of the preceding month. The EMPLOYER shall transmit all aggregate contribution deductions for that month in one (1) check, together with the names and social security numbers of each employee on whose behalf a deduction is made, and the amount of the employee's contribution deduction. A sample copy of the form of voluntary contributions deduction authorization is attached.

## CONVERSION TO RESIDENTIAL USE

57. (A) If, during the term of this Agreement, a signatory Hotel is converted to residential use (e.g., a condominium or co-operative use of the building, apartment rental units, etc.) the EMPLOYER shall pay to the affected employees, i.e., those who suffer a permanent loss of employment due to such conversion, severance under the following terms: fifteen (15) days for each year of service, calculated and paid under the procedures of Article 52(B). The benefit funds shall receive a payment, calculated in accordance with Article 52(B), for each affected employee.

(B) In the event that the Hotel's entire premises are affected by the conversion to residential use, then employees eligible for the enhanced severance above shall, as a condition of receiving such severance payment, execute a separation document releasing the parties to this Agreement from any liability and future obligations, such as recall rights, under this Agreement.

(C) In cases of a partial conversion of the Hotel's premises to residential use, then the enhanced severance provisions contained herein shall only apply to employees affected by such conversion.

## AUTHORITY TO ENFORCE CONTRACT

58. All rights, benefits, privileges and/or immunities granted or secured by this Agreement to the UNION or any of its affiliates or members can be enforced only by or through the New York Hotel and Motel Trades Council, AFL-CIO, the UNION herein.

## SUCCESSORS AND ASSIGNS

59. (A) This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provisions, terms, or obligations herein contained shall be affected, modified, altered, or changed in any respect whatsoever by the consolidation, merger, sale, transfer, or assignment of either party hereto or affected, modified, altered or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party hereto. Any successor EMPLOYER shall assume all of

the obligations under this Agreement of the prior operator of the hotel or concession to the employees, the UNION or any of the funds to which EMPLOYERS are required to contribute hereunder.

(B) EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel or Concessionaire such that the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement.

(C) A successor, assign or transferee shall assume all obligations of the predecessor, assignor or transferor, including this Agreement and those agreements and practices supplementing this Agreement.  Subject to Paragraph (D), every successor, assign and transferee shall execute an assumption agreement substantially similar to the following not less than ten (10) business days prior to any transfer or change covered by this Article.

### ASSUMPTION AGREEMENT

*Agreement made as of this____day of ____ 20__, by and between [PURCHASER NAME] and [MANAGER/OPERATOR NAME, IF DIFFERENT] its managing agent, on their own behalf and on behalf of any affiliated or related entity and any current or future owner, manager or operator, and their respective successors or assigns (collectively, "Purchaser"), and the New York Hotel and Motel Trades Council, AFL-CIO ("Union").*

*Whereas, Purchaser has agreed to purchase the [HOTEL NAME] ("Hotel") from the current owner, [SELLER NAME] ("Seller");*

*Whereas, the Seller is bound to, inter alia, Article 59 of a collective bargaining agreement known as the Industry Wide Agreement between the Union and the Hotel Association of New York City, Inc. known as the Industry Wide Collective Bargaining Agreement ("IWA");*

*Whereas, Article 59 of the IWA requires successors, assigns and transferees ("successor") to be bound to the IWA;*

*Whereas, the Purchaser agrees that it is a successor to the obligations under the IWA;*

*Now, therefore it is agreed:*

*1.   Purchaser agrees that it shall retain all current bargaining unit employees, whose employment will continue uninterrupted and without loss of seniority, compensation, benefits or fringe benefits, and with no adverse effect on other terms and conditions of employment, subject to the IWA and applicable law.*

*2.   Purchaser agrees that, effective as of the date of the closing, it has assumed, adopted and is bound by all of the terms, both economic and non-economic, of the IWA and those agreements and practices supplementing the IWA.*

*3. By virtue of the closing, Purchaser acknowledges that no new verification of currently valid I-9 forms will be necessary.*

*4. Effective immediately any and all disputes between the parties or regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, the entirety of which is incorporated herein by reference.*

| | |
|---|---|
| *FOR THE UNION* | *FOR THE PURCHASER (on behalf of each owner, operator and manager)* |
| *By: _____* | *By: _____* |
| *Name: _____* | *Name:_____* |
| *Title:_____* | *Title: _____* |
| *Authorized to Sign* | *Authorized to Sign* |
| *Dated: _____* | *Dated:_____* |

(D) In the event an Owner of a Hotel is not the EMPLOYER of the Hotel's employees nor otherwise bound by the IWA, the Owner shall be (i) bound by the Successor and Assigns, Accretion, and Neutrality and Card Check provisions of IWA (ii) shall be secondarily liable for any obligations of any EMPLOYER in the Hotel under the IWA, and (iii) shall be bound by the arbitration provisions of the IWA as they relate to any dispute regarding these provisions. Such Owner shall be required to sign an agreement with the UNION reaffirming such, including the obligation to retain all bargaining unit employees, whose employment will continue uninterrupted without loss of seniority, compensation, benefits, or other terms and conditions of employment subject to the IWA and applicable law.

(E) Not less than thirty (30) days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the possibility of a transaction between the EMPLOYER and the potential transferee and the notice to the UNION will provide the details then known to the EMPLOYER as to the nature, expected closing date, and identity of the parties to the transaction. Not less than ten (10) business days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the transaction between the EMPLOYER and the transferee and the notice to the UNION will provide the full and complete identity of the transferee, together with a duly executed copy of the pertinent portion of the transaction agreement between the EMPLOYER and the transferee pursuant to which the transferee agrees to assume this Agreement.

(F) Said notices will be held by the UNION in strict confidence and the UNION, upon request of the EMPLOYER, will agree to a confidentiality pledge upon terms mutually acceptable to the EMPLOYER and the UNION, provided, however, that such confidentiality pledge will be ineffective upon the EMPLOYER'S violation of this Article 59. If the UNION is provided with a signed copy of the portion of the agreement where the transferee agrees to assume this Agreement, the UNION will not contact the transferee prior to the closing.

(C) The EMPLOYER and UNION agree that if a determination is made by the Impartial Chairperson that a violation of Article 59 has occurred, then in such case, the violation will be deemed to be irreparably harmful to the UNION and its members. In such event, the UNION may seek such relief as is necessary to redress and remedy such violation and irreparable harm, including, but not limited to, the award of monetary damages and/or injunctive relief either from the Office of the Impartial Chairperson, the National Labor Relations Board, a court of competent jurisdiction or such other forum as deemed appropriate by the UNION.

## ACCRETION AND NEUTRALITY/CARD CHECK

60. (A) Accretion

(1) EMPLOYER and its affiliated and related entities agree to the accretion of any and all hotel or concessionaire properties which come to be owned and/or managed only in the five (5) boroughs of New York City to the bargaining unit(s) presently or hereafter covered by the Industry Wide Agreement or any successor collective bargaining agreement thereto, and that all of the terms and conditions set forth in the Industry Wide Agreement or its successor shall be immediately applicable to the accreted bargaining unit(s).

(2) The parties acknowledge that they have negotiated and exchanged valuable consideration in reliance upon the lawfulness and validity of their agreement but recognize the complexity and change inherent in the legal doctrine of accretion. Nevertheless, in the event that any accretion at a hotel or concessionaire pursuant to these provisions, applied to the fullest extent of that legal doctrine, should be ruled ineffective, invalid, or unenforceable by competent legal authority, then the parties hereby agree that the neutrality and card count agreement annexed hereto as Addendum IV shall apply to that hotel or concessionaire. For the purposes of this provision, "competent legal authority" shall mean the Office of the Impartial Chairperson, the Regional Director for Region 2 or 29 of the National Labor Relations Board ("NLRB"), the United States District Courts for the Southern or Eastern Districts of New York, or the United States Court of Appeals for the Second Circuit.

(3) The parties agree that they shall meet to review and discuss such particular facts and circumstances as either party may contend warrants mutually agreed upon revisions to the provisions of the Industry Wide Agreement, or successor collective bargaining agreement as the case may be.

(B) Neutrality/Card Check

(1) In addition to and without limiting the other provisions of this Article 60, EMPLOYERS and their affiliated and related entities shall abide and be bound by the neutrality and card check provisions annexed hereto as Addendum IV and incorporated herein by reference effective July 1, 2001 with respect to Hotels and Concessionaires in the five (5) boroughs of New York City and effective February 3, 2012 with respect to Hotels and Concessionaires in the remainder of the Greater New York City Metropolitan Area, Northern and Central New Jersey, and the New York State Capital District, defined below.

(2) The "Greater New York City Metropolitan Area, Northern and Central New Jersey and the New York State Capital District" shall be defined as and limited to the following counties: in New York State: Albany, Bronx, Dutchess, Greene, Kings, Nassau, New York, Orange, Queens, Putnam, Rennsselaer, Richmond, Rockland, Saratoga, Schenectady, Suffolk, Sullivan, Ulster, Washington and Westchester; in New Jersey: Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Morris, Passaic, Somerset, Sussex, Union and Warren.

(3) The EMPLOYER shall notify the UNION, in writing, at least thirty (30) days prior to the commencement of hiring of employees in a property covered by this Article. Such notice must contain the name, address and number of rooms in the hotel; the projected opening date of the hotel; the name(s) of each owner, management company and operator of the hotel; the number of employees expected to be hired in each classification and the wages and benefits available to applicants, if hired; and information on the application process for such positions.

(C) The EMPLOYER may not evade its obligations under the IWA or Article 60 by entering into any transaction nor by creating any entity. Any such act shall be a violation of this Agreement, and the same, including any and all disputes in reference thereto or with respect to any of the foregoing provisions, shall be submitted to the Impartial Chairperson as any other dispute under this Agreement.

(D) Article 60(A) and/or Article 60(B) shall not apply to a bona fide franchise arrangement. Nothing herein is intended to create a "franchise exception" as to any arrangement, including a franchise arrangement, which would otherwise be subject to Article 60 or Addendum IV. Nothing herein is intended to create a "franchise exception" as to any Hotel or Concessionaire which would otherwise be subject to Article 60 or Addendum IV.

(E) Impartial Chairperson Decision #2011-32 ("Parsippany Decision") shall be deemed null and void and of no legal, arbitral or contractual effect with regard to the Hotel Association of New York City, Inc. Bargaining Group Hotels for those hotels which were members of the bargaining group as of January 26, 2012 and Hotels and Employers who are otherwise bound to the 2012 IWA (e.g. through a "Me Too" Agreement) as of January 26, 2012. All other Hotels and Employers shall continue to be subject to the Parsippany Decision notwithstanding anything to the contrary in this Article or Addendum IV.

## MAINTENANCE AND ELECTRICAL WORK

61. It is intended that employees to be classified as in the "Maintenance Department" shall include those engaged in doing plastering, mason work, tile setting, lathing and cement work; carpentry; plumbing and steamfitting; upholstering and mattress making; painting, furniture varnishing and paperhanging; operating and maintaining house radio systems; mechanical work on elevators; machine work, locksmithing and key work; silversmithing, coppersmithing and tinsmithing; and boiler repair work.

The painting, decorating and paperhanging includes the service of painting, decorating, woodfinishing, paperhanging, and preparatory work incidental to each of the aforementioned as follows:

1. The service of painting and decorating means the application of all paint and painting material of every description in and on all parts of the hotel.

2. The service of paperhanging includes the application and/or installation of wallpaper, hangings and decorating materials of every kind or description applied directly to any surface in the hotel.

3. Woodfinishing and polishing. The removal of all wood surfaces, cleaning, refinishing, varnishing and polishing of furniture and wood fixtures in the hotel.

An Electrician is one who installs, adds to, repairs or maintains any electric conduits, equipment, machines, fixtures, or electrical devices, that carry conductors that will or do carry an electrical current.

## UNION TRAINING

62. Each Delegate, Assistant Delegate and a reasonable number of such other employees as may be selected by the UNION shall be granted two (2) days' unpaid leave each year to attend union training, provided that the EMPLOYER is provided with a minimum of ten (10) days' advance written notice and further provided that the absence of such employee(s) shall not cause undue disruption to the operations of the EMPLOYER.

## SPOTTERS

63. (A)  In cases where the EMPLOYER'S investigation of an employee's performance or conduct may lead to suspension or discharge based upon a spotter's report, the EMPLOYER shall:

(1) Notify the employee as soon as practicable, but in no event later than seventy-two (72) hours of the close of his/her shift in question, that s/he is the subject of a spotter inspection; or, if the employee is not working during such period, at any time prior to the close of his/her next scheduled shift. The EMPLOYER shall specify the shift which is at issue.

(2) Within fourteen (14) days following the notification set forth in Article 63(A)(1) above, the EMPLOYER shall effectuate the discipline of the employee, if any.

(3) Upon such notice to the employee that s/he is being suspended or discharged based upon a spotter's report, the EMPLOYER shall provide the UNION with all reports, notes, video or audio recordings, or other documents relied upon by the EMPLOYER which relate to the discipline of the employee.

(B) In cases where the EMPLOYER'S investigation of an employee's performance or conduct based upon a spotter's report results in a verbal warning or a written warning, the EMPLOYER shall effectuate the verbal warning or written warning within thirty (30) days of the EMPLOYER'S receipt of the spotter's report and shall provide the UNION with the information specified in Article 63(A)(3) above.

(C) The foregoing times and dates shall be exclusive of Saturdays, Sundays, and Holidays.

(D) The foregoing shall not apply where information obtained from a spotter is used for non-disciplinary purposes (i.e., retraining).

(E) Nothing in this Article shall be construed to restrict the UNION'S right to request relevant information.

## HIDDEN SURVEILLANCE CAMERAS

64. (A) Under no circumstances shall the EMPLOYER install or use hidden surveillance equipment in employee restrooms; locker rooms; changing rooms; in places when and where, with prior consent of the EMPLOYER, employees have been given access to areas of the Hotel to conduct religious prayer or services or to administer lawful medications; or where and when union meetings are occurring.

(B) Hidden surveillance equipment shall only be used for a limited time not to exceed sixty (60) calendar days. If the EMPLOYER intends to utilize any evidence gathered by use of such equipment as a basis to discipline an employee, the EMPLOYER shall timely notify the UNION in writing of the type of the equipment installed or used, the location of the equipment, the purpose of the installation or use, the duration and dates of the installment and use, and a detailed description of any allegations the EMPLOYER intends to make of employee misconduct based on the evidence gathered.

(C) Every six (6) months, i.e., on January 15th and July 15th of each year, the EMPLOYER shall provide the UNION with the following information relating to the installation and use of hidden surveillance equipment completed during the previous six (6) month period: the type of equipment installed or used, the location of the equipment, the purpose of the installation or use, and the duration and dates of the installment and use.

(D) Evidence gathered by such hidden surveillance equipment shall not be admissible in arbitration to support disciplinary action against an employee under any of the following circumstances:

(1) The equipment was installed or used without a reasonable good faith belief that theft, vandalism, drug or alcohol use, criminal activity, workplace violence or other serious employee misconduct has or would occur in the area surveilled during the period of the installation or use or such reasonable good faith belief was not the sole reason for installation of the camera.

(2) The EMPLOYER failed to preserve all evidence gathered by the equipment, unexpurgated, including exculpatory evidence, relevant to the disciplinary case.

(3) The EMPLOYER shall furnish the UNION, upon request, with any evidence gathered by such hidden surveillance equipment which is relevant to the grievance, or possible grievance, being investigated by the UNION which is connected with the misconduct which is the subject of the hidden surveillance.

(4) Since the EMPLOYER has the right to use the surveillance evidence gathered on issues or instances of misconduct which were not the subject of the original reasonable good faith belief, then, upon timely request, the UNION has the right to view the surveillance evidence for the grievance being investigated or any possible grievance.

(E) For purposes of this Article, the term "hidden surveillance equipment" shall only include cameras or video equipment but shall not include equipment where the camera or video equipment, or a camera "dome" casing is visible to the naked eye.

(F) The above terms and conditions may not be varied except by mutual agreement of the parties.

## BANKRUPTCY

65. (A) The EMPLOYER shall advise the UNION, in writing by electronic mail or fax, as soon as reasonably practicable of, and in any event immediately upon the EMPLOYER'S knowledge or receipt of notice of, the filing of any bankruptcy, state court receivership or similar proceeding which would affect bargaining unit employees or this Agreement. The EMPLOYER shall provide electronic copies of any papers filed in connection with any such proceeding, in addition to any other relevant information requested by the UNION.

(B) It is acknowledged that Section 2(1) and (2) of the National Labor Relations Act include trustees and receivers within the definition of person and, therefore, EMPLOYER, and that trustees and receivers are successors subject to Article 59 of this Agreement.

(C) In the event a motion is made pursuant to Section 1113 of the Bankruptcy Code, or similar statute, that would have the effect of modifying this Agreement, the Union shall have the right to submit the issue of whether the provisions of Article 38 (other than those regarding arbitration) may terminate to the Office of the Impartial Chairperson on an expedited basis.

(D) In the event this Agreement is modified pursuant to Section 1113 of the Bankruptcy Code or similar statute, any provisions so modified shall, unless the parties agree otherwise, revert to their original terms immediately upon the sooner of (i) the discharge or termination of the bankruptcy or (ii) expiration of any interim period for the modifications set by the Court.

## ELECTRONIC INFORMATION

66. (A)  The EMPLOYER shall electronically transmit to the UNION any information to which the UNION is entitled in a mutually agreed upon electronically searchable and importable form and format, except where such information is not available in electronic format.

(B) Such information transmittals shall be in electronic format unless an EMPLOYER has a valid claim that to do so would be unreasonably costly or technologically infeasible. Disagreements as to the application of this Article shall be decided by the Impartial Chairperson.

67. (A) Union Notification

In the event that a post-probationary employee has a problem with his/her right to work in the United States, or in the event the U.S. Citizenship and Immigration Services (USCIS) or other agency specifically notifies the EMPLOYER of its intent to conduct an audit or investigation or serves a warrant relating to employees' authorization to work, the EMPLOYER shall notify the UNION in writing as soon as the problem is known. Upon the UNION'S request, the EMPLOYER shall meet with the UNION to discuss the nature of the problem. Whenever possible, and to the extent permitted by law, the meeting shall take place before any action is taken by the EMPLOYER, but the EMPLOYER shall not be required to postpone such audits or meetings with agencies.

(B) Unpaid Leave

Upon request, employees shall be released for a total of five (5) unpaid working days per each rolling twelve (12) month period, in order to attend USCIS proceedings and any related matters for the employee only. The employee shall submit proof of such proceedings and attendance by the employee to the EMPLOYER.

(C) Reinstatement

(1) A post-probationary employee who is not authorized to work in the United States and whose employment has been terminated for this reason shall be immediately reinstated to the next week's schedule to his/her former classification without loss of prior seniority provided the employee produces proper work authorization within twelve (12) months of the date of termination. Employees shall not accrue vacation or other benefits during such absence.

(2) If the employee needs additional time, the EMPLOYER will rehire the employee into the next available opening in the employee's former classification, as a new hire without retaining seniority, upon the former employee providing proper work authorization within a maximum of twelve (12) additional months from the time noted in Article 67(C)(1) above. The UNION may grieve and arbitrate any subsequent failure to complete probation if arbitrary or capricious or an abuse of this provision.

(D) No-Match Letters

The EMPLOYER who receives a "No-Match" letter agrees to take any and all reasonable steps necessary to resolve the discrepancy prior to effectuating any adverse employment action in order to be consistent with applicable federal law, regulations, or enforcement guidelines.

(E) Change in Name or Social Security Number

No employee covered by this Agreement shall suffer the loss of seniority, compensation or IWA benefits due to any change in the employee's name or social security number, provided that the new social security number is valid and the employee is authorized to work in the United States.

### (F) No Discrimination or Retaliation

The EMPLOYER may not discriminate or retaliate against any employee, including for engaging in union or protected and concerted activity or enforcing this Agreement, by inquiring into or using an employee's work authorization status.

### (G) No Voluntary Authorization Programs

Unless required by law, the EMPLOYER shall not use voluntary work authorization programs, such as e-Verify, for any non-probationary employees.

### (H) No Re-verification

Unless required by law, the EMPLOYER shall not re-verify unexpired work authorization documents which are facially valid.

### (I) Pre-1986 Employees

Except as required by law, no employee continuously employed as of November 6, 1986 (or before as amended by Congress) shall be required to document his or her immigration status.

### (J) New Legislation

The parties acknowledge that federal legislation, regulations or enforcement guidelines ("law") are currently being considered pertaining to the rights of immigrants. The parties agree that they will meet and negotiate if changes in the law materially impact the rights and obligations outlined in Article 67(A) through (I). If the parties are unable to resolve issues pertaining to any such changes in the federal law, the issue shall then be submitted for resolution to the Office of the Impartial Chairperson. The Impartial Chairperson will have the right to consider expert testimony.

## TRANSLATIONS

68. In meetings involving discipline, except in situations where an employee is being suspended pending investigation, an employee who clearly needs language assistance or who cannot fully understand the issues relevant to his/her discipline and requests language assistance shall be provided by the EMPLOYER with an individual capable of assisting in the communication. Any reasonable delay in interviewing or effectuating discipline as a result of the need for such shall not affect the timeliness of any grievance or discipline. In all other matters, the EMPLOYER shall make a good faith effort to provide appropriate language assistance when an employee clearly needs such assistance or when the employee cannot fully understand what is being said and requests language assistance.

## SAFETY AND HEALTH

### 69. (A) General

The EMPLOYER and UNION agree that the safety and health of employees is of paramount concern. Accordingly, the EMPLOYER agrees to provide a safe and

healthy work environment. The EMPLOYER further agrees to provide such training and equipment, adopt procedures and safeguards, and make repairs or modifications to its facility as required by law or this Article in order to provide a safe and healthy work environment.

### (B) Ventilation

The EMPLOYER shall provide sufficient ventilation and air temperature for a safe and healthy working environment.

### (C) Safety Equipment

The EMPLOYER shall provide and maintain personal protective equipment and devices required under this Article at the EMPLOYER'S expense (e.g., respirators, goggles, etc.).

### (D) Right to Refuse Unsafe Assignment

An employee may refuse a work assignment if s/he has a reasonable good faith belief that such assignment subjects him/her to unusually dangerous conditions which are not normally part of the job.  Prior to exercising his/her rights under this Article, the employee shall promptly notify management of the perceived unsafe condition. The EMPLOYER may not discriminate or retaliate against an employee for exercising his/her right hereunder.

### (E) Investigation by Expert

(1) If the UNION has a reasonable basis to conclude that a potential specific violation of this Article exists which could endanger employee safety or health and is appropriately subject to investigation by a safety and health consultant ("consultant"), absent agreement by the parties, on the request of the UNION, such a consultant shall be appointed by the Office of the Impartial Chairperson on an expedited basis to investigate and report on the conditions at the Hotel.

(2) Such consultant shall be selected from a list of consultants mutually agreed upon between the ASSOCIATION and the UNION, who will meet within thirty (30) days of the effective date of this Agreement to compile such list. Absent agreement on such list the selection of consultants shall be submitted to the Impartial Chairperson for final and binding resolution.

(3) The expense of such consultant shall be borne by the EMPLOYER.

(4) The consultant's investigation shall be limited to the issue(s) covered in Article 69(E)(1).

(5) The EMPLOYER will fully cooperate with the consultant, providing same with any requested information relevant to the issue(s) covered in Article 69(E)(1) and allow unfettered access to those area(s) of the EMPLOYER'S premises where it is alleged the potential specific violation(s) exist(s) (subject to Article 69(E)(6) and Article 69(E)(8)) and personnel with relevant information.

(6) The consultant shall follow reasonable security rules maintained by the EMPLOYER regarding access to the premises, but such rules shall not be applied to delay or interfere with the consultant in its review or its unfettered access to those specific area(s) of the EMPLOYER'S premises in accordance with Article 69(E)(5).

(7) UNION and EMPLOYER representatives will be permitted to accompany the consultant during any investigation, provided that EMPLOYER and UNION representatives will not be permitted to attend bargaining unit employee interviews absent mutual agreement. Neither the UNION nor EMPLOYER representatives may delay or interfere with the investigation. Any documents provided by either party to the consultant shall simultaneously be provided to the other party. Any documents provided by the consultant to one party shall be provided simultaneously to the other.

(8) The consultant shall provide the EMPLOYER and UNION with twenty-four (24) hours' notice of its visits, except in the case of an emergency (i.e., an incident or occurrence that presents an imminent or present threat to the safety or health of employees), in which case the consultant shall give the UNION and EMPLOYER as much notice as practicable.

(9) Notwithstanding anything herein to the contrary, the consultant shall have the authority to issue a specific "stop work" order and/or to close areas of the EMPLOYER'S premises if the consultant deems employee working conditions to pose a clear and present danger to the safety or health of employees due to the specific violation(s) or remediation efforts with respect to those specific violation(s) and to rescind such order if it deems the unsafe or unhealthy condition to have been cured. After complying with any such order issued by the consultant, the EMPLOYER shall have the right to contest such order at the Office of the Impartial Chairperson on an expedited basis, with the matter submitted to and heard by the Impartial Chairperson within twenty-four (24) hours. Telephonic hearings conducted by the Office of the Impartial Chairperson are permissible on weekends and holidays.

(10) At the conclusion of the investigation, the consultant shall issue a written report, detailing the results of the investigation and recommendations for correcting violations or hazards, to both the EMPLOYER and UNION.

(11) The EMPLOYER shall promptly comply with any uncontested recommendations made by the consultant. Should the EMPLOYER or UNION disagree with any such recommendation, it must apply for relief before the Impartial Chairperson within forty-eight (48) hours of the issuance of the report or recommendation, and the Impartial Chairperson shall hold a hearing within five (5) business days thereafter.

## PANIC BUTTONS

70. (A) General Obligation of the EMPLOYER to Protect Employees

The EMPLOYER reaffirms that the safety of Employees is of paramount concern and includes safety from harassment by hotel guests. The EMPLOYER shall take reasonable steps to address inappropriate guest advances, harassment and threats and to respond promptly and adequately should such incidents occur.

Within one (1) year of the date of this Agreement, the EMPLOYER will equip Room Attendants, Housekeeping Attendants, Minibar Attendants, Room Service Servers and any other employee who is required to enter an occupied guest room with devices to be carried on their persons at work that they can quickly and easily activate to effectively summon prompt assistance to their location. It is recognized that because of the varying size and physical layout of each hotel, different devices may be appropriate for different hotels.

### (C) Right to Request Accompaniment Prior to Entering an Occupied Guest Room

An Employee who has a reasonable good faith belief that entering an occupied guest room alone poses a risk to his/her safety from guest conduct shall promptly notify management of the perceived safety risk and if asked to enter the guest room shall be accompanied by a security officer, manager, or other appropriate staff member, as determined by the EMPLOYER. As an alternative, the EMPLOYER shall have the right to reassign the Employee to another guest room or to refuse service, in whole or in part, to said room.

### (D) Employee Complaints

The EMPLOYER shall promptly and adequately respond to Employee complaints of inappropriate advances, harassment, or threats by guests. The EMPLOYER shall not discipline nor otherwise adversely affect any employee for making a good faith complaint against a guest.

### (E) Purpose of Article

The purpose of this Article is to protect employees and the device may not be used for any purpose other than employee protection.

## ADEQUATE SUPPLIES

71. The EMPLOYER shall provide employees supplies or equipment needed for the timely, safe, efficient and effective performance of their duties.

## EXPIRATION AND RENEWAL

72. (A) (1)This Agreement shall be effective as of July 1, 2012, except as otherwise specified, and shall continue for a period ending midnight on the 30th day of June, 2019. This Agreement shall be renewed from year to year thereafter unless written notice of termination by certified mail, return receipt requested is given by either party to the other not less than sixty (60) days prior to its expiration.

(2) This Agreement may be executed by hotel and concessionaire EMPLOYERS on separate copies hereof, and all copies hereof, although separately signed, shall be deemed and taken together as constituting one agreement.

(1) In the event at any time during the term of this Agreement an EMPLOYER signatory hereto temporarily ceases its business operations in order to undertake a major renovation project which is not completed during the term of this Agreement, the EMPLOYER and UNION agree that in such case, the term of this Agreement shall be automatically extended up to and through the actual completion date of the major renovation project and for an additional one hundred and eighty (180) days thereafter. For example, if this Agreement by its terms expires on June 30, 2019 and the EMPLOYER'S major renovation project will not be completed until September 30, 2019, the term of this Agreement will be automatically extended up to and through March 31, 2020 , i.e., one hundred and eighty (180) days past the September 30, 2019 completion date of the major renovation project.

(2) The UNION and EMPLOYER agree that for purposes of work practices, upon actual completion of the EMPLOYER'S major renovation project, the EMPLOYER shall be treated as a new hotel, motel or concession and none of the EMPLOYER'S prior work practices or industry-wide work practices will be deemed to be applicable to the EMPLOYER'S operations.

(C) It is agreed that the execution of the within Agreement by the ASSOCIATION and the UNION, and by the UNION and ASSOCIATION members who have not authorized the ASSOCIATION to execute the within Agreement on their behalf, shall be deemed to immediately supersede, cancel and annul the 2006 Agreement. It is further agreed that each Agreement made between the UNION and the members of the ASSOCIATION who became parties to the 2006 Agreement shall likewise be immediately superseded, canceled and annulled as to those members who become parties to this Agreement by agreeing to the same.

(D) In the case of all other EMPLOYERS, it is agreed that the execution of the within Agreement by the EMPLOYER and the UNION shall be deemed to immediately supersede, cancel and annul the 2006 Agreement.

## SEPARABILITY

73. Should any part hereof or any provision herein contained be rendered or declared illegal, unenforceable, or an unfair labor practice by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction or by the decision of any authorized government agency, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof, provided, however, upon such invalidation, the parties agree immediately to meet and negotiate substitute provisions for such parts or provisions rendered or declared illegal, unenforceable, or an unfair labor practice and, failing agreement, submit the matter to the Office of the Impartial Chairperson for resolution. The remaining parts or provisions shall remain in full force and effect.

**RATIFICATION OF AGREEMENT**

74. The parties hereto agree that their understanding and agreements as set forth in this Agreement and any attached side letter agreements have been ratified by the Union and by the HANYC Bargaining Group Hotels.

IN WITNESS WHEREOF, the EMPLOYER and the UNION have offered their hands and seals the day and year first above written.


HOTEL ASSOCIATION OF NEW YORK CITY, INC.
in its own behalf and in behalf of the HANYC Bargaining Group Hotels


_____          7/1/12
By: Joseph E. Spinnato, President, ASSOCIATION                     Date



NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO

_____
By: Peter Ward, President, UNION                                      Date

# SCHEDULE 1

The following wage increases shall be granted as provided in Article 14 for employees:

Effective:

| | |
|---|---|
| July 1, 2012 | 3.5% |
| July 1, 2013 | 4.0% |
| July 1, 2014 | 4.0% |
| July 1, 2015 | 4.0% |
| July 1, 2016 | 3.5% |
| July 1, 2017 | 3.5% |
| July 1, 2018 | 3.5% |

All increases based on the employees' actual rates of pay in effect on that date.

Banquet rates are shown separately in Schedule A-1.


TIP CLASSIFICATIONS INCLUDE THE FOLLOWING:

Servers (including extra meal servers)[*]
Banquet Servers
Dining Room Attendants
Turkish Baths –   Masseurs/Masseuses
                  Attendants
                  Steam Room Attendants
                  Floor Attendants
Bellpersons and Baggage Porters – T, ST and R
Working Bell Captains
Driver/Bellpersons
Driver/Doorpersons
Doorpersons
Package Room Messengers
Pages
Valet Runners & Deliverers (this does not include pressers who also deliver)

---

*\* The parties will study the matter of service charges in lieu of tips for servers.*

## SCHEDULE A

### MINIMUM WAGE SCALES

| DINING ROOM | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Captains | Wkly | $923.61 | $955.94 | $994.18 | $1,033.95 | $1,075.31 | $1,112.95 | $1,151.90 | $1,192.22 |
| | Hrly | $23.0903 | $23.8985 | $24.8545 | $25.8488 | $26.8828 | $27.8238 | $28.7975 | $29.8055 |
| Scrub Captains | Wkly | $547.13 | $566.28 | $588.93 | $612.49 | $636.99 | $659.28 | $682.35 | $706.23 |
| | Hrly | $13.6783 | $14.1570 | $14.7233 | $15.3123 | $15.9248 | $16.4820 | $17.0588 | $17.6558 |
| Greeters | Wkly | $911.68 | $943.59 | $981.33 | $1,020.58 | $1,061.40 | $1,098.55 | $1,137.00 | $1,176.80 |
| | Hrly | $22.7920 | $23.5898 | $24.5333 | $25.5145 | $26.5350 | $27.4638 | $28.4250 | $29.4200 |
| Food Servers | Wkly | $526.84 | $545.28 | $567.09 | $589.77 | $613.36 | $634.83 | $657.05 | $680.05 |
| | Hrly | $13.1710 | $13.6320 | $14.1773 | $14.7443 | $15.3340 | $15.8708 | $16.4263 | $17.0013 |
| Bus Attendants | Wkly | $565.51 | $585.30 | $608.71 | $633.06 | $658.38 | $681.42 | $705.27 | $729.95 |
| | Hrly | $14.1378 | $14.6325 | $15.2178 | $15.8265 | $16.4595 | $17.0355 | $17.6318 | $18.2488 |
| Extra Meal Food Servers - 1 Meal | | $53.94 | $55.83 | $58.06 | $60.38 | $62.80 | $65.00 | $67.28 | $69.63 |
| Extra Meal Food Servers - 1 Day | | $107.92 | $111.70 | $116.17 | $120.82 | $125.65 | $130.05 | $134.60 | $139.31 |
| Banquet Captains | Wkly | $923.61 | $955.94 | $994.18 | $1,033.95 | $1,075.31 | $1,112.95 | $1,151.90 | $1,192.22 |
| | Hrly | $23.0903 | $23.8985 | $24.8545 | $25.8488 | $26.8828 | $27.8238 | $28.7975 | $29.8055 |
| KITCHEN & STEWARDING | | | | | | | | | |
| | | | | | Effective Date | | | | |
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Sous Chef | Wkly | $995.36 | $1,030.20 | $1,071.41 | $1,114.27 | $1,158.84 | $1,199.40 | $1,241.38 | $1,284.83 |
| | Hrly | $28.4389 | $29.4343 | $30.6117 | $31.8363 | $33.1097 | $34.2686 | $35.4680 | $36.7094 |
| Night Chef | Wkly | $980.20 | $1,014.51 | $1,055.09 | $1,097.29 | $1,141.18 | $1,181.12 | $1,222.46 | $1,265.25 |
| | Hrly | $28.0057 | $28.9860 | $30.1454 | $31.3511 | $32.6051 | $33.7463 | $34.9274 | $36.1500 |
| Saucier | Wkly | $973.68 | $1,007.76 | $1,048.07 | $1,089.99 | $1,133.59 | $1,173.27 | $1,214.33 | $1,256.83 |
| | Hrly | $27.8194 | $28.7931 | $29.9449 | $31.1426 | $32.3883 | $33.5220 | $34.6951 | $35.9094 |
| Garde Manger | Wkly | $971.50 | $1,005.50 | $1,045.72 | $1,087.55 | $1,131.05 | $1,170.64 | $1,211.61 | $1,254.02 |
| | Hrly | $27.7571 | $28.7286 | $29.8777 | $31.0729 | $32.3157 | $33.4469 | $34.6174 | $35.8291 |
| Tournant | Wkly | $971.50 | $1,005.50 | $1,045.72 | $1,087.55 | $1,131.05 | $1,170.64 | $1,211.61 | $1,254.02 |
| | Hrly | $27.7571 | $28.7286 | $29.8777 | $31.0729 | $32.3157 | $33.4469 | $34.6174 | $35.8291 |

## KITCHEN & STEWARDING (continued)

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Chef de partie & Chef Butcher | Wkly | $969.35 | $1,003.28 | $1,043.41 | $1,085.15 | $1,128.56 | $1,168.06 | $1,208.94 | $1,251.25 |
| | Hrly | $27.6957 | $28.6651 | $29.8117 | $31.0043 | $32.2446 | $33.3731 | $34.5411 | $35.7500 |
| Banquet Chef | Wkly | $980.20 | $1,014.51 | $1,055.09 | $1,097.29 | $1,141.18 | $1,181.12 | $1,222.46 | $1,265.25 |
| | Hrly | $28.0057 | $28.9860 | $30.1454 | $31.3511 | $32.6051 | $33.7463 | $34.9274 | $36.1500 |
| First Commis-Garde Manger | Wkly | $947.66 | $980.83 | $1,020.06 | $1,060.86 | $1,103.29 | $1,141.91 | $1,181.88 | $1,223.25 |
| | Hrly | $27.0760 | $28.02371 | $29.1446 | $30.3103 | $31.5226 | $32.6260 | $33.7680 | $34.9500 |
| First Commis-Saucier | Wkly | $947.66 | $980.83 | $1,020.06 | $1,060.86 | $1,103.29 | $1,141.91 | $1,181.88 | $1,223.25 |
| | Hrly | $27.0760 | $28.0237 | $29.1446 | $30.3103 | $31.5226 | $32.6260 | $33.7680 | $34.9500 |
| First Commis-Others | Wkly | $943.33 | $976.35 | $1,015.40 | $1,056.02 | $1,098.26 | $1,136.70 | $1,176.48 | $1,217.66 |
| | Hrly | $26.9523 | $27.8957 | $29.0114 | $30.1720 | $31.3789 | $32.4771 | $33.6137 | $34.7903 |

Hotels that employ special workers for fish, soup and hors d'oeuvres. These workers are to be classified and receive the minimum wage, the same as the first Commis; in other words, they are not to be classified as Chefs de partie.

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| Working Chef | Wkly | $969.35 | $1,003.28 | $1,043.41 | $1,085.15 | $1,128.56 | $1,168.06 | $1,208.94 | $1,251.25 |
| | Hrly | $27.6957 | $28.6651 | $29.8117 | $31.0043 | $32.2446 | $33.3731 | $34.5411 | $35.7500 |
| First Assistant | Wkly | $947.66 | $980.83 | $1,020.06 | $1,060.86 | $1,103.29 | $1,141.91 | $1,181.88 | $1,223.25 |
| | Hrly | $27.0760 | $28.0237 | $29.1446 | $30.3103 | $31.5226 | $32.6260 | $33.7680 | $34.9500 |
| All Assistant Cooks-White Jackets | Wkly | $934.67 | $967.38 | $1,006.08 | $1,046.32 | $1,088.17 | $1,126.26 | $1,165.68 | $1,206.48 |
| | Hrly | $26.7049 | $27.6394 | $28.7451 | $29.8949 | $31.0906 | $32.1789 | $33.3051 | $34.4709 |
| Pastry Chef | Wkly | $984.49 | $1,018.95 | $1,059.71 | $1,102.10 | $1,146.18 | $1,186.30 | $1,227.82 | $1,270.79 |
| | Hrly | $28.1283 | $29.1129 | $30.2774 | $31.4886 | $32.7480 | $33.8943 | $35.0806 | $36.3083 |
| First Assistant | Wkly | $949.82 | $983.06 | $1,022.38 | $1,063.28 | $1,105.81 | $1,144.51 | $1,184.57 | $1,226.03 |
| | Hrly | $27.1377 | $28.0874 | $29.2109 | $30.3794 | $31.5946 | $32.7003 | $33.8449 | $35.0294 |
| All Other Assistants | Wkly | $934.67 | $967.38 | $1,006.08 | $1,046.32 | $1,088.17 | $1,126.26 | $1,165.68 | $1,206.48 |
| | Hrly | $26.7049 | $27.6394 | $28.7451 | $29.8949 | $31.0906 | $32.1789 | $33.3051 | $34.4709 |
| Ice Cream Chef | Wkly | $962.82 | $996.52 | $1,036.38 | $1,077.84 | $1,120.95 | $1,160.18 | $1,200.79 | $1,242.82 |
| | Hrly | $27.5091 | $28.4720 | $29.6109 | $30.7954 | $32.0271 | $33.1480 | $34.3083 | $35.5091 |
| Head Baker | Wkly | $969.35 | $1,003.28 | $1,043.41 | $1,085.15 | $1,128.56 | $1,168.06 | $1,208.94 | $1,251.25 |
| | Hrly | $27.6957 | $28.6651 | $29.8117 | $31.0043 | $32.2446 | $33.3731 | $34.5411 | $35.7500 |
| Night Bakers | Wkly | $954.17 | $987.57 | $1,027.07 | $1,068.15 | $1,110.88 | $1,149.76 | $1,190.00 | $1,231.65 |
| | Hrly | $27.2620 | $28.2163 | $29.3449 | $30.5186 | $31.7394 | $32.8503 | $34.0000 | $35.1900 |

## KITCHEN & STEWARDING (continued)

| | | Effective Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Bakers | Wkly | $954.17 | $987.57 | $1,027.07 | $1,068.15 | $1,110.88 | $1,149.76 | $1,190.00 | $1,231.65 |
| | Hrly | $27.2620 | $28.2163 | $29.3449 | $30.5186 | $31.7394 | $32.8503 | $34.0000 | $35.1900 |
| Head Vegetable Preparers | Wkly | $881.56 | $912.41 | $948.91 | $986.87 | $1,026.34 | $1,062.26 | $1,099.44 | $1,137.92 |
| | Hrly | $25.1874 | $26.0689 | $27.1117 | $28.1963 | $29.3240 | $30.3503 | $31.4126 | $32.5120 |
| All Other Vegetable Preparers | Wkly | $874.22 | $904.82 | $941.01 | $978.65 | $1,017.80 | $1,053.42 | $1,090.29 | $1,128.45 |
| | Hrly | $24.9777 | $25.8520 | $26.8860 | $27.9614 | $29.0800 | $30.0977 | $31.1511 | $32.2414 |
| Chicken and Fish Butchers | Wkly | $934.67 | $967.38 | $1,006.08 | $1,046.32 | $1,088.17 | $1,126.26 | $1,165.68 | $1,206.48 |
| | Hrly | $26.7049 | $27.6394 | $28.7451 | $29.8949 | $31.0906 | $32.1789 | $33.3051 | $34.4709 |
| Head Oyster Preparer | Wkly | $906.52 | $938.25 | $975.78 | $1,014.81 | $1,055.40 | $1,092.34 | $1,130.57 | $1,170.14 |
| | Hrly | $25.9006 | $26.8071 | $27.8794 | $28.9946 | $30.1543 | $31.2097 | $32.3020 | $33.4326 |
| All Other Oyster Preparers | Wkly | $897.82 | $929.24 | $966.41 | $1,005.07 | $1,045.27 | $1,081.85 | $1,119.71 | $1,158.90 |
| | Hrly | $25.6520 | $26.5497 | $27.6117 | $28.7163 | $29.8649 | $30.9100 | $31.9917 | $33.1114 |
| Head Pantry Person | Wkly | $895.67 | $927.02 | $964.10 | $1,002.66 | $1,042.77 | $1,079.27 | $1,117.04 | $1,156.14 |
| | Hrly | $25.5906 | $26.4863 | $27.5457 | $28.6474 | $29.7934 | $30.8363 | $31.9154 | $33.0326 |
| Pantry, Coffee Persons | Wkly | $883.77 | $914.70 | $951.29 | $989.34 | $1,028.91 | $1,064.92 | $1,102.19 | $1,140.77 |
| | Hrly | $25.2506 | $26.1343 | $27.1797 | $28.2669 | $29.3974 | $30.4263 | $31.4911 | $32.5934 |
| Head Silver Cleaner | Wkly | $877.18 | $907.88 | $944.20 | $981.97 | $1,021.25 | $1,056.99 | $1,093.98 | $1,132.27 |
| | Hrly | $25.0623 | $25.9394 | $26.9771 | $28.0563 | $29.1786 | $30.1997 | $31.2566 | $32.3506 |
| Regular Silver Cleaner | Wkly | $866.38 | $896.70 | $932.57 | $969.87 | $1,008.66 | $1,043.96 | $1,080.50 | $1,118.32 |
| | Hrly | $24.7537 | $25.6200 | $26.6449 | $27.7106 | $28.8189 | $29.8274 | $30.8714 | $31.9520 |
| Dishwashers | Wkly | $866.38 | $896.70 | $932.57 | $969.87 | $1,008.66 | $1,043.96 | $1,080.50 | $1,118.32 |
| | Hrly | $24.7537 | $25.6200 | $26.6449 | $27.7106 | $28.8189 | $29.8274 | $30.8714 | $31.9520 |
| Potwashers | Wkly | $872.91 | $903.46 | $939.60 | $977.18 | $1,016.27 | $1,051.84 | $1,088.65 | $1,126.75 |
| | Hrly | $24.9403 | $25.8131 | $26.8457 | $27.9194 | $29.0363 | $30.0526 | $31.1043 | $32.1929 |
| Floor Stewards | Wkly | $934.67 | $967.38 | $1,006.08 | $1,046.32 | $1,088.17 | $1,126.26 | $1,165.68 | $1,206.48 |
| | Hrly | $26.7049 | $27.6394 | $28.7451 | $29.8949 | $31.0906 | $32.1789 | $33.3051 | $34.4709 |
| Kitchen Runners | Wkly | $866.40 | $896.72 | $932.59 | $969.89 | $1,008.69 | $1,043.99 | $1,080.53 | $1,118.35 |
| | Hrly | $24.7543 | $25.6206 | $26.6454 | $27.7111 | $28.8197 | $29.8283 | $30.8723 | $31.9529 |

Base wage scales fixed herein for all of the foregoing classifications and for Cooks and Servers in the Employee's Cafeteria shall include meals.

_____

## EMPLOYEES' CAFETERIA

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Head Cook | Wkly | $934.67 | $967.38 | $1,006.08 | $1,046.32 | $1,088.17 | $1,126.26 | $1,165.68 | $1,206.48 |
| | Hrly | $26.7049 | $27.6394 | $28.7451 | $29.8949 | $31.0906 | $32.1789 | $33.3051 | $34.4709 |
| Assistants | Wkly | $897.82 | $929.24 | $966.41 | $1,005.07 | $1,045.27 | $1,081.85 | $1,119.71 | $1,158.90 |
| | Hrly | $25.6520 | $26.5497 | $27.6117 | $28.7163 | $29.8649 | $30.9100 | $31.9917 | $33.1114 |

## BAR

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Bartenders (Public Bars) | Wkly | $912.98 | $944.93 | $982.73 | $1,022.04 | $1,062.92 | $1,100.12 | $1,138.62 | $1,178.47 |
| | Hrly | $26.0851 | $26.9980 | $28.0780 | $29.2011 | $30.3691 | $31.4320 | $32.5320 | $33.6706 |
| Bartenders (Service Bars) | Wkly | $945.49 | $978.58 | $1,017.72 | $1,058.43 | $1,100.77 | $1,139.30 | $1,179.18 | $1,220.45 |
| | Hrly | $27.0140 | $27.9594 | $29.0777 | $30.2409 | $31.4506 | $32.5514 | $33.6909 | $34.8700 |
| Bartender's Helper | Wkly | $866.38 | $896.70 | $932.57 | $969.87 | $1,008.66 | $1,043.96 | $1,080.50 | $1,118.32 |
| | Hrly | $24.7537 | $25.6200 | $26.6449 | $27.7106 | $28.8189 | $29.8274 | $30.8714 | $31.9520 |

## HOUSEKEEPING

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Floor Housekeepers | Wkly | $933.90 | $966.59 | $1,005.25 | $1,045.46 | $1,087.28 | $1,125.33 | $1,164.72 | $1,205.49 |
| | Hrly | $26.6829 | $27.6169 | $28.7214 | $29.8703 | $31.0651 | $32.1523 | $33.2777 | $34.4426 |
| Room Attendants | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |
| Bath Attendants | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |
| Housekeeping Attendants** | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |

Meaning those employees who do general housekeeping work including Vacuumers, Shade Cleaners, Curtain and Draperies hangers and Carpet Washers and Night Cleaners

*\*\*Minimum wage scales do not include compensation for (1) handling and transportation of items in bulk quantity such as mattresses, furniture, carpeting, television sets, etc. from the point of receipt to the point assigned by management and (2) dislodging, removal and transportation of carpeting from hotel guest rooms and/or public areas as required. Housekeeping attendants required to perform any or all such duties shall receive, in addition to their regular wages, 90 cents per hour for all hours worked for 3 ½ or less hours per day or 17 ½ hours per week, or for employees scheduled to perform these additional duties for 7 hours a day or 35 hours a week, an additional $5.00 per day. Any inside moves of items listed in (1) above are excluded from this agreement.*

## HOUSEKEEPING (continued)

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Employees who are employed as part-time window washers and do work as Housekeeping Attendants | Wkly | $902.16 | $933.74 | $971.09 | $1,009.93 | $1,050.33 | $1,087.09 | $1,125.14 | $1,164.52 |
| | Hrly | $25.7760 | $26.6783 | $27.7454 | $28.8551 | $30.0094 | $31.0597 | $32.1469 | $33.2720 |
| Wall Washers | Wkly | $902.16 | $933.74 | $971.09 | $1,009.93 | $1,050.33 | $1,087.09 | $1,125.14 | $1,164.52 |
| | Hrly | $25.7760 | $26.6783 | $27.7454 | $28.8551 | $30.0094 | $31.0597 | $32.1469 | $33.2720 |
| Furniture Polishers | Wkly | $879.39 | $910.17 | $946.58 | $984.44 | $1,023.82 | $1,059.65 | $1,096.74 | $1,135.13 |
| | Hrly | $25.1254 | $26.0049 | $27.0451 | $28.1269 | $29.2520 | $30.2757 | $31.3354 | $32.4323 |

## LAUNDRY

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Washers | Wkly | $883.77 | $914.70 | $951.29 | $989.34 | $1,028.91 | $1,064.92 | $1,102.19 | $1,140.77 |
| | Hrly | $25.2506 | $26.1343 | $27.1797 | $28.2669 | $29.3974 | $30.4263 | $31.4911 | $32.5934 |
| Wash Room Helpers | Wkly | $877.18 | $907.88 | $944.20 | $981.97 | $1,021.25 | $1,056.99 | $1,093.98 | $1,132.27 |
| | Hrly | $25.0623 | $25.9394 | $26.9771 | $28.0563 | $29.1786 | $30.1997 | $31.2566 | $32.3506 |
| Guest Markers/ Assorters | Wkly | $877.18 | $907.88 | $944.20 | $981.97 | $1,021.25 | $1,056.99 | $1,093.98 | $1,132.27 |
| | Hrly | $25.0623 | $25.9394 | $26.9771 | $28.0563 | $29.1786 | $30.1997 | $31.2566 | $32.3506 |
| Hand Ironers | Wkly | $877.18 | $907.88 | $944.20 | $981.97 | $1,021.25 | $1,056.99 | $1,093.98 | $1,132.27 |
| | Hrly | $25.0623 | $25.9394 | $26.9771 | $28.0563 | $29.1786 | $30.1997 | $31.2566 | $32.3506 |
| Operators & Starchers | Wkly | $875.08 | $905.71 | $941.94 | $979.62 | $1,018.80 | $1,054.46 | $1,091.37 | $1,129.57 |
| | Hrly | $25.0023 | $25.8774 | $26.9126 | $27.9891 | $29.1086 | $30.1274 | $31.1820 | $32.2734 |
| Hand Washers | Wkly | $875.08 | $905.71 | $941.94 | $979.62 | $1,018.80 | $1,054.46 | $1,091.37 | $1,129.57 |
| | Hrly | $25.0023 | $25.8774 | $26.9126 | $27.9891 | $29.1086 | $30.1274 | $31.1820 | $32.2734 |
| Curtain Processors | Wkly | $875.08 | $905.71 | $941.94 | $979.62 | $1,018.80 | $1,054.46 | $1,091.37 | $1,129.57 |
| | Hrly | $25.0023 | $25.8774 | $26.9126 | $27.9891 | $29.1086 | $30.1274 | $31.1820 | $32.2734 |
| Flat Workers Shakers Feeders Receivers Folders | Wkly | $872.91 | $903.46 | $939.60 | $977.18 | $1,016.27 | $1,051.84 | $1,088.65 | $1,126.75 |
| | Hrly | $24.9403 | $25.8131 | $26.8457 | $27.9194 | $29.0363 | $30.0526 | $31.1043 | $32.1929 |

## LAUNDRY (continued)

| | | \multicolumn{8}{c}{Effective Date} |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Misc. Laundry Workers Linen Exchange, Linen, Chute and Bundle Workers Porters Sewers | Wkly | $872.91 | $903.46 | $939.60 | $977.18 | $1,016.27 | $1,051.84 | $1,088.65 | $1,126.75 |
| | Hrly | $24.9403 | $25.8131 | $26.8457 | $27.9194 | $29.0363 | $30.0526 | $31.1043 | $32.1929 |
| Mini-Laundry Employees | Wkly | $881.56 | $912.41 | $948.91 | $986.87 | $1,026.34 | $1,062.26 | $1,099.44 | $1,137.92 |
| | Hrly | $25.1874 | $26.0689 | $27.1117 | $28.1963 | $29.3240 | $30.3503 | $31.4126 | $32.5120 |

## FRONT SERVICE

| | | \multicolumn{8}{c}{Effective Date} |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Stationary Bell Captains | Wkly | $938.25 | $971.09 | $1,009.93 | $1,050.33 | $1,092.34 | $1,130.57 | $1,170.14 | $1,211.09 |
| | Hrly | $26.8071 | $27.7454 | $28.8551 | $30.0094 | $31.2097 | $32.3020 | $33.4326 | $34.6026 |
| Elevator Starters | Wkly | $895.67 | $927.02 | $964.10 | $1,002.66 | $1,042.77 | $1,079.27 | $1,117.04 | $1,156.14 |
| | Hrly | $25.5906 | $26.4863 | $27.5457 | $28.6474 | $29.7934 | $30.8363 | $31.9154 | $33.0326 |
| Elevator Operators, Passenger | Wkly | $892.63 | $923.87 | $960.82 | $999.25 | $1,039.22 | $1,075.59 | $1,113.24 | $1,152.20 |
| | Hrly | $25.5037 | $26.3963 | $27.4520 | $28.5500 | $29.6920 | $30.7311 | $31.8069 | $32.9200 |
| Elevator Operator, Service | Wkly | $895.02 | $926.35 | $963.40 | $1,001.94 | $1,042.02 | $1,078.49 | $1,116.24 | $1,155.31 |
| | Hrly | $25.5720 | $26.4671 | $27.5257 | $28.6269 | $29.7720 | $30.8140 | $31.8926 | $33.0089 |
| Lobby Porters | Wkly | $880.50 | $911.32 | $947.77 | $985.68 | $1,025.11 | $1,060.99 | $1,098.12 | $1,136.55 |
| | Hrly | $25.1571 | $26.0377 | $27.0791 | $28.1623 | $29.2889 | $30.3140 | $31.3749 | $32.4729 |
| Checkroom Attendants | Wkly | $862.08 | $892.25 | $927.94 | $965.06 | $1,003.66 | $1,038.79 | $1,075.15 | $1,112.78 |
| | Hrly | $24.6309 | $25.4929 | $26.5126 | $27.5731 | $28.6760 | $29.6797 | $30.7186 | $31.7937 |
| Package Room Messenger | Wkly | $564.73 | $584.50 | $607.88 | $632.20 | $657.49 | $680.50 | $704.32 | $728.97 |
| | Hrly | $14.1183 | $14.6125 | $15.1970 | $15.8050 | $16.4373 | $17.0125 | $17.6080 | $18.2243 |
| Package Room Employees | Wkly | $876.15 | $906.82 | $943.09 | $980.81 | $1,020.04 | $1,055.74 | $1,092.69 | $1,130.93 |
| | Hrly | $25.0329 | $25.9091 | $26.9454 | $28.0231 | $29.1440 | $30.1640 | $31.2197 | $32.3123 |
| Chauffeurs and Drivers (full time) | Wkly | $929.54 | $962.07 | $1,000.55 | $1,040.57 | $1,082.19 | $1,120.07 | $1,159.27 | $1,199.84 |
| | Hrly | $26.5583 | $27.4877 | $28.5871 | $29.7306 | $30.9197 | $32.0020 | $33.1220 | $34.2811 |

**FRONT SERVICE (continued**

| | Effective Date | Weekly Rate | Hourly Rate | Minimum Hourly Rate for Benefit Days |
|---|---|---|---|---|
| Working Bell Captains | 7/1/11 | 690.68 | 17.2670 | 34.5340 |
| | 7/1/12 | 714.85 | 17.8713 | 35.7426 |
| | 7/1/13 | 743.44 | 18.5860 | 37.1720 |
| | 1/1/14 | 783.44 | 19.5860 | 37.1720 |
| | 7/1/14 | 814.78 | 20.3695 | 38.6590 |
| | 1/1/15 | 834.78 | 20.8695 | 38.6590 |
| | 7/1/15 | 868.17 | 21.7043 | 40.2056 |
| | 1/1/16 | 888.17 | 22.2043 | 40.2056 |
| | 7/1/16 | 919.26 | 22.9815 | 41.6126 |
| | 1/1/17 | 939.26 | 23.4815 | 41.6126 |
| | 7/1/17 | 972.13 | 24.3033 | 43.0690 |
| | 1/1/18 | 992.13 | 24.8033 | 43.0690 |
| | 7/1/18 | 1026.85 | 25.6713 | 44.5766 |
| | **Effective Date** | **Weekly Rate** | **Hourly Rate** | **Minimum Hourly Rate for Benefit Days** |
| Bellperson T | 7/1/11 | 531.93 | 13.2983 | 26.5966 |
| | 7/1/12 | 550.55 | 13.7638 | 27.5276 |
| | 7/1/13 | 572.57 | 14.3143 | 28.6286 |
| | 1/1/14 | 612.57 | 15.3143 | 28.6286 |
| | 7/1/14 | 637.07 | 15.9268 | 29.7736 |
| | 1/1/15 | 657.07 | 16.4268 | 29.7736 |
| | 7/1/15 | 683.35 | 17.0838 | 30.9646 |
| | 1/1/16 | 703.35 | 17.5838 | 30.9646 |
| | 7/1/16 | 727.97 | 18.1993 | 32.0486 |
| | 1/1/17 | 747.97 | 18.6993 | 32.0486 |
| | 7/1/17 | 774.15 | 19.3538 | 33.1700 |
| | 1/1/18 | 794.15 | 19.8538 | 33.1700 |
| | 7/1/18 | 821.95 | 20.5488 | 34.3310 |

## FRONT SERVICE (continued

|  | Effective Date | Weekly Rate | Hourly Rate | Minimum Hourly Rate for Benefit Days |
|---|---|---|---|---|
|  | 7/1/11 | 531.93 | 13.2983 | 26.5966 |
|  | 7/1/12 | 550.55 | 13.7638 | 27.5276 |
|  | 7/1/13 | 572.57 | 14.3143 | 28.6286 |
|  | 1/1/14 | 612.57 | 15.3143 | 28.6286 |
|  | 7/1/14 | 637.07 | 15.9268 | 29.7736 |
| Bellperson ST | 1/1/15 | 657.07 | 16.4268 | 29.7736 |
|  | 7/1/15 | 683.35 | 17.0838 | 30.9646 |
|  | 1/1/16 | 703.35 | 17.5838 | 30.9646 |
|  | 7/1/16 | 727.97 | 18.1993 | 32.0486 |
|  | 1/1/17 | 747.97 | 18.6993 | 32.0486 |
|  | 7/1/17 | 774.15 | 19.3538 | 33.1700 |
|  | 1/1/18 | 794.15 | 19.8538 | 33.1700 |
|  | 7/1/18 | 821.95 | 20.5488 | 34.3310 |
|  | Effective Date | Weekly Rate | Hourly Rate | Minimum Hourly Rate for Benefit Days |
|  | 7/1/11 | 564.47 | 14.1118 | 28.2236 |
|  | 7/1/12 | 584.23 | 14.6058 | 29.2116 |
|  | 7/1/13 | 607.60 | 15.1900 | 30.3800 |
|  | 1/1/14 | 647.60 | 16.1900 | 30.3800 |
|  | 7/1/14 | 673.50 | 16.8375 | 31.5950 |
| Bellperson R | 1/1/15 | 693.50 | 17.3375 | 31.5950 |
|  | 7/1/15 | 721.24 | 18.0310 | 32.8590 |
|  | 1/1/16 | 741.24 | 18.5310 | 32.8590 |
|  | 7/1/16 | 767.18 | 19.1795 | 34.0090 |
|  | 1/1/17 | 787.18 | 19.6795 | 34.0090 |
|  | 7/1/17 | 814.73 | 20.3683 | 35.1996 |
|  | 1/1/18 | 834.73 | 20.8683 | 35.1996 |
|  | 7/1/18 | 863.95 | 21.5988 | 36.4316 |

## FRONT SERVICE (continued

|  | Effective Date | Weekly Rate | Hourly Rate | Minimum Hourly Rate for Benefit Days |
|---|---|---|---|---|
| Driver-Bell | 7/1/11 | 809.80 | 20.2450 | 40.4900 |
|  | 7/1/12 | 838.14 | 20.9535 | 41.9070 |
|  | 7/1/13 | 871.67 | 21.7918 | 43.5836 |
|  | 1/1/14 | 911.67 | 22.7918 | 43.5836 |
|  | 7/1/14 | 948.14 | 23.7035 | 45.3270 |
|  | 1/1/15 | 968.14 | 24.2035 | 45.3270 |
|  | 7/1/15 | 1006.87 | 25.1718 | 47.1400 |
|  | 1/1/16 | 1026.87 | 25.6718 | 47.1400 |
|  | 7/1/16 | 1062.81 | 26.5703 | 48.7900 |
|  | 1/1/17 | 1082.81 | 27.0703 | 48.7900 |
|  | 7/1/17 | 1120.71 | 28.0178 | 50.4976 |
|  | 1/1/18 | 1140.71 | 28.5178 | 50.4976 |
|  | 7/1/18 | 1180.63 | 29.5158 | 52.2650 |
| Doorperson | Effective Date | Weekly Rate | Hourly Rate | Minimum Hourly Rate for Benefit Days |
|  | 7/1/11 | 542.02 | 13.5505 | 27.1010 |
|  | 7/1/12 | 560.99 | 14.0248 | 28.0496 |
|  | 7/1/13 | 583.43 | 14.5858 | 29.1716 |
|  | 1/1/14 | 623.43 | 15.5858 | 29.1716 |
|  | 7/1/14 | 648.37 | 16.2093 | 30.3386 |
|  | 1/1/15 | 668.37 | 16.7093 | 30.3386 |
|  | 7/1/15 | 695.10 | 17.3775 | 31.5520 |
|  | 1/1/16 | 715.10 | 17.8775 | 31.5520 |
|  | 7/1/16 | 740.13 | 18.5033 | 32.6566 |
|  | 1/1/17 | 760.13 | 19.0033 | 32.6566 |
|  | 7/1/17 | 786.73 | 19.6683 | 33.7996 |
|  | 7/1/18 | 814.27 | 20.3568 | 34.9826 |

## FRONT SERVICE (continued

| | Effective Date | Weekly Rate | Hourly Rate | Minimum Hourly Rate for Benefit Days |
|---|---|---|---|---|
| | 7/1/11 | 809.80 | 20.2450 | 40.4900 |
| | 7/1/12 | 838.14 | 20.9535 | 41.9070 |
| | 7/1/13 | 871.67 | 21.7918 | 43.5836 |
| | 1/1/14 | 911.67 | 22.7918 | 43.5836 |
| | 7/1/14 | 948.14 | 23.7035 | 45.3270 |
| Driver-Door | 1/1/15 | 968.14 | 24.2035 | 45.3270 |
| | 7/1/15 | 1006.87 | 25.1718 | 47.1400 |
| | 1/1/16 | 1026.87 | 25.6718 | 47.1400 |
| | 7/1/16 | 1062.81 | 26.5703 | 48.7900 |
| | 1/1/17 | 1082.81 | 27.0703 | 48.7900 |
| | 7/1/17 | 1120.71 | 28.0178 | 50.4976 |
| | 7/1/18 | 1159.93 | 28.9983 | 52.2650 |

## WHITE COLLAR - ADMINISTRATIVE

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| Accounting Clerks | Wkly | $897.82 | $929.24 | $966.41 | $1,005.07 | $1,045.27 | $1,081.85 | $1,119.71 | $1,158.90 |
| | Hrly | $25.6520 | $26.5497 | $27.6117 | $28.7163 | $29.8649 | $30.9100 | $31.9917 | $33.1114 |
| Circuit Clerks | Wkly | $886.97 | $918.01 | $954.73 | $992.92 | $1,032.64 | $1,068.78 | $1,106.19 | $1,144.91 |
| | Hrly | $25.3420 | $26.2289 | $27.2780 | $28.3691 | $29.5040 | $30.5366 | $31.6054 | $32.7117 |
| Concierges | Wkly | $930.33 | $962.89 | $1,001.41 | $1,041.47 | $1,083.13 | $1,121.04 | $1,160.28 | $1,200.89 |
| | Hrly | $26.5809 | $27.5111 | $28.6117 | $29.7563 | $30.9466 | $32.0297 | $33.1509 | $34.3111 |
| E.F. Typists | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |
| F&B Checkers | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |
| F&B Control & Card Control Clerks | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |
| File Clerks | Wkly | $884.84 | $915.81 | $952.44 | $990.54 | $1,030.16 | $1,066.22 | $1,103.54 | $1,142.16 |
| | Hrly | $25.2811 | $26.1660 | $27.2126 | $28.3011 | $29.4331 | $30.4634 | $31.5297 | $32.6331 |

## WHITE COLLAR - ADMINISTRATIVE (continued)

| | | Effective Date | | | | | | | |
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| Floor Clerks | Wkly | $876.15 | $906.82 | $943.09 | $980.81 | $1,020.04 | $1,055.74 | $1,092.69 | $1,130.93 |
| | Hrly | $25.0329 | $25.9091 | $26.9454 | $28.0231 | $29.1440 | $30.1640 | $31.2197 | $32.3123 |
| F.O. Cashiers | Wkly | $903.21 | $934.82 | $972.21 | $1,011.10 | $1,051.54 | $1,088.34 | $1,126.43 | $1,165.86 |
| | Hrly | $25.8060 | $26.7091 | $27.7774 | $28.8886 | $30.0440 | $31.0954 | $32.1837 | $33.3103 |
| F.O. Coordinators | Wkly | $930.33 | $962.89 | $1,001.41 | $1,041.47 | $1,083.13 | $1,121.04 | $1,160.28 | $1,200.89 |
| | Hrly | $26.5809 | $27.5111 | $28.6117 | $29.7563 | $30.9466 | $32.0297 | $33.1509 | $34.3111 |
| Guest History Clerks | Wkly | $884.84 | $915.81 | $952.44 | $990.54 | $1,030.16 | $1,066.22 | $1,103.54 | $1,142.16 |
| | Hrly | $25.2811 | $26.1660 | $27.2126 | $28.3011 | $29.4331 | $30.4634 | $31.5297 | $32.6331 |
| House Officers | Wkly | $932.81 | $965.46 | $1,004.08 | $1,044.24 | $1,086.01 | $1,124.02 | $1,163.36 | $1,204.08 |
| | Hrly | $26.6517 | $27.5846 | $28.6880 | $29.8354 | $31.0289 | $32.1149 | $33.2389 | $34.4023 |
| Key, Mail, Information Clerks | Wkly | $884.84 | $915.81 | $952.44 | $990.54 | $1,030.16 | $1,066.22 | $1,103.54 | $1,142.16 |
| | Hrly | $25.2811 | $26.1660 | $27.2126 | $28.3011 | $29.4331 | $30.4634 | $31.5297 | $32.6331 |
| Night Auditors | Wkly | $909.74 | $941.58 | $979.24 | $1,018.41 | $1,059.15 | $1,096.22 | $1,134.59 | $1,174.30 |
| | Hrly | $25.9926 | $26.9023 | $27.9783 | $29.0974 | $30.2614 | $31.3206 | $32.4169 | $33.5514 |
| Payroll Clerks | Wkly | $895.67 | $927.02 | $964.10 | $1,002.66 | $1,042.77 | $1,079.27 | $1,117.04 | $1,156.14 |
| | Hrly | $25.5906 | $26.4863 | $27.5457 | $28.6474 | $29.7934 | $30.8363 | $31.9154 | $33.0326 |
| Reservation Clerks | Wkly | $889.15 | $920.27 | $957.08 | $995.36 | $1,035.17 | $1,071.40 | $1,108.90 | $1,147.71 |
| | Hrly | $25.4043 | $26.2934 | $27.3451 | $28.4389 | $29.5763 | $30.6114 | $31.6829 | $32.7917 |
| Restaurant & Beverage Cashiers | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |
| Room Clerks | Wkly | $904.32 | $935.97 | $973.41 | $1,012.35 | $1,052.84 | $1,089.69 | $1,127.83 | $1,167.30 |
| | Hrly | $25.8377 | $26.7420 | $27.8117 | $28.9243 | $30.0811 | $31.1340 | $32.2237 | $33.3514 |
| Stenographers | Wkly | $893.52 | $924.79 | $961.78 | $1,000.25 | $1,040.26 | $1,076.67 | $1,114.35 | $1,153.35 |
| | Hrly | $25.5291 | $26.4226 | $27.4794 | $28.5786 | $29.7217 | $30.7620 | $31.8386 | $32.9529 |
| Timekeepers | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |
| Typists | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |
| Voucher Clerks | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |

## WHITE COLLAR - ADMINISTRATIVE (continued)

|  |  | Effective Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Security Guards | Wkly | $881.56 | $912.41 | $948.91 | $986.87 | $1,026.34 | $1,062.26 | $1,099.44 | $1,137.92 |
|  | Hrly | $25.1874 | $26.0689 | $27.1117 | $28.1963 | $29.3240 | $30.3503 | $31.4126 | $32.5120 |
| Telephone Operators | Wkly | $893.52 | $924.79 | $961.78 | $1,000.25 | $1,040.26 | $1,076.67 | $1,114.35 | $1,153.35 |
|  | Hrly | $25.5291 | $26.4226 | $27.4794 | $28.5786 | $29.7217 | $30.7620 | $31.8386 | $32.9529 |

## ENGINEERING

|  |  | Effective Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Engineers | Wkly | $962.82 | $996.52 | $1,036.38 | $1,077.84 | $1,120.95 | $1,160.18 | $1,200.79 | $1,242.82 |
|  | Hrly | $27.5091 | $28.4720 | $29.6109 | $30.7954 | $32.0271 | $33.1480 | $34.3083 | $35.5091 |
| Boiler Room Attendant | Wkly | $941.13 | $974.07 | $1,013.03 | $1,053.55 | $1,095.69 | $1,134.04 | $1,173.73 | $1,214.81 |
|  | Hrly | $26.8894 | $27.8306 | $28.9437 | $30.1014 | $31.3054 | $32.4011 | $33.5351 | $34.7089 |
| Oilers | Wkly | $935.74 | $968.49 | $1,007.23 | $1,047.52 | $1,089.42 | $1,127.55 | $1,167.01 | $1,207.86 |
|  | Hrly | $26.7354 | $27.6711 | $28.7780 | $29.9291 | $31.1263 | $32.2157 | $33.3431 | $34.5103 |
| Electricians | Wkly | $945.49 | $978.58 | $1,017.72 | $1,058.43 | $1,100.77 | $1,139.30 | $1,179.18 | $1,220.45 |
|  | Hrly | $27.0140 | $27.9594 | $29.0777 | $30.2409 | $31.4506 | $32.5514 | $33.6909 | $34.8700 |
| Electric Switch Board Operator | Wkly | $928.17 | $960.66 | $999.09 | $1,039.05 | $1,080.61 | $1,118.43 | $1,157.58 | $1,198.10 |
|  | Hrly | $26.5191 | $27.4474 | $28.5454 | $29.6871 | $30.8746 | $31.9551 | $33.0737 | $34.2314 |
| Helpers | Wkly | $915.18 | $947.21 | $985.10 | $1,024.50 | $1,065.48 | $1,102.77 | $1,141.37 | $1,181.32 |
|  | Hrly | $26.1480 | $27.0631 | $28.1457 | $29.2714 | $30.4423 | $31.5077 | $32.6106 | $33.7520 |
| Helpers in Engineering Dept. | Wkly | $915.18 | $947.21 | $985.10 | $1,024.50 | $1,065.48 | $1,102.77 | $1,141.37 | $1,181.32 |
|  | Hrly | $26.1480 | $27.0631 | $28.1457 | $29.2714 | $30.4423 | $31.5077 | $32.6106 | $33.7520 |
| Air Condition Control Mechanics | Wkly | $943.33 | $976.35 | $1,015.40 | $1,056.02 | $1,098.26 | $1,136.70 | $1,176.48 | $1,217.66 |
|  | Hrly | $26.9523 | $27.8957 | $29.0114 | $30.1720 | $31.3789 | $32.4771 | $33.6137 | $34.7903 |
| Refrigeration Mechanics | Wkly | $947.66 | $980.83 | $1,020.06 | $1,060.86 | $1,103.29 | $1,141.91 | $1,181.88 | $1,223.25 |
|  | Hrly | $27.0760 | $28.0237 | $29.1446 | $30.3103 | $31.5226 | $32.6260 | $33.7680 | $34.9500 |
| Painters | Wkly | $943.33 | $976.35 | $1,015.40 | $1,056.02 | $1,098.26 | $1,136.70 | $1,176.48 | $1,217.66 |
|  | Hrly | $26.9523 | $27.8957 | $29.0114 | $30.1720 | $31.3789 | $32.4771 | $33.6137 | $34.7903 |
| Paper Hangers and Sign Painters | Wkly | $954.17 | $987.57 | $1,027.07 | $1,068.15 | $1,110.88 | $1,149.76 | $1,190.00 | $1,231.65 |
|  | Hrly | $27.2620 | $28.2163 | $29.3449 | $30.5186 | $31.7394 | $32.8503 | $34.0000 | $35.1900 |
| Wood Finishers and Polishers | Wkly | $943.33 | $976.35 | $1,015.40 | $1,056.02 | $1,098.26 | $1,136.70 | $1,176.48 | $1,217.66 |
|  | Hrly | $26.9523 | $27.8957 | $29.0114 | $30.1720 | $31.3789 | $32.4771 | $33.6137 | $34.7903 |

## ENGINEERING (continued)

| | | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Upholsterers | Wkly | $943.33 | $976.35 | $1,015.40 | $1,056.02 | $1,098.26 | $1,136.70 | $1,176.48 | $1,217.66 |
| | Hrly | $26.9523 | $27.8957 | $29.0114 | $30.1720 | $31.3789 | $32.4771 | $33.6137 | $34.7903 |
| Upholsterers' Sewers | Wkly | $932.48 | $965.12 | $1,003.72 | $1,043.87 | $1,085.62 | $1,123.62 | $1,162.95 | $1,203.65 |
| | Hrly | $26.6423 | $27.5749 | $28.6777 | $29.8249 | $31.0177 | $32.1034 | $33.2271 | $34.3900 |
| Maintenance Employees | Wkly | $943.33 | $976.35 | $1,015.40 | $1,056.02 | $1,098.26 | $1,136.70 | $1,176.48 | $1,217.66 |
| | Hrly | $26.9523 | $27.8957 | $29.0114 | $30.1720 | $31.3789 | $32.4771 | $33.6137 | $34.7903 |
| Maintenance Helpers and Apprentices | Wkly | $915.17 | $947.20 | $985.09 | $1,024.49 | $1,065.47 | $1,102.76 | $1,141.36 | $1,181.31 |
| | Hrly | $26.1477 | $27.0629 | $28.1454 | $29.2711 | $30.4420 | $31.5074 | $32.6103 | $33.7517 |

## VALET DEPARTMENT

| | | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Tailors | Wkly | $888.05 | $919.13 | $955.90 | $994.14 | $1,033.91 | $1,070.10 | $1,107.55 | $1,146.31 |
| | Hrly | $25.3729 | $26.2609 | $27.3114 | $28.4040 | $29.5403 | $30.5743 | $31.6443 | $32.7517 |
| Pressers | Wkly | $888.05 | $919.13 | $955.90 | $994.14 | $1,033.91 | $1,070.10 | $1,107.55 | $1,146.31 |
| | Hrly | $25.3729 | $26.2609 | $27.3114 | $28.4040 | $29.5403 | $30.5743 | $31.6443 | $32.7517 |
| Dry Cleaners | Wkly | $896.77 | $928.16 | $965.29 | $1,003.90 | $1,044.06 | $1,080.60 | $1,118.42 | $1,157.56 |
| | Hrly | $25.6220 | $26.5189 | $27.5797 | $28.6829 | $29.8303 | $30.8743 | $31.9549 | $33.0731 |
| Runners and Delivery Employees | Wkly | $545.77 | $564.87 | $587.46 | $610.96 | $635.40 | $657.64 | $680.66 | $704.48 |
| | Hrly | $13.6443 | $14.1218 | $14.6865 | $15.2740 | $15.8850 | $16.4410 | $17.0165 | $17.6120 |

## PRINT SHOP DEPARTMENT

| | | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Compositors | Wkly | $885.91 | $916.92 | $953.60 | $991.74 | $1,031.41 | $1,067.51 | $1,104.87 | $1,143.54 |
| | Hrly | $25.3117 | $26.1977 | $27.2457 | $28.3354 | $29.4689 | $30.5003 | $31.5677 | $32.6726 |
| Press Operators and Linotypists | Wkly | $907.57 | $939.33 | $976.90 | $1,015.98 | $1,056.62 | $1,093.60 | $1,131.88 | $1,171.50 |
| | Hrly | $25.9306 | $26.8380 | $27.9114 | $29.0280 | $30.1891 | $31.2457 | $32.3394 | $33.4714 |
| Miscellaneous Employees | Wkly | $875.08 | $905.71 | $941.94 | $979.62 | $1,018.80 | $1,054.46 | $1,091.37 | $1,129.57 |
| | Hrly | $25.0023 | $25.8774 | $26.9126 | $27.9891 | $29.1086 | $30.1274 | $31.1820 | $32.2734 |

## TURKISH BATHS

| | | 7/1/11 | 7/1/12 | 7/1/13 | Effective Date 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| Masseurs/Masseuses | Wkly | $526.84 | $545.28 | $567.09 | $589.77 | $613.36 | $634.83 | $657.05 | $680.05 |
| | Hrly | $13.1710 | $13.6320 | $14.1773 | $14.7443 | $15.3340 | $15.8708 | $16.4263 | $17.0013 |
| Attendants | Wkly | $531.20 | $549.79 | $571.78 | $594.65 | $618.44 | $640.09 | $662.49 | $685.68 |
| | Hrly | $13.2800 | $13.7448 | $14.2945 | $14.8663 | $15.4610 | $16.0023 | $16.5623 | $17.1420 |
| Steam Room Attendants | Wkly | $524.67 | $543.03 | $564.75 | $587.34 | $610.83 | $632.21 | $654.34 | $677.24 |
| | Hrly | $13.1168 | $13.5758 | $14.1188 | $14.6835 | $15.2708 | $15.8053 | $16.3585 | $16.9310 |
| Floor Attendants | Wkly | $573.38 | $593.45 | $617.19 | $641.88 | $667.56 | $690.92 | $715.10 | $740.13 |
| | Hrly | $14.3345 | $14.8363 | $15.4298 | $16.0470 | $16.6890 | $17.2730 | $17.8775 | $18.5033 |

## MISCELLANEOUS

| | | 7/1/11 | 7/1/12 | 7/1/13 | Effective Date 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| Audio Visual Technician | Wkly | $945.49 | $978.58 | $1,017.72 | $1,058.43 | $1,100.77 | $1,139.30 | $1,179.18 | $1,220.45 |
| | Hrly | $27.0140 | $27.9594 | $29.0777 | $30.2409 | $31.4506 | $32.5514 | $33.6909 | $34.8700 |
| Carpet Cleaners | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |
| Floor Polishers | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |
| F&B Storeroom Attendant | Wkly | $880.50 | $911.32 | $947.77 | $985.68 | $1,025.11 | $1,060.99 | $1,098.12 | $1,136.55 |
| | Hrly | $25.1571 | $26.0377 | $27.0791 | $28.1623 | $29.2889 | $30.3140 | $31.3749 | $32.4729 |
| Furniture Polishers (Maintenance) | Wkly | $917.33 | $949.44 | $987.42 | $1,026.92 | $1,068.00 | $1,105.38 | $1,144.07 | $1,184.11 |
| | Hrly | $26.2094 | $27.1269 | $28.2120 | $29.3406 | $30.5143 | $31.5823 | $32.6877 | $33.8317 |
| Incinerator Attendants | Wkly | $889.17 | $920.29 | $957.10 | $995.38 | $1,035.20 | $1,071.43 | $1,108.93 | $1,147.74 |
| | Hrly | $25.4049 | $26.2940 | $27.3457 | $28.4394 | $29.5771 | $30.6123 | $31.6837 | $32.7926 |
| Kitchen Fire Person | Wkly | $886.97 | $918.01 | $954.73 | $992.92 | $1,032.64 | $1,068.78 | $1,106.19 | $1,144.91 |
| | Hrly | $25.3420 | $26.2289 | $27.2780 | $28.3691 | $29.5040 | $30.5366 | $31.6054 | $32.7117 |
| Linen Handlers/Distributors | Wkly | $872.91 | $903.46 | $939.60 | $977.18 | $1,016.27 | $1,051.84 | $1,088.65 | $1,126.75 |
| | Hrly | $24.9403 | $25.8131 | $26.8457 | $27.9194 | $29.0363 | $30.0526 | $31.1043 | $32.1929 |
| Linen Room Personnel | Wkly | $864.25 | $894.50 | $930.28 | $967.49 | $1,006.19 | $1,041.41 | $1,077.86 | $1,115.59 |
| | Hrly | $24.6929 | $25.5571 | $26.5794 | $27.6426 | $28.7483 | $29.7546 | $30.7960 | $31.8740 |
| Linen Room Sewers | Wkly | $868.58 | $898.98 | $934.94 | $972.34 | $1,011.23 | $1,046.62 | $1,083.25 | $1,121.16 |
| | Hrly | $24.8166 | $25.6851 | $26.7126 | $27.7811 | $28.8923 | $29.9034 | $30.9500 | $32.0331 |

## MISCELLANEOUS (continued)

| | | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Effective Date | | | | |
| Locker Room Attendant | Wkly | $872.97 | $903.52 | $939.66 | $977.25 | $1,016.34 | $1,051.91 | $1,088.73 | $1,126.84 |
| | Hrly | $24.9420 | $25.8149 | $26.8474 | $27.9214 | $29.0383 | $30.0546 | $31.1066 | $32.1954 |
| Minibar Attendant | Wkly | $891.33 | $922.53 | $959.43 | $997.81 | $1,037.72 | $1,074.04 | $1,111.63 | $1,150.54 |
| | Hrly | $25.4666 | $26.3580 | $27.4123 | $28.5089 | $29.6491 | $30.6869 | $31.7609 | $32.8726 |
| Newspaper Deliverers | Wkly | $864.25 | $894.50 | $930.28 | $967.49 | $1,006.19 | $1,041.41 | $1,077.86 | $1,115.59 |
| | Hrly | $24.6929 | $25.5571 | $26.5794 | $27.6426 | $28.7483 | $29.7546 | $30.7960 | $31.8740 |
| Pages | Wkly | $706.86 | $731.60 | $760.86 | $791.29 | $822.94 | $851.74 | $881.55 | $912.40 |
| | Hrly | $17.6715 | $18.2900 | $19.0215 | $19.7823 | $20.5735 | $21.2935 | $22.0388 | $22.8100 |
| Sidewalk Cleaners | Wkly | $876.15 | $906.82 | $943.09 | $980.81 | $1,020.04 | $1,055.74 | $1,092.69 | $1,130.93 |
| | Hrly | $25.0329 | $25.9091 | $26.9454 | $28.0231 | $29.1440 | $30.1640 | $31.2197 | $32.3123 |
| Soda Fountain Employees | Wkly | $886.97 | $918.01 | $954.73 | $992.92 | $1,032.64 | $1,068.78 | $1,106.19 | $1,144.91 |
| | Hrly | $25.3420 | $26.2289 | $27.2780 | $28.3691 | $29.5040 | $30.5366 | $31.6054 | $32.7117 |
| Swimming Pool Attendant | Wkly | $873.99 | $904.58 | $940.76 | $978.39 | $1,017.53 | $1,053.14 | $1,090.00 | $1,128.15 |
| | Hrly | $24.9711 | $25.8451 | $26.8789 | $27.9540 | $29.0723 | $30.0897 | $31.1429 | $32.2329 |
| Window Cleaners F.T. | Wkly | $943.67 | $976.70 | $1,015.77 | $1,056.40 | $1,098.66 | $1,137.11 | $1,176.91 | $1,218.10 |
| | Hrly | $26.9620 | $27.9057 | $29.0220 | $30.1829 | $31.3903 | $32.4889 | $33.6260 | $34.8029 |
| Yard and Sanitation Employees | Wkly | $866.38 | $896.70 | $932.57 | $969.87 | $1,008.66 | $1,043.96 | $1,080.50 | $1,118.32 |
| | Hrly | $24.7537 | $25.6200 | $26.6449 | $27.7106 | $28.8189 | $29.8274 | $30.8714 | $31.9520 |

It is agreed that, if any employee shall be engaged in work of any class or kind which has not been included in any of the specific classifications herein, the parties shall negotiate the amount of the minimum wage for such classifications, and if unable to agree, submit the matter to arbitration in accordance with the provisions of Article 26 of the Agreement. Pending determination by the Impartial Chairperson, the wage and hours and conditions of work for such employee shall continue as heretofore.

## SCHEDULE A-1

### CLASSIFICATION OF MEALS, HOURS AND WAGES FOR BANQUET SERVERS & BANQUET CAPTAINS

(Wage scales set forth herein shall include meals)

| Schedule A-1 | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Breakfast - Starting between 7:00 a.m. and 11:00 a.m., consuming 3 hours. | $54.27 | $56.17 | $58.42 | $60.76 | $63.19 | $65.40 | $67.69 | $70.06 |
| Luncheon - Starting between 11:00 a.m. and 3:00 p.m., consuming 3-1/2 hours. | $54.90 | $56.82 | $59.09 | $61.45 | $63.91 | $66.15 | $68.47 | $70.87 |
| Afternoon Tea or Cocktail Party - Starting between 2:30 p.m. and 5:00 p.m., consuming 3 hours. | $53.63 | $55.51 | $57.73 | $60.04 | $62.44 | $64.63 | $66.89 | $69.23 |
| Dinner or Supper - Starting after 6:00 p.m., consuming 4-1/2 hours. | $56.10 | $58.06 | $60.38 | $62.80 | $65.31 | $67.60 | $69.97 | $72.42 |
| Dance (no food) - Starting after 8:00 p.m., consuming 5-1/2 hours. | $54.90 | $56.82 | $59.09 | $61.45 | $63.91 | $66.15 | $68.47 | $70.87 |
| Additional for each setting up and each clearing off. | $35.73 | $36.98 | $38.46 | $40.00 | $41.60 | $43.06 | $44.57 | $46.13 |
| Holidays | $210.76 | $218.14 | $226.87 | $235.94 | $245.38 | $253.97 | $262.86 | $272.06 |

In setting forth the stated hours and the time to be consumed by these various functions, it is the intent that overtime compensation will be paid in the event that service exceeds the hours set forth above, in the following amounts:

| | Effective Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 7/1/11 | 7/1/12 | 7/1/13 | 7/1/14 | 7/1/15 | 7/1/16 | 7/1/17 | 7/1/18 |
| Breakfast | $27.10 | $28.05 | $29.17 | $30.34 | $31.55 | $32.65 | $33.79 | $34.97 |
| Luncheon | $23.47 | $24.29 | $25.26 | $26.27 | $27.32 | $28.28 | $29.27 | $30.29 |
| Afternoon | $26.86 | $27.80 | $28.91 | $30.07 | $31.27 | $32.36 | $33.49 | $34.66 |
| Dinner OT | $18.68 | $19.33 | $20.10 | $20.90 | $21.74 | $22.50 | $23.29 | $24.11 |

Overtime compensation for banquet captains shall be paid at one and one-half (1-1/2) times their hourly rate of pay.

It is not the intent of this provision to alter or abrogate any practice now existing that had been agreed upon between the parties hereto.

The hours designated for any function shall be the hours, beginning at the time when the service personnel report on the floor for duty, exclusive of any time consumed for dressing or eating.

Committee reception in connection with a dinner, held in a private room, wherein personnel also serve at the dinner—effective July 1, 2011, in addition to regular wages, $34.98; effective July 1, 2012, $36.20; effective July 1, 2013, $37.65; effective July 1, 2014, $39.16; effective July 1, 2015, $40.73; effective July 1, 2016, $42.16; effective July 1, 2017, $43.64; and effective July 1, 2018, $45.17.

Buffet, starting before 6:00 P.M., to be paid for at Luncheon Prices.

Buffet, starting after 6:00 P.M., to be paid for at Dinner Prices.

## WORKING CONDITIONS

1. Service personnel shall report one (1) hour before the function is scheduled to begin.

2. Set-up personnel shall report for duty one (1) hour before service personnel report.

3. Clear-off personnel shall remain until function terminates.

4. Fifteen (15) covers shall be considered the standard set-up for breakfast and for supper (except in the case of an elaborate supper, in which case the set-up shall be ten (10)). Ten (10) covers shall be considered the standard set-up for luncheon and dinner.

5. Tables of eleven (11) and twelve (12) will be accepted as a regular set-up in exceptional cases, but not as a regular procedure.

6. Thirteen (13) to seventeen (17) covers will be considered a "split" table for which, for breakfast and luncheon, an extra $33.93 shall be paid effective July 1, 2011; $35.12 effective July 1, 2012; $36.52 effective July 1, 2013; $37.98 effective July 1, 2014; $39.50 effective July 1, 2015; $40.88 effective July 1, 2016; $42.31 effective July 1, 2017; and $43.79 effective July 1, 2018. For dinner, an extra $35.07 shall be paid effective July 1, 2011; $36.30 effective July 1, 2012; $37.75 effective July 1, 2013; $39.26 effective July 1, 2014; $40.83 effective July 1, 2015; $42.26 effective July 1, 2016; $43.74 effective July 1, 2017; and $45.27 effective July 1, 2018.

7. Double tables of twenty (20) to twenty-four (24) shall be considered two (2) tables as far as wages are concerned, except for breakfast where double tables shall be considered a "double split."

8. Set-up and clear-off personnel shall follow the general industry practice of servicing forty (40) covers.

9. In cases where no set-up personnel are provided and servers are required to set up their own tables, each shall be paid extra, in addition to his/her regular pay, as follows: July 1, 2011, $8.91; July 1, 2012, $9.22; July 1, 2013, $9.59; July 1, 2014, $9.97; July 1, 2015, $10.37; July 1, 2016, $10.73; July 1, 2017, $11.11; and $11.50 July 1, 2018.

10. When food is not provided, due to the late hour or otherwise, servers shall be paid twenty-five cents ($0.25) extra in addition to their regular pay.

11. Payment of wages and gratuities shall be made as soon as possible after the termination of service but in no case later than forty-eight (48) hours after the function, except in exceptional cases.

12. Extra Banquet Captains who work on a daily basis instead of a weekly basis shall be paid for breakfast and luncheon $95.72 effective July 1, 2011; $99.07 effective July 1, 2012; $103.03 effective July 1, 2013; $107.15 effective July 1, 2014; $111.44 effective July 1, 2015; $115.34 effective July 1, 2016; $119.38 effective July 1, 2017; and $123.56 effective July 1, 2018. They shall be paid for dinner $96.40 effective July 1, 2011; $99.77 effective July 1, 2012; $103.76 effective July 1, 2013; $107.91 effective July 1, 2014; $112.23 effective July 1, 2015; $116.16 effective July 1, 2016; $120.23 effective July 1, 2017; and $124.44 effective July 1, 2018. It is understood that they will work during the entire period of the function, including the time required for setting up and clearing off.

13. Banquet clear-off servers at dinner dances who are required to remain more than one (1) hour after the service food terminates shall be paid, in addition to their regular clear-off wages, a flat sum of $36.20 effective July 1, 2011; $37.47 effective July 1, 2012; $38.97 effective July 1, 2013; $40.53 effective July 1, 2014; $42.15 effective July 1, 2015; $43.63 effective July 1, 2016; $45.16 effective July 1, 2017; and $46.74 effective July 1, 2018, and dinner overtime after completion of five and one-half (5-1/2) hours from the time they are called for service of the function. (It is understood that this rule will be uniform in all hotels for dinner dances and the various arrangements now in effect in individual hotels will be modified to conform with this procedure, except that any existing arrangements providing greater compensation to employees shall not be reduced.)

14. In order to avoid errors and confusion, the UNION shall provide the EMPLOYER with the names of the extra personnel referred for a function at least two (2) hours before they report for work. (This provision can be effective only in cases where the hotel calls the UNION not later than 3:30 P.M. on the day preceding the date of the function.)

15. Under no circumstances shall Banquet personnel or delegates have the privilege or right to discuss working conditions, wages or gratuities with Banquet Committees or guests. All grievances must be referred to the Headwaiter, and by the Delegate only.

16. It is understood that the hours, wages and working conditions for extra banquet servers and captains provide a minimum standard for all hotels. Any hotel that has already granted and put into effect conditions more favorable to the UNION than those listed above will be obligated to continue such practices now existing except as otherwise provided in Paragraph 13 above.

17. Banquet servers, at all functions with music, where the function continues after 2:00 A.M., shall be paid for work performed after 2:00 A.M. at the rate of $23.32 effective July 1, 2011; $24.14 effective July 1, 2012; $25.11 effective July 1, 2013; $26.11 effective July 1, 2014; $27.15 effective July 1, 2015; $28.10 effective July 1, 2016; $29.08 effective July 1, 2017; and $30.10 effective July 1, 2018. This rate shall be paid in addition to the present clear-off rates, as set forth in Paragraph 13 above, for banquet clear-off personnel who are required to remain more than one (1) hour after the service of food terminates. Any hotel which has already granted and put into effect conditions more favorable to banquet servers than those listed above shall continue such more favorable practices.

18. On or before October 1st of each year, a committee of the ASSOCIATION and a committee of the UNION shall meet to determine the wages to be paid employees for the following New Year's Eve. In the event the parties are unable to reach an agreement by November 1st, the matter may be submitted to arbitration.

19. Banquet servers covered by this Schedule shall receive the following vacation and holiday pay:

A. Eligibility

(1) A banquet server shall be eligible for vacation pay in a hotel in any fiscal year if s/he was on the hotel's steady rotation list for at least six (6) months in the previous fiscal year provided that his/her gross wages earned in the hotel were at least one thousand dollars ($1,000).

For purposes of this provision the fiscal year shall be the period starting September 1, and ending August 31 of the following year. Vacation pay shall be paid to all eligible employees at the beginning of each fiscal year for the preceding year.

(2) The number of weeks of vacation pay for which a banquet server shall be eligible under Paragraph (1) above, shall be based on hotel's steady or rotation list for at least six (6) months, based on the schedule set forth in Article 28(A)(1) of the Agreement.

(3) The amount of vacation pay for employees who have been on the steady or rotation list for six (6) months or more in the preceding year will be calculated by multiplying the amounts arrived at under Paragraph (a) or (b) below by the following fractions:

6 months but less than 6-1/2 months .................................. 6/9

6-1/2 months but less than 7-1/2 months .......................... 7/9

7-1/2 months but less than 8-1/2 months .......................... 8/9

8-1/2 months or more .......................................... full amount

(a) Gross wages of one thousand dollars ($1,000) but less than three thousand dollars ($3,000):

One point nine percent (1.9%) of gross wages per week of vacation plus one hundred percent (100%).

(b) Gross wages of three thousand dollars ($3,000) or more:

Effective July 1, 2011 – One thousand and fifty-three dollars and sixty-five cents ($1,053.65)

Effective July 1, 2012 – One thousand and ninety dollars and fifty-three cents ($1,090.53) per week

Effective July 1, 2013 – One thousand one hundred and thirty-four dollars and fifteen cents ($1,134.15) per week

Effective July 1, 2014 – One thousand one hundred and seventy-nine dollars and fifty-two cents ($1,179.52) per week

Effective July 1, 2015 – One thousand two hundred and twenty-six dollars and seventy cents ($1,226.70) per week

Effective July 1, 2016 – One thousand two hundred and sixty-nine dollars and sixty-three cents ($1,269.63) per week

Effective July 1, 2017 – One thousand three hundred and fourteen dollars and seven cents ($1,314.07) per week

Effective July 1, 2018 – One thousand three hundred and sixty dollars and six cents ($1,360.06) per week

Gross wages shall mean the sum of the function rate plus the rate for split tables, set-up and clear-off (exclusive of gratuities).

B. <u>Banquet Captains</u>

Banquet captains on a hotel's steady list shall be eligible for vacations in accordance with the foregoing rules, but gross wages shall mean the banquet captain's total straight-time earnings, exclusive of gratuities, received during the preceding calendar year.

C. <u>Roll-Call Banquet Servers</u>

Effective July 1, 2011, Roll Call banquet servers shall be paid $6.53 for each banquet function as vacation and holiday pay. The foregoing payment shall be increased effective July 1, 2012 to $6.76; effective July 1, 2013 to $7.03; effective July 1, 2014 to $7.31; effective July 1, 2015 to $7.60; effective July 1, 2016 to $7.87; effective July 1, 2017 to $8.15; and effective July 1, 2018 to $8.44. Said payment shall be paid together with their regular earnings.

In the event Roll Call banquet servers work on a holiday listed in Article 29(A) of the collective bargaining agreement, they shall receive holiday pay in the same amount payable to a la carte servers under the wage scale set forth in Schedule A. Said holiday pay shall be in addition to the wages payable for the banquet function or functions.

D. Banquet servers on a hotel's steady rotation list and banquet captains on a hotel's steady list shall receive holiday pay based upon the same eligibility applicable

to regular employees. The amount of pay for a holiday shall be the amount payable to a la carte servers or a la carte captains under the wage scales set forth in Schedule A.

Should it be necessary for such banquet servers or banquet captains to work on any of the holidays listed in Article 29(A) of the collective bargaining agreement, said holiday pay shall be in addition to the wages payable for the banquet function or functions.

**SCHEDULE A-2**

## VACATIONS, CALL-IN PAY AND HOLIDAY PAY FOR
## CHECKROOM AND WASHROOM ATTENDANTS

Checkroom and Washroom Attendants shall receive vacations, holiday benefits and call-in pay as follows:

A. Vacation Pay

(1) Amount of Vacation Pay:

Upon completion of one (1), two (2), three (3), and four (4) years respectively of continuous employment, each employee shall receive two percent (2%), three percent (3%), four percent (4%), and five percent (5%) respectively of the wages earned during the immediate calendar year preceding the vacation payment.

(2) Eligibility for vacation pay shall be based upon each employee having been employed for not less than six (6) months during the preceding calendar year.

B. Call-in Pay

An employee called in to work on any given day shall be provided with not less than three and one-half (3-1/2) hours of work.

C. Holiday Pay

(1) The following six (6) holidays shall be recognized as paid holidays: Thanksgiving, December 24th, Christmas Day, New Year's Day, President's Day, and Martin Luther King, Jr.'s Birthday.

(2) All questions concerning eligibility and any other related issues shall be determined in accordance with the terms of the Agreement.

(3) An employee who is eligible to receive holiday pay and who is called in to work on any one of the aforementioned holidays, and does so work, shall be paid at the rate of double time.

(4) An employee who is eligible to receive holiday pay and does not work on the holiday shall receive as holiday pay three and one-half (3-1/2) hours pay at straight time.

(5) An employee who is eligible to receive holiday pay and who is called in to work on any one of the following holidays: Memorial Day, July Fourth and Labor Day, and does so work, shall be paid at the rate of double time.

(6) An employee who is eligible to receive holiday pay and who does not work any of the holidays referred to in Paragraph (C)(5) above, shall not be entitled to receive any holiday pay.

# SCHEDULE A-3

## VACATIONS AND HOLIDAYS FOR STEADY EXTRA
## BANQUET BARTENDERS

Steady extra banquet bartenders shall be eligible for vacation and holiday pay in accordance with the following provisions:

### 1. Eligibility

A. A steady extra banquet bartender shall be eligible for vacation pay in a hotel in any calendar year if s/he was on the hotel's steady extra list for at least six (6) months in the previous calendar year, provided that his/her gross wages earned in the hotel, exclusive of gratuities, was at least one thousand dollars ($1,000).

B. The number of weeks of vacation pay for which a steady extra bartender shall be eligible under Paragraph "A" above shall be based on the number of consecutive years, in each of which the employee has been on the hotel's steady extra banquet bartenders list for at least six (6) months and shall be in accordance with the schedule set forth in Article 28(A) of the Agreement.

C. The amount of vacation pay for employees who have been on the hotel's steady extra banquet bartenders list for at least six (6) months or more in the preceding years will be calculated as follows:

Each employee in order to be eligible for vacation pay must earn a minimum of one thousand dollars ($1,000) of wages and a maximum of three thousand dollars ($3,000) of wages.

Each employee receiving three thousand dollars ($3,000) or more in wages excluding gratuities should receive a maximum vacation pay of $955.10 effective July 1, 2011; $988.53 per week, effective July 1, 2012; $1,028.07 effective July 1, 2013; $1,069.19 effective July 1, 2014; $1,111.96 effective July 1, 2015; $1,150.88 effective July 1, 2016; $1,191.16 effective July 1, 2017; and $1,232.85 effective July 1, 2018.

For steady extra banquet bartenders earning more than one thousand dollars ($1,000) but less than three thousand dollars ($3,000), the rate of vacation pay will be prorated on the percentage of earnings considering three thousand dollars ($3,000) as one hundred percent (100%).

Said proportion to be applied as follows:

The vacation pay above would be subject to the following:

6 months employment but less than 6-1/2 months: ............... 6/9

6-1/2 months employment but less than 7-1/2 months: .......... 7/9

7-1/2 months employment but less than 8-1/2 months: .......... 8/9

8-1/2 months employment or more: .......................... full amount

D. Steady extra banquet bartenders shall receive holiday pay based upon the same eligibility applicable to regular employees. The amount of pay for a holiday shall be the amount payable to a service bartender under the wage scale set forth in Schedule A.

Should it be necessary for a steady extra banquet bartender to work on any of the holidays listed in Article 29(A), said holiday pay shall be in addition to the wages payable for the banquet function or functions.

E.   Bartenders who are neither on the steady extra banquet payroll nor the regular hotel payroll and are called in to service banquet functions shall receive $5.73 per function as vacation and holiday pay effective July 1, 2011; $5.93 as of July 1, 2012; $6.17 as of July 1, 2013; $6.42 as of July 1, 2014; $6.68 as of July 1, 2015; $6.91 as of July 1, 2016; $7.15 as of July 1, 2017; and $7.40 as of July 1, 2018.

SUPPLEMENTAL AGREEMENT dated the 1st day of July, 2012 between the HO-TEL ASSOCIATION OF NEW YORK CITY, INC., hereinafter called the ASSOCIATION, and the operators of hotels who are Bargaining Group Hotels of the ASSOCIATION, and with respect to whom the UNION (as hereinafter designated) has been designated as sole collective bargaining agent for the employees in the hotels and concessionaires covered by this Agreement, and who shall become signatories or otherwise parties hereto, each and every such signatory and/or party hotel and concessionaire being hereinafter referred to as the EMPLOYER, and the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its members, now employed or hereinafter to be employed by the EMPLOYER.

WHEREAS, the ASSOCIATION, the EMPLOYER and the UNION have simultane-ously herewith executed a Collective Bargaining Agreement; and

WHEREAS, as part of the consideration for the execution of the Collective Bargain-ing Agreement, the EMPLOYER agreed to contribute sums of money equal to a stated percentage of its payroll or a specific amount to the Funds (as defined below) to be used to provide various medical, accident and sickness, life insurance, pension, legal services and industry training benefits to employees covered by the Collective Bargain-ing Agreement, and employed by the EMPLOYER, medical and legal services benefits to the families of such employees, health care benefits to the enrolled domestic partners of such employees and scholarship benefits to the children of such employees, all as determined by the Trustees; and

WHEREAS, the Agreement effective July 1, 2006 made between the parties is su-perseded by the Collective Bargaining Agreement executed simultaneously herewith and it is desired to continue payments to the Funds to provide the benefits hereinafter set forth,

NOW, THEREFORE, in consideration of the promises, the EMPLOYER and the UNION agree that the Collective Bargaining Agreement shall be supplemented by add-ing hereto the following provisions:

1.  Effective July 1, 2012, the Supplemental Agreement contained in this Schedule B is intended to supersede and replace in its entirety Schedule B of the July 1, 2006 Agreement.

2.  Definitions. For purposes of this Supplemental Agreement, the following terms shall have the following meanings:

The term "employees of the EMPLOYER," means, unless otherwise provided, all of the employees of the EMPLOYER who are covered by and are entitled to the benefits of the Collective Bargaining Agreement, certain employees of the New York Hotel Trades Council and Hotel Association of New York City, Health Center, Inc. and the New York Hotel Trades Council and Hotel Association of New York City, Inc. Em-

ployee Benefit Funds, and certain employees of the UNION and those of its affiliated local unions which have agreed to contribute to the Funds.

The term "family" means an employee's spouse, unmarried children, stepchildren, foster children and adopted children under age nineteen (19), provided they depend on the employee for more than half of their support, and unmarried children, regardless of age, who are unable to support themselves as a result of a physical, developmental or mental illness or condition which incapacitated the child prior to reaching age nineteen (19). The term family will also include full-time students who are dependents of covered employees until the last calendar day of the calendar year in which said dependent reaches twenty-six (26) years of age.

The term "domestic partner" means a person who is living with an employee and sharing financial responsibility with the employee for their joint household. Domestic partners of eligible fund participants will be treated as qualified dependents and eligible for Health Benefits Fund benefits.

The term "wages", for purposes of calculating EMPLOYER contributions equal to a percentage of employee wages, shall be defined as including vacation pay, overtime pay, holiday pay, sick leave pay, personal day pay, jury duty pay, bereavement pay, value of meals and lodgings where such are part of an employee's wages commencing from the first day of employment, whether such employment be permanent, temporary, casual, part-time or extra, and banquet servers' tips. Notwithstanding the foregoing, an employee's wages in excess of the amount of earnings at which the EMPLOYER'S FICA contributions are required shall not be taken into account in calculating EMPLOYER contributions to the Funds. Further, "wages" are limited as set forth in Article 6(D) of the Collective Bargaining Agreement regarding the date as of which contributions must commence to be made to certain of the Funds on behalf of new employees.

The term "Funds" means the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund, Pension Fund, Prepaid Legal Services Fund and Industry Training and Scholarship Fund.

### 3. The Health Benefits Fund

(A) Effective January 1, 1999, the New York Hotel Trades Council and Hotel Association of New York City, Inc. Insurance Fund, Union Family Medical Fund and Dental Fund were merged into a single fund renamed the "New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund" (the "Health Benefits Fund"). Said merged fund is the successor to the separate Union Family Medical, Insurance and Dental Funds and, as such, provides multiple plans of benefits, including a medical benefits plan (formerly provided by the Union Family Medical Fund), a hospital and insurance benefits plan and an optical benefits plan (formerly provided by the Insurance Fund), and a dental benefits plan (formerly provided by the Dental Fund). Effective July 1, 2012, the EMPLOYER shall make a single, aggregate monthly contribution to the Trustees of the Health Benefits Fund for all benefit plans within that Fund covering the employees of the EMPLOYER equal to the following amounts (or such amounts as may be agreed upon from time to time by the UNION and the ASSOCIATION):

| CONTRIBUTION RATE | BENEFIT COVERAGE |
|---|---|
| (a) Effective January 1, 2012, 20.5% of employee wages. Effective July 1, 2012, 21% of employee wages. Effective January 1, 2015, 21.5% of employee wages. Effective January 1, 2016, 22% of employee wages. Effective January 1, 2017, 22.5% of employee wages. | Combined Medical and Insurance (Hospital Life, Accidental Death and Dismemberment, Short-Term Disability)[1] |
| (b) $1.50 per employee per month | Optical Benefits [2] |
| (c) 2.00% of employee wages | Dental Benefits [3] |

Notwithstanding the foregoing, the Trustees shall maintain the projected liquid assets of the Health Benefits Fund at the end of each calendar year at not less than twenty-five percent (25%) of the following year's expenses of the Fund. Those contributions expressed as a percentage of wages shall be computed with respect to wages payable to the employees of the EMPLOYER for the preceding pay period. All contributions to the Health Benefits Fund shall be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of providing medical, accident and sickness and insurance benefits to the employees of the EMPLOYER and medical benefits to the families and enrolled domestic partners of such employees, all as determined by the Trustees. Effective January 1, 2012, EMPLOYERS acknowledge and agree that they shall maintain all benefits currently provided by the Health Benefits Fund at no less than current eligibility and coverage during the life of this Agreement, and in no event shall any benefit, eligibility, or coverage be reduced for any reason absent signed agreement by the parties to the contrary.[123]

(B) In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of medical, life, health and accident, or hospitalization insurance benefits under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period, with the amount of such tax or exaction payable by it for such pay period.

(C) The Health Benefits Fund will provide up to thirty (30) days of in-patient psychiatric coverage. It is understood that in the event legislation is enacted which requires modification of this benefit, the parties agree to meet to discuss the impact

---

*1 Such contributions will be due with respect to each employee of the EMPLOYER from the employee's initial date of employment.*

*2 Such contributions will be due with respect to each employee on the EMPLOYER'S payroll on the fifteenth (15th) day of each month.*

*3 Such contributions will be due with respect to each employee of the EMPLOYER immediately after the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement.*

of such mandated modification of this benefit in order to maintain the then-current contribution rate.

(D) Effective January 1, 2012, the parties agree that a medical facility in Brooklyn, New York, substantially comparable to the current facility operating in Harlem, New York is essential, and shall promptly effect the acquisition of realty, disposition of the current Brooklyn facility, construction of the new facility toward completion, and commencement of operations of such facility as soon as possible.

### 4. The Pension Fund

(A) Effective July 1, 2006 the EMPLOYER shall increase its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund from seven percent (7%) to nine percent (9%) (or such percentage as may be agreed upon from time to time by the UNION and the ASSOCIATION) of the wages payable to the employees of the EMPLOYER for the preceding pay period, to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of providing pensions to the employees employed by the EMPLOYER.[4] Effective July 1, 2013, the EMPLOYER shall increase its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund from nine percent (9%) to nine and one-half percent (9.5%).  Effective July 1, 2016, the EMPLOYER shall increase its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund from nine and one-half percent (9.5%) to ten percent (10%).  Effective July 1, 2018, the EMPLOYER shall increase its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund from ten percent (10%) to ten and one-half percent (10.5%). Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B) The EMPLOYER and the UNION agree that, subject to all of the terms and conditions set forth in the Pension Fund's Rules and Regulations, the following increases in monthly pension benefit payments will be implemented in accordance with the following table for employees in active covered employment who are not Pensioners as of the effective dates set forth below:

---

*4 Effective January 1, 2012 and for a period of one (1) year thereafter or such other time period as determined by the Funds, the 0.5% contribution to the Prepaid Legal Fund shall be suspended and reallocated to the Pension Fund.*

| EFFECTIVE DATE | REGULAR MAXIMUM MONTHLY BENEFIT | AGE AND SERVICE PENSION (25 YEARS OF SERVICE AND AGE 55) |
|---|---|---|
| July 1, 2003 | $850 per month | $800 per month |
| July 1, 2004 | $950 per month | $850 per month |
| July 1, 2005 | $1,000 per month | $875 per month |

In addition, effective July 1, 2001, as approved by the Trustees, Participants in Covered Employment on June 30, 2001 whose Pension Effective Date occurs thereafter shall accrue an additional Regular Pension benefit of twenty dollars ($20) per Pension Credit for each Pension Credit in excess of twenty-five (25), up to a maximum of forty (40) Pension Credits. This additional accrual does not apply to Participants retiring on an Age and Service Pension.

It is acknowledged and agreed that the Trustees of the Pension Fund shall have the authority to determine when, and to what extent, the Regular Maximum Monthly Benefit shall be increased. At no time shall the Trustees permit the Pension Fund to subject contributing Employers to excise tax or any other penalties.

(C) The EMPLOYER and the UNION acknowledge and agree that, subject to all of the terms and conditions set forth in the Pension Fund's Rules and Regulations, the following increases in monthly pension benefit payments will be implemented in accordance with the following table for Pensioners and beneficiaries in pay status on the effective dates set forth below:

| EFFECTIVE DATE | % INCREASE |
|---|---|
| July 1, 2002 | 2.0% |
| July 1, 2003 | 2.0% |
| July 1, 2004 | 2.0% |
| July 1, 2005 | 2.0% |

(D) The EMPLOYER agrees to increase its contribution to the Pension Fund in order to meet the requirements of the Employee Retirement Income Security Act of 1974, as amended, by such amount as is finally determined upon completion of an actuarial valuation.

<u>5. The Pre-Paid Legal Fund</u>

(A) The EMPLOYER shall continue to contribute to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund one-half of one percent (0.50%) (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) of the wages payable to the

employees for the preceding pay period, to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of making available certain legal services benefits to employees of the EMPLOYER and their dependents.[5] Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B) In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administrated system of prepaid legal insurance under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period, with the amount of such tax or exaction payable by it for such pay period.

(C) Contributions to the Fund shall continue only so long as the Fund retains its tax exempt status.

### 6. Industry Training and Scholarship Fund

(A) The EMPLOYER shall continue to pay the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund the sum of one dollar and fifty cents ($1.50) per month for each employee on the EMPLOYER'S payroll on the 15th day of each month (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of establishing and maintaining programs to train employees for promotion and advancement. Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B) The EMPLOYER shall continue to pay the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund the sum of one dollar ($1) per month for each employee on the EMPLOYER'S payroll on the 15th day of each month (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument and to provide educational scholarships and tuition aid to dependents of the EMPLOYER'S employees. Such contributions will be due with respect to each employee of the EMPLOYER from the employee's initial date of employment.

---

*5 Effective January 1, 2012 and for a period of one (1) year thereafter or such other time period as determined by the Funds, the 0.5% contribution to the Prepaid Legal Fund shall be suspended and reallocated to the Pension Fund.*

(C) In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of job training and scholarship insurance under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period, with the amount of such tax or exaction payable by it for such pay period.

### 7. The 401(k) Savings Plan and Trust

The EMPLOYER shall continue remitting employee contributions to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. 401(k) Savings Plan and Trust solely on behalf of each of its employees who has elected to defer a portion of his/her wages on a pre-tax basis to such Plan and Trust. The employee contributions remitted by the EMPLOYER shall be the aggregate amount of the wage deferrals deducted by the EMPLOYER in accordance with employees' elections for each pay period. The EMPLOYER shall, as required by law, remit such contributions to the Trustees as of the earliest date on which such contributions can reasonably be segregated from the EMPLOYER'S general assets. Any and all costs attendant to the establishment, implementation and administration of the 401(k) Plan, other than costs of deducting and withholding from employee wages and transmitting same to the Plan, shall be paid out of the employee elective deferral contributions.

### 8. Provisions Common to All Funds

The following provisions shall apply to all of the foregoing Funds:

(A) The terms and provisions of each Fund's trust instrument are specifically incorporated herein by reference.[6]

(B) If the Trustees shall complain that any EMPLOYER has not made full payment of contributions to the Trustees of any of the foregoing Funds, such complaint shall be filed with the Impartial Chairperson named in the Collective Bargaining Agreement, and the Impartial Chairperson shall make the necessary findings and award, and his/her decision shall be final and binding on the parties. Any EMPLOYER delinquent in contributions shall be required to pay said contributions and any audit or accounting fees in connection therewith if said delinquent contributions are paid prior to the institution of legal or arbitration proceedings. Any EMPLOYER against whom legal or arbitration proceedings are instituted shall be required to pay in addition to the amount

---

*6 Health Benefits Fund – Agreement and Restated Declaration of Trust dated January 1, 1999.*

*Pension Fund – Restated Agreement and Declaration of Trust dated January 1, 1976 and amended March 1, 1988.*

*Prepaid Legal Fund – Agreement and Declaration of Trust dated November 1, 1987.*

*Training and Scholarship Fund – Restated Agreement and Declaration of Trust dated July 29, 1987.*

*401(k) Savings Plan and Trust – Agreement and Declaration of Trust dated July 1, 2001.*

of the delinquency, interest at the then legal rate, audit fees, liquidated damages in the amount of twenty percent (20%) of the amount of the delinquency, attorneys' fees and costs.

(C) No employee of an EMPLOYER and no member of any such employee's family shall have the option to receive instead of the foregoing benefits any part of any contribution of the EMPLOYER. No employee or family member shall have the right to assign the benefits to which s/he may be or become entitled hereunder or under the trust instruments pertaining to each of the foregoing Funds, except as may otherwise be provided by law and the express provisions of a benefit plan, or to receive a cash consideration in lieu of such benefits, either upon termination of the trust therein created or through severance of employment or otherwise.

(D) During the term of this Supplemental Agreement, the UNION obligates itself to enter into no contract or agreement whereby any EMPLOYER engaged in the hotel business in the City of New York will not be obligated to pay the amount required to be paid to the Trustees as set forth above. During the term of this Supplemental Agreement, the UNION agrees to insert a clause in all of its Collective Bargaining Agreements with hotels employing members of the UNION engaged in the hotel business in the City of New York to the effect that the hotel shall pay to the Trustees under the trust instruments pertaining to each of the Funds the applicable sums set forth above (as the same may from time to time be modified according to the terms hereof), to be applied under the said trust instruments. This Paragraph (D) may be waived by an instrument in writing executed by the Board of Directors of the HOTEL ASSOCIATION OF NEW YORK CITY, INC. and the UNION.

(E) This Supplemental Agreement and the Collective Bargaining Agreement and each of the trust instruments pertaining to each of the Funds shall be construed as a single document, and all the provisions of the Collective Bargaining Agreement relating to the administration and enforcement thereof (including provisions for arbitration) shall apply to the administration and enforcement of this Supplemental Agreement, provided, however, that any controversy, claim, complaint, grievance or dispute arising out of or relating to the provisions of this Supplemental Agreement or the interpretation, breach, application or performance thereof, shall be referred by the UNION, the Trustees or the EMPLOYER for arbitration and determination to the Impartial Chairperson provided for in the Collective Bargaining Agreement.

(F) The Trustees, in their names as Trustees, may institute or intervene in any proceedings at law, in equity, or in bankruptcy for the purpose of effectuating the collection of any sums due to them from the EMPLOYER under the provisions of this Supplemental Agreement.

(G) The Trustees shall have the right to make such periodic audits of the EMPLOYER'S payroll records as they deem necessary. For purposes of this provision, payroll records shall include, but not be limited to, employee time cards, individual employee earnings records, Federal quarterly withholding and FICA tax returns (Form 941), State unemployment tax returns and EMPLOYER cash disbursement records.

(H) In the event of a dispute between the Trustees and the EMPLOYER, either party may submit same directly to the Impartial Chairperson for determination.

(I) The provisions of this Supplemental Agreement shall remain in full force and effect for the full term of the Collective Bargaining Agreement, but shall terminate and come to an end with the Collective Bargaining Agreement, or prior thereto by an instrument in writing executed by the Board of Directors of the HOTEL ASSOCIATION OF NEW YORK CITY, INC. and the UNION or, in the case of a non-ASSOCIATION hotel or concessionaire EMPLOYER, by an instrument in writing executed by the non-ASSOCIATION hotel or concessionaire EMPLOYER and the UNION.

(J) All contributions made prior to the date of this Supplemental Agreement by the EMPLOYER, or due from the EMPLOYER, under prior collective bargaining agreements and in the hands of the Trustees as of the date of this Supplemental Agreement (and not as of the date of this Supplemental Agreement, already applied to the purchase of insurance benefits for employees) and in whatever form or investments such contributions shall be, shall be deemed to be covered and controlled by, and embraced in and applied under, the terms of the within Supplemental Agreement and the trust instruments pertaining to each of the Funds, free from all rights and claims therein and hereto on the part of any EMPLOYER or of the UNION, with the same force and effect as if such contributions, in whatever form the same may be, had been contributed by the EMPLOYER immediately after the execution of the within Supplemental Agreement.

(K) The primary purpose of this Supplemental Agreement and the trust instruments pertaining to each of the Funds being to provide a comprehensive range of benefits designed to promote the health and well-being of the employees of the EMPLOYER and their families, it is understood that the form of the benefit plans funded by each of their respective Funds and of this Supplemental Agreement and of each of the trust instruments pertaining to the Funds, shall not give rise to a literal or formal interpretation or construction; such interpretation or construction shall be placed on this Supplemental Agreement and the trust instruments as will assist in the functioning of the plans for the benefit of employees and their families regardless of form.

(L) In no event will the EMPLOYER be entitled to the return of any part of any contribution hereafter made hereunder, or heretofore made under any prior collective bargaining agreement, provided, however, that an EMPLOYER who has made an overpayment of contributions as the result of mistake or arithmetical error and who notifies the Fund Trustees of such overpayment in writing within sixty (60) days of the due date to which such overpayment relates may receive a credit against future contributions due in the amount of the overpayment. The Fund Trustees shall have the sole discretion to determine the existence and amount of any claimed overpayment and whether, under the circumstances, the EMPLOYER is eligible for such credit.

(M) Regardless of the date on which the within Supplemental Agreement shall be executed, the within Supplemental Agreement shall be effective as of July 1, 2012 with the same force and effect as if it had been actually executed on that date.

(N) Neither the execution of this Supplemental Agreement, nor any provisions herein contained or contained in any other agreement affecting the same, shall be deemed to release the EMPLOYER from any contribution or contributions provided for in a prior Supplemental Agreement or any collective bargaining agreement and not yet paid to the Trustees under the terms of the Supplemental Agreement.

(O) In the event that the obligation of the EMPLOYERS to make EMPLOYER contributions shall terminate, or upon the liquidation of the one or more trust estates, the Trustees shall continue to apply the trust estate affected to the purposes set forth in its related trust instrument and described in the foregoing and none other, and upon the disbursement of the entire trust estate affected, such Trust shall terminate.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Agreement to be executed by their duly authorized representatives on the day and year first written above.

Peter Ward
President, New York Hotel and
Motel Trades Council, AFL-CIO

Joseph E. Spinnato
President, Hotel Association
of New York City, Inc.

## ADDENDUM I

To Hotel Association of New York City, Inc.:

In consideration of your execution of the agreement (hereinafter referred to as the Hotel Association contract) between Hotel Association of New York City, Inc., on behalf of itself and its HANYC Bargaining Group Hotels, and the New York Hotel and Motel Trades Council, it is understood and agreed that if the New York Hotel and Motel Trades Council shall make an agreement or other arrangement with another hotel association and/or with an individual hotel owner in the City of New York which does not include the union shop and/or check-off or which contains provisions in lieu thereof or contains other provisions and terms which the Hotel Association, on behalf of itself and on behalf of its HANYC Bargaining Group Hotels, may consider more favorable than the terms of the Hotel Association contract, whether or not such terms and provisions would be construed by the Impartial Chairperson as benefits or aids within the meaning of Section 39 of said contract, then, in such event, the Hotel Association, on behalf of itself and on behalf of its HANYC Bargaining Group Hotels, shall have the right to be released from the Hotel Association contract upon signing such other agreement; or if all EMPLOY-ERS who shall have signed the Hotel Association contract accept the provisions of such other agreement, then the Hotel Association contract shall be deemed amended so as to conform thereto without further action, and any provisions of the Hotel Association contract inconsistent therewith shall be of no further force and effect. This Addendum shall confer no right or benefit on any party other than the Hotel Association, on behalf of itself and on behalf of its Bargaining Group Hotels, and the New York Hotel and Motel Trades Council.

NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO

Faithfully Yours,
By Vito J. Pitta, President
Dated: June 26, 1985

## ADDENDUM II

If the United States Congress promulgates legislation, or the Internal Revenue Service issues a ruling, which, for federal income tax purposes, provides that any portion of EMPLOYER paid benefits be included in the gross income of the EMPLOYER'S employees, and/or if the United States Congress, or the Internal Revenue Service, disallows, for federal income tax purposes, the deductibility of EMPLOYER paid wages and fringe benefits provided by this Agreement, the UNION and the ASSOCIATION agree that they shall expeditiously convene a study committee to discuss and study the impact of such tax law changes and to propose measures to be implemented by the parties so that no EMPLOYER or employee incurs an increased income tax liability solely as a result of the tax law changes.

It is the parties' intention that the foregoing matters be studied, reviewed, discussed and resolved within ninety (90) days after the passage of such legislation. In the event the parties fail to agree within the aforesaid time period, the parties shall, by mutual agreement, have the right to submit this matter to the Impartial Chairperson, who shall

be empowered to make a final and binding decision on any and all matters not resolved by the parties not later than forty-five (45) days after submission of this matter.

In the event that either party fails to agree to submit this matter to the Impartial Chairperson, such party may submit the matter to the United States District Court for the Southern District of New York for resolution by the Court.

## ADDENDUM III

Notice to all Contributing Employers of The New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund:

The Multi-Employer Pension Plan Amendments Act of 1980 ("the Act") imposes a potential liability upon an employer who "withdraws" as a contributing employer from a pension fund. "Withdrawals" and the acts/conditions/circumstances occasioning same are defined in the Act. In general, a contributing employer "withdraws" when it ceases to be obligated to make periodic contributions to a pension fund due to a cessation or, in some cases, a diminution of operations or after a sale, transfer of its business, or after a union is decertified as bargaining agent. All contributing employers are urged to obtain legal advice as to the foregoing withdrawal liability.

## ADDENDUM IV

Company Name

Address

Dear _____:

This letter agreement will confirm the discussions we have had regarding the procedures to be followed by the New York Hotel & Motel Trades Council ("UNION") to organize certain employees at hotels and concessionaires within the five (5) boroughs of New York City at which Company has or acquires an ownership, management or control interest on or after July 1, 2001 and hotels and concessionaires in the Greater New York City Metropolitan Area (other than the five (5) boroughs of New York City), Northern and Central New Jersey and the New York State Capital District at which the Company has or acquires an ownership, management or control interest on or after February 3, 2012 and the UNION does not have representational rights ("Hotel"), and various other matters, including the resolution of disputes related to such organizational drive and/or the terms of this letter agreement ("Agreement") and any subsequent collective bargaining agreement.

1. Use of Impartial Chairperson

The Impartial Chairperson of the Hotel Industry of New York City ("Impartial Chairperson") will conduct a "card count" to determine whether the UNION has obtained valid cards from a majority of full-time and regular part-time employees of the Hotel, employed in job classifications listed in Schedule A to the Industry Wide Agreement between the UNION and the Hotel Association of New York City, Inc. ("IWA"), designating the UNION as their representative for purposes of collective bargaining (the "Cards") and to certify the result of his/her card count, all in accordance with the procedures

set forth in Section 3 below. Full-time and regular part-time employees of the Hotel employed in job classifications listed in Schedule A shall be referred to throughout this Agreement as "Employees".

The Impartial Chairperson also will resolve any and all disputes of any kind whatsoever arising out of this Agreement, or concerning the meaning or interpretation of any and all matters discussed herein, including, but not limited to, the terms and provisions of any collective bargaining agreement entered, or to be entered into, by and between the Hotel and the UNION. Any costs incurred by the parties in instituting proceedings before the Impartial Chairperson, or defending against the same, shall be the responsibility of the respective party. Costs charged by the Impartial Chairperson shall be shared and paid equally by the parties. Any arbitration award or decision issued by the Impartial Chairperson, written or otherwise, shall be final and binding upon the parties, and subject to the provisions of Article 75 of the New York Civil Practice Law and Rules ("CPLR") including, but not limited to, the procedures to vacate or modify an award pursuant to Section 7511 of the CPLR, and shall be enforceable in a court of competent jurisdiction.

2. Union Access to the Hotel

The UNION will begin its organization of the Hotel's employees at any time upon notice to the Hotel's General Manager. The UNION will be permitted to have its organizers or representatives enter the Hotel to meet with Employees during the Employees' non-working times (for example, before work, after work, and during shift changes, meals and breaks) and/or during such other periods as the parties may mutually agree upon in writing. The UNION may engage in organizing efforts in non-public areas of the Hotel such as the Employee meal rooms and locker rooms or such other non-public areas as the parties may mutually agree upon.

Within three (3) days following receipt of the above described written notice of intent to organize Employees, the EMPLOYER will furnish the UNION with a complete list of such Employees, including both full and part-time Employees, showing their job classifications and departments, work schedules, wages, and benefits, and the home addresses and telephone numbers of all Employees. Thereafter, the EMPLOYER will promptly provide updated lists for the duration of the organizing drive.

There shall be no lockouts of the Employees by the Hotel and the UNION shall not cause any disruption of work by the Employees during the organizing activity, nor shall there be any picketing, strikes, slow downs or other work stoppages at the Hotel by or caused by the UNION for any purpose, including organizing, contract negotiations, dispute publication or enforcement of the terms of this Agreement. The "no lockout, no strike" provisions hereof shall not apply in the event either party fails to abide by an award or decision of the Impartial Chairperson within three (3) business days after issuance. Both the Hotel and the UNION agree to respect the National Labor Relations Act ("NLRA") Section 7 rights of employees during the UNION'S organizing drive, and neither party shall, or be required to, act in contravention of those rights. The Hotel specifically agrees that its supervisory employees, its agents and/or its representatives will not act or make any statements that will directly or indirectly imply the Hotel's opinion as to whether or not the employees should support the UNION or as to the reputation of the

UNION or any of its officers and affiliate local unions or as to the reputation of any of the officers of the UNION'S affiliate local unions and/or their parent unions.

3. Determination of Majority Status

At any time after the commencement date of the UNION'S organizing effort, the UNION may request that a card count be conducted by the Impartial Chairperson. The UNION shall initiate that process by advising the Hotel's General Manager in writing ("Notification Letter") that it represents a majority of the full-time and regular part-time employees employed by the Hotel in the job classifications set forth in the IWA Schedule A. The date of the UNION'S Notification Letter shall be the date ("Notification Date") used for purposes of determining the composition of the list of the names of the Employees to be furnished by the Hotel to the Impartial Chairperson, so that all full-time and regular part-time Employees of the Hotel employed on or before the Notification Date will be the only Employees whose names will appear on the list.

Within forty-eight (48) hours of the delivery of the Notification Letter by the UNION to the Hotel indicating its majority status, the UNION shall notify the Impartial Chairperson in writing that his/her services are requested for purposes of conducting a card count. The UNION shall immediately confirm to the Hotel's General Manager that the Impartial Chairperson has retained jurisdiction of the card count proceeding. As soon as practicable thereafter, but in any event no later than seven (7) days after the date of the UNION'S written card count request made to the Impartial Chairperson, the UNION shall furnish to the Impartial Chairperson the Cards it has obtained from the Employees, and the Hotel shall furnish the Impartial Chairperson the list containing the names and job classifications of Employees employed as of the date of the UNION'S Notification Letter (with a copy to the UNION) together with copies of official employment documents containing the signatures of each of the Employees (e.g. Forms I-9, Form W4 or similar documents), in care of the Office of the Impartial Chairperson, 321 West 44th Street, New York, New York 10036.

Within forty-eight (48) hours after his/her receipt of the documents described above, the Impartial Chairperson shall conduct a card count by checking the Cards against the list of Employees and by comparing the Employees' names and signatures appearing on the Cards to the names and signatures appearing on the employment documents supplied to the Impartial Chairperson by the Hotel. At the conclusion of the card count, the Impartial Chairperson shall inform the parties of the results of his/her count and shall certify in writing that either the UNION has or has not been selected by a majority of eligible Employees of the Hotel as their collective bargaining representative. Both the Hotel and the UNION agree to abide by the determinations made by the Impartial Chairperson regarding any challenges either to the validity of the Cards, the eligibility of Employees, the appropriateness of the unit and/or to the majority status of the UNION.

If, after the conduct of the card count, the UNION fails to be certified by the Impartial Chairperson as the majority representative of the eligible Employees, this Agreement shall be deemed to continue in full force and effect, unless it is otherwise terminated in writing by mutual agreement of the parties. Notwithstanding any of the foregoing seemingly to the contrary, the Hotel and UNION also agree that the Impartial Chairperson shall be empowered to issue such remedial orders as are consistent with applicable NLRB standards and necessary during and after the pendency of the UNION'S orga-

nization drive to ensure the maintenance of the neutral environment and/or to penalize the Hotel or the UNION for violating their obligations hereunder, including an order to bargain in accordance with applicable NLRB standards, and/or monetary or punitive damages to either party.

If the UNION is certified as the majority representative of the Employees, the Hotel must recognize the UNION and the Hotel and the UNION will commence negotiations within seven (7) calendar days of the date of the certification, at a mutually agreeable time and place, for a collective bargaining agreement covering wages, hours and other terms and conditions of employment (the "Agreement").

I believe that the above correctly describes our discussions on these matters. Please signify your concurrence by signing where indicated below and returning one copy to me, the other being for your files.

Very truly yours,


Peter Ward
President

Executed, Agreed and Accepted
on behalf of Hotel/Company

By: _____

Name: _____

Title: _____

Date: _____

## ADDENDUM V

Extra Rooms/Wage Equalization Lawsuit

a. Effective August 1, 1990:

(i) Room Attendants shall no longer be assigned to make up extra rooms without being compensated for them at the extra room rates specified in the Agreement.

(ii) The base weekly rates of pay for both bath and night shift room attendants will be equalized to the base weekly rates of pay of day shift room attendants.

b. In consideration of the foregoing, the parties shall immediately enter into a stipulation of settlement, and the Trades Council shall do everything necessary in accordance therewith, withdrawing and terminating the various actions in the United States District Court for the Southern District of New York entitled and referenced as: New York Hotel and Motel Trades Council, AFL-CIO, et al. v. Hotel Association of New York City, Inc. et al., 85 Civ. 0216, 0222, 0223, 0225, 0226, 0227, 0228, 0229, 0239, 0231, 1020 and 9925 and all proceedings relating thereto, including any and all charges or complaints filed with the Equal Employment Opportunity Commission, New York State Division of Human Rights and New York City Commission on Human Rights against any EMPLOYER

who is a member of the ASSOCIATION and who is also bound by the terms of the 1990 Memorandum of Understanding and the Agreement as therein modified and extended.

It is agreed that each of the parties thereto hereby release the other from any and all liability arising out of or connected in any way to or with any of the issues associated with the aforesaid actions, proceedings or claims of the Trades Council made, instituted or filed in behalf of itself or its members.

## ADDENDUM VI

Nothing in the preamble to this Agreement is intended to modify an Owner's letter executed prior to January 26, 2012, which existing owner's letter shall be red circled for so long as such current Owner remains the owner of the Hotel.

Nothing in Article 59(D) is intended to modify an Owner's letter executed prior to January 26, 2012, which existing owner's letter shall be red circled for so long as such current owner remains the owner of the Hotel.

## ADDENDUM VII
## STUDY COMMITTEE[*]

(A) The 1985 Agreement provided as follows:

The parties agree to convene joint study committees, each consisting of an equal number of members designated by the ASSOCIATION and the UNION, to study and report upon problems relating to the following:

1. Industry-Wide Benefit Programs

2. Industry Training Fund

3. Delayed or Canceled Flights

4. Job Posting and Bidding

5. Grievance Procedures

6. Major Structural Alterations

7. Operating Distinctions Between Hotels

---

*\* The parties hereto were signatories to a Collective Bargaining Agreement signed June 26, 1985, as amended by a Memorandum of Understanding signed January 30, 1990 (hereinafter collectively referred to as the "1990 Agreement"), which 1990 Agreement, by its terms, expired on June 30, 1995, and was extended by the parties to midnight July 4, 1995, and further amended by a Memorandum of Understanding signed July 5, 1995 (hereinafter referred to as the "1995 Agreement"), which Agreement, by its terms, expired on June 30, 2001, and was replaced by a Collective Bargaining Agreement effective July 1, 2001 (hereinafter referred to as the "2001 Agreement") which Agreement, by its terms, expired on June 30, 2006, and was replaced by a Collective Bargaining Agreement effective July 1, 2006 ("2006 Agreement") which Agreement, by its terms, expired on June 30, 2012, and was replaced by this Agreement, effective July 1, 2012.*

In the event that any of the foregoing study committees are unable to reach agreement within ninety (90) days or such other time as the parties may agree, either party shall have the right to submit the matter to the Impartial Chairperson for decision.

(1) The parties recognize (i) the need to continue to provide the variety of benefits offered by the Industry-wide pension, welfare and training programs, (hereinafter called "benefit programs"), (ii) the necessity of maintaining the high standards of quality contained in each of the benefit programs and (iii) the financial pressures on said programs due to inflation. Therefore, the parties will immediately establish a joint study committee to study and formulate the plans required to support, maintain and/or improve each of the benefit programs.

(2) The parties recognize the significant achievements of the Industry Training Program and the need to maintain the program. Accordingly, the parties agree that the trustees of said program shall at their earliest opportunity study the present conditions of the program, the industry needs and the best method of providing upgrading to the employees employed in the industry. Upon completion of the study, the trustees shall adopt a program to meet the needs and requirements of the industry and its employees. In the event the trustees are unable to agree on such a program either party may submit the matter to the Impartial Chairperson for decision.

(3) The UNION contends that the earning capacity of front service employees and a la carte servers has been adversely affected as a result of the problems encountered by hotels in servicing guests who are affected by delayed or canceled flights and that therefore the earnings of these employees have been reduced. The UNION has therefore proposed, and the ASSOCIATION has agreed, to the establishment of a joint study committee to conduct a study of the UNION'S claim and report its finding to the parties. The committee is empowered to make specific proposals as to how to deal with the results of their study.

(4) The parties hereto agree to convene a joint study committee to examine the advisability of, and the best method of, if so agreed, establishing a program whereby all job openings shall be posted for bids. The purpose of such a program, if same is found to be needed, would be to enable employees to bid on such openings.

Among the issues to be considered by the committee are seniority, ability, the needs of the hotel, the right of part-time employees to have preference over new hires for full-time jobs within the classification in which they are employed, and the right of the UNION to file a grievance if a bid request is denied.

The parties recognize the great variety of skills by various groups of employees within the hotels and therefore agree that any program adopted shall provide that bidding, and filling of job openings may, in the EMPLOYER'S discretion, be limited to those employees in the same classification.

(5) The parties agree to meet and revise the grievance machinery in accordance with their mutual agreement, or upon the recommendation of a third party or parties from whom they may request an overall study, review and analysis of this machinery.

Pending mutual agreement as to the language, the present machinery shall be continued. In the event the parties fail to agree within one hundred and eighty (180) days, either party shall have the right to submit this matter to the Impartial Chairperson, who shall be empowered to make a final and binding decision on any and all matters not resolved by the parties not later than forty-five (45) days after submission of this matter.

(6) The parties hereto agree to convene a joint study committee to study and report on a revision of Article 17 concerning Major Structural Alterations.

(7) The parties recognize that significant operational distinctions exist between hotels as a result of location, size, market and nature of operation (i.e., cooperatives, residential, proximity to theaters and shopping). Further, they recognize the need to provide suitable programs for all hotels, which will enable said hotels to remain viable in order to ensure their continued operation and employment of members of the UNION. Therefore, the parties agree to forthwith convene a study committee to determine the nature of such relief, if any, as may be required to accomplish the recognized needs set forth above.

(8) The parties, in an effort to ensure the continued growth of the industry, and in recognition of the ever changing needs and services to be provided to clients of the hotels, as well as the continually changing patterns of operations employed by the industry, agree to immediately establish a joint committee to study and formulate such programs as might be required to assist the hotels in attaining greater productivity in order to enable the hotels to offer better services to their guests. Among the areas of study are those of the front service, banquet, housekeeping and front office departments. It is understood, however, that either party may add to the departments to be reviewed by the study committee.

(B) The January 30, 1990 Memorandum of Understanding provided:

The parties shall convene a joint study committee to review the:

1. Utilization by signatory EMPLOYERS of kosher caterers and its effect on the terms and conditions of the Agreement;

2. Impact, if any, on bell persons and door persons as a result of changes in the "tour party" arrangements.

(C) The July 1, 1995 Memorandum of Understanding provided:

Article 56 of the 1990 Agreement will be amended to provide for the formation of additional joint study committees which will review and decide within one hundred and eighty (180) days after the effective date of the 1995 Agreement the issues of:

1. Determination of a minimum gratuity payable to tipped category employees for work performed in connection with independent kosher catered functions held on the EMPLOYER'S premises;

2. Front Service Employee gratuity rates and all issues impacting thereon;

3. Modification of the banquet Roll Call job referral system, creation of C-Lists by banquet hotels and review of current practice of pre-plating;

4. Establishment of a Credit Union;

5. Technological changes and productivity.

6. In addition to the above study committees, within forty-eight (48) hours after ratification of this Agreement, the parties agree pursuant to Article 56(A)(7) and (8) to jointly convene the study committees, Productivity and Operating Distinctions Between Hotels in and/or job categories set forth in Schedule A and to review the EMPLOYER'S need, if any, for additional flexibility in the combination of jobs, otherwise limited by Article 22(B). The EMPLOYER and the UNION agree that no employee shall be laid off or discharged or suffer a loss of wages and/or benefits as a result of any resolution of these foregoing issues by the study committee. The study committee shall make every effort to resolve the issues set forth in Article 56(C)(6) by September 30, 1995. At the request of the ASSOCIATION, the UNION agrees that it will expeditiously meet with representatives of the ASSOCIATION and representatives of individual HANYC Bargaining Group Hotels or groups of such HANYC Bargaining Group Hotels sharing common operational needs or issues of concern in order to study, review and resolve to the mutual satisfaction of the HANYC Bargaining Group Hotels and the UNION any such productivity or operational issues.

In the event that any of the foregoing study committees are unable to reach agreement within one hundred and eighty (180) days after the effective date of the 1995 Agreement, upon mutual agreement, discussion between the EMPLOYER and the UNION shall continue until a resolution is reached, i.e., none of the foregoing study committee's issues, set forth in Article 56(C)(1) through (6) above, shall be referred to arbitration before the Impartial Chairperson unless both the HANYC on behalf of its Bargaining Group Hotels and the UNION mutually consent thereto, notwithstanding any of the provisions of the 1990 Agreement seemingly to the contrary.

(D) The 2012 MOU provides:

Groups and Porterage Study Committee. Within one (1) week of the full ratification of this Agreement, the parties agree to convene a study committee to address the claim by the UNION that hotels have been misapplying Articles 50(A)(2), (A)(3), and (A)(4) to the detriment of the Bell and Door staff.  If the parties cannot reach agreement within sixty (60) days from the date of the full ratification of this Agreement, such matter shall be referred to a panel of the three (3) Impartial Chairpersons, who shall act as interest arbitrators.  The decision of the panel must be by a majority opinion.  No existing rates, terms, or conditions shall be reduced by the panel, which shall have broad powers to fashion an appropriate remedy by selecting from one (1) of the following options: to establish a reasonable period of time for the definition of the "common arrival" of a group; to determine a reasonable interpretation of a group booking to a master account; and to order additional compensation, including an increase in the hourly rate for Bell and Door staff not to exceed two dollars ($2.00) per hour over the term of the Agreement and an increase in the porterage rate not to exceed four percent (4%) over and above the existing wage increases provided for during the term of this Agreement.

**FORM OF VOLUNTARY CONTRIBUTION DEDUCTION AUTHORIZATION**

I, [name], hereby authorize my Employer to deduct from my pay for my benefit the sum of $_____ per month and to forward that amount to the Union's Political Action Fund (the "Fund"). I sign this authorization voluntarily with the understanding that the Fund will use my voluntary contribution deduction to make political contributions and expenditures in connection with Federal, State, Municipal or Local elections and to pay the Fund's lawful administrative expenses.[*] I acknowledge my right to decline to authorize such contribution deduction amount. I understand that my voluntary contribution deduction is not a condition of my membership in the Union or of any employment. I may revoke this authorization prospectively upon at least thirty (30) days' signed written notice of revocation to the Union Comptroller and to my Employer's Human Resources Department.

Name: _____Date: _____

[Print]

Signature:_____Social Security #: _____

Home Address: _____

Home City:_____ State:_____ Zip:_____

Employer:_____

Job Classification: _____

---

[*] Voluntary contribution deductions to the Fund are not deductible as charitable contributions for Federal income tax purposes. A copy of the Fund report is filed with the Federal Election Commission ("FEC") and is available upon request from the FEC in Washington, D.C.

July 1, 2012

Joseph E. Spinnato, President
Hotel Association of New York City, Inc.
437 Madison Avenue
New York, New York  10022

Dear Mr. Spinnato:

This letter shall confirm that the Union, in furtherance of its efforts to maintain stable and harmonious labor relationships with the Hotel Association of New York City, Inc. ("Association") and its member hotels, has historically granted to newly organized hotels owned/operated by members of the Association relief from certain economic and non-economic provisions of the I.W.A. based upon the bona fide business needs of said hotels including, but not limited to, the operational distinctions as between hotels.

In furtherance thereof, the Union agrees upon the request of the Association to meet and negotiate in good faith with respect to any such relief or operational issues which the Association and the Union deem applicable to said newly organized hotels, including any newly organized hotels that are owned and/or operated by Employer signatories to the Industry Wide Agreement and which have been accreted to the collective bargaining unit.

Very truly yours,

Peter Ward

July 1, 2012

Mr. Peter Ward
President
New York Hotel & Motel Trades Council, AFL-CIO
707 Eighth Avenue
New York, New York 10036

Dear Mr. Ward:

Article 39 of the Industry Wide Agreement provides, *inter alia*, that non-Hotel Association of New York City, Inc. Bargaining Group Hotels must agree to the "plan of adjustment and arbitration herein provided for." For purposes of this letter, the phrase "plan of adjustment and arbitration" means the use of the Office of the Impartial Chairperson in whole or in part. The Hotel Association of New York City, Inc., on its own behalf and on behalf of its Bargaining Group Hotels, will not assert a violation thereto, which do not provide for the "plan of adjustment and arbitration" referred to therein.

Sincerely,

Joseph. E. Spinnato
President

JES/brc

**SIDE AGREEMENT (3)**

July 1, 2012

Mr. Peter Ward
President
New York Hotel & Motel Trades Council, AFL-CIO
707 Eighth Avenue
New York, New York 10036

Re: Health Benefits Fund
    First Time Employer Contribution Rate

Dear Mr. Ward:

This is to confirm that in accordance with past practice and the interests of the Fund, its participants and beneficiaries, the 2.75% surcharge for the first six months of contributions for an Employer not previously a party to the collective bargaining agreement shall not be charged except upon written notice from the Hotel Association to the Employer and Union within said six month period.

Kindly sign below to signify your agreement.

Sincerely,

Joseph E. Spinnato
President

Agreed:

Peter Ward

**401(K) Plan**
  401(k) PLAN (ARTICLE 34)….[34]….29
  401(k) Savings Plan and Trust….[S.B(7)]….92

**A-List (see Banquet)**

**Abuses**
  Layoff or transfer….[22(A)]….17
  Scheduling….[11(C)]….9

**Accretion and Neutrality/Card Check**
  Accretion….[60(A)]….49
  ACCRETION AND NEUTRALITY/CARD CHECK (ARTICLE 60)….[60]….49
  Definition of Greater New York Metropolitan Area….[60(B)(2)]….50
  Employer prohibited from evading contract via a transaction or creation of an entity….[60(C)]….50
  Employer required to notify union prior to hiring employees of new property….[60(B)(3)]….50
  Neutrality/card check agreement….[A.IV]….97
  Neutrality/card check, binding….[60(B)]….49

**Addenda**
  ADDENDUM I….[A.I]….96
  ADDENDUM II….[A.II]….96
  ADDENDUM III….[A.III]….97
  ADDENDUM IV….[A.IV]….97
  ADDENDUM V….[A.V]….100
  ADDENDUM VI….[A.VI]….101
  ADDENDUM VII….[A.VII]….101

**ADEQUATE SUPPLIES (ARTICLE 71)….[71]….58**

**Age, discrimination based on….[25]….19**

**Anniversary date of employment (see Personal days)**

**AREA STANDARDS AND WORK PRESERVATION (ARTICLE 45)….[45]….34**

**AUTHORITY TO ENFORCE CONTRACT (ARTICLE 58)….[58]….46**

**B-List (see Banquet)**

**Back pay**
  Limitation on number of positions held by banquet servers, employer's violation of….[47(C)(5)(d)]….39
  Liquidated damages for willful violations of contract….[26(L)]….21
  Probationary period used to discriminate against union members or evade the contract….[6(B)(2)]….4
  Unjust discharge or discipline….[27(A)(2)]….21

**Bankruptcy**
  BANKRUPTCY (ARTICLE 65)….[65]….53
  Notice to union….[65(A)]….53
  Trustees and receivers acknowledged as successors….[65(B)]….53

**Banquet**
  A-List
    B-List size not to exceed 60% of….[47(A)(5)]….36

C-List size not to be increased if B-List size is not 60% of A-List size….[47(B)(2)(c)]….36

C-List to staff all remaining function work, after A-List, B-List, and Roll-Call….[47(B)(2)(d)]….36

Limitation on permissible number of banquet server positions per employee….[47(C)(5)]….38

Names of servers on, employer to provide to union….[47(A)(1)]….35

Openings on, filled by seniority from B-List….[47(C)(1)(a)]….37

Other sources may not be used to staff functions if A, B and C lists and Roll-Call not offered work first….[47(B)(2)(d)]….36

Other sources may not be used to staff functions if A, B and C lists are not fully staffed….[47(B)(2)(d)]….36

B-List

C-List size not to be increased if B-List size is not 60% of A-List size….[47(B)(2)(c)]….36

C-List size not to exceed 125% of….[47(B)(2)(c)]….36

C-List to staff all remaining function work, after A-List, B-List, and Roll-Call….[47(B)(2)(d)]….36

Limitation on permissible number of banquet server positions per employee….[47(C)(5)]….38

Names of servers on, employer to provide to union….[47(A)(1)]….35

Other sources may not be used to staff functions if A, B and C lists and Roll-Call not offered work first….[47(B)(2)(d)]….36

Other sources may not be used to staff functions if A, B and C lists are not fully staffed….[47(B)(2)(d)]….36

Right of, to fill A-List openings by seniority….[47(C)(1)(a)]….37

Size of, not to exceed 60% of A-List size….[47(A)(5)]….36

BANQUET DEPARTMENT (ARTICLE 47)….[47]….35

Bartenders

Personal days….[30(C)]….27

Vacations and holidays….[S.A-3]….84

C-List

Eligibility for….[47(B)(2)(b)]….36

Employer may not require any employee to register for or work on….[47(B)(2)(h)]….37

Employer not required to offer extra banquet work if employee would incur overtime or premium pay….[47(B)(2)(j)]….37

Employer required to notify union of addition to, before scheduling the employee for any function….[47(B)(2)(g)]….37

Establishment of….[47(B)(2)(a)]….36

Job opportunities for non-banquet personnel….[47(B)(2)]….36

Other sources may not be used to staff functions if A, B and C lists and Roll-Call not offered work first….[47(B)(2)(d)]….36

Other sources may not be used to staff functions if A, B and C lists are not fully staffed….[47(B)(2)(d)]….36

Procedures for notifying of available work….[47(B)(2)(f)]….37

Right of, to refuse any function….[47(B)(2)(i)]….37

*Banquet (continued...)*
    Right of, to staff all remaining function work, after A-List, B-List, and Roll-Call....
    [47(B)(2)(d)]....36
    Rotation, work offered by....[47(B)(2)(e)]....37
    Size of, not to exceed 125% of B-List size....[47(B)(2)(c)]....36
Captains
    Entitled to meals, included with wages....[S.A-1]....77
    Hiring of, covered by Article 47, not Article 21....[21(A)]....14
    Holidays....[S.A-1/WC19(D)]....81
    Personal days....[30(C)]....27
    Vacations....[S.A-1/WC19(B)]....81
Certification of eligibility to apply for steady job openings....[47(C)(2)]....38
Discrimination in hiring of banquet servers....[47(A)(2)]....36
Employer required to notify union of steady banquet job openings....[47(C)(1)(b)]....37
Employer's obligation to interview all union-referred applicants....[47(C)(1)(e)]....37
Extra banquet employees (see Extra employees)....[8(D)]....6
Extra banquet work....[47(B)]....36
Gratuities....[47(D)]....39
Hiring procedure....[47(C)(1)]....37
Industry Training Program certifies eligibility of applicants for steady job openings....
[47(C)(2)(d)]....38
Job openings, steady....[47(C)]....37
Job opportunities for non-banquet personnel....[47(B)(2)]....36
Notice of job referral and hiring procedures....[47(A)(3)]....36
Notification to employer of applicants eligible to work in banquet culinary....[36(F)
(6)]....31
Personal days....[30(C)]....27
Personal days that fall in the summer....[30(C)(4)]....28
Roll-Call
    Annual re-registration of....[47(B)(1)(a)]....36
    Automatic eligibility of, to apply for steady banquet job openings....[47(C)(2)
    (a)]....38
    C-List to staff all remaining function work, after A-List, B-List, and Roll-Call....[47(B)
    (2)(d)]....36
    Freezing of list to provide greater opportunity to work....[47(B)(1)(b)]....36
    Other sources may not be used to staff functions if A, B and C lists and Roll-Call not
    offered work first....[47(B)(2)(d)]....36
    Other sources may not be used to staff functions if A, B and C lists are not fully
    staffed....[47(B)(2)(d)]....36
    Protection of....[47(B)(1)]....36
Servers
    Entitled to meals, included with wages....[S.A-1]....77
    Hiring of banquet servers....[47(A)]....35
    Hiring of banquet servers covered by Article 47, not Article 21....[21(A)]....14
    Holidays....[S.A-1/WC19(D)]....81
    Personal days....[30(C)]....27
Training....[47(C)(3)]....38
Vacation....[28(A)(3)]....23
Wages

Function wage rates….[S.A-1]….77
Overtime rates….[S.A-1]….77
Schedule A-1, banquet wages and working conditions….[S.A-1]….77
Wage increases applicable to all wage-related items….[14(F)]….12
Working conditions
Captains' vacations….[S.A-1/WC19(B)]….81
Clear-off personnel, departure time….[S.A-1/WC3]….78
Clear-off, standard number of covers….[S.A-1/WC8]….79
Covers, standard set-up….[S.A-1/WC4]….78
Dinner dance clear-off wage….[S.A-1/WC13]….79
Doubles….[S.A-1/WC7]….78
Extra banquet captains wage….[S.A-1/WC12]….79
Functions with music after 2:00 A.M., wage….[S.A-1/WC17]….80
Grievances….[S.A-1/WC15]….79
Holidays for banquet servers and captains….[S.A-1/WC19(D)]….81
New Year's Eve wage….[S.A-1/WC18]….80
No reduction in wages or benefits….[S.A-1/WC16]….79
Payment of wages and gratuities, no later than 48 hours after function….[S.A-1/WC11]….79
Roll-Call servers' vacations and holidays….[S.A-1/WC19(C)]….81
Schedule A-1….[S.A-1]….77
Service personnel, report time….[S.A-1/WC1]….78
Set-up personnel, report time….[S.A-1/WC2]….78
Set-up, standard number of covers….[S.A-1/WC8]….79
Splits….[S.A-1/WC6]….78
Vacations….[S.A-1/WC19]….80
Set-up wage….[S.A-1/WC9]….79
**Bargaining unit work, management prohibited from performing….[45(B)]….34**
**Bellpersons, tours (see also Groups and porterage)….[50]….41**
**Benefit day rate for bellpersons and doorpersons….[50(H)(4)]….42**
**Benefits**
401(k) PLAN (ARTICLE 34)….[34]….29
BEREAVEMENT PAY (ARTICLE 32)….[32]….29
Brooklyn Medical Facility (new), to be built….[S.B(3)(D)]….89
Concessionaire must furnish security, at union's request, to guarantee wages and benefits of employees….[46(A)]….35
Extended as part of severance….[52(B)]….43
Funded by employer….[33]….29
HEALTH BENEFITS FUND (ARTICLE 33)….[33]….29
HOLIDAYS (ARTICLE 29)….[29]….25
Hotel responsible for defaults by concessionaire on employees' benefit contributions….[46(C)]….35
Industry training program….[36]….30
JURY DUTY (ARTICLE 31)….[31]….28
LEAVE OF ABSENCE (ARTICLE 55)….[55]….45
No reduction in, as a result of contract….[13(B)(1)]….11
PENSION FUND (ARTICLE 35)….[35]….30

**Benefits (continued...)**
Personal days….[29]….25
PERSONAL DAYS (ARTICLE 30)….[30]….27
Prepaid Legal….[37]….31
Prior wages and benefits protected….[13(B)]….11
Scholarship fund….[36]….30
SICK LEAVE (ARTICLE 54)….[54]….44
VACATIONS (ARTICLE 28)….[28]….23

**Bereavement Pay**
Advance notice to employer….[32(B)(3)]….29
BEREAVEMENT PAY (ARTICLE 32)….[32]….29
Days for which paid….[32(B)(1)]….29
Entitlement….[32(A)]….29
Immediate family, definition of….[32(A)(2)]….29
Night differential….[51(C)(2)]….43
Payment and calculation….[32(B)]….29
Rate of compensation….[32(B)(2)]….29

**Birthday (see Personal days)**

**Brooklyn Medical Facility (new), to be built….[S.B(3)(D)]….89**

**Bulletin boards….[43]….34**

**C-List (see Banquet)**

**Cafeteria employees entitled to meals, included with wages….[S.A]….64**

**Call-in pay**
Checkroom and washroom attendants….[S.A-2(B)]….83
General….[11(B)]….9

**Captains**
Banquet (see Banquet)
Work week, for which minimum wage rates are applicable….[13(B)(2)]….11
Work week, regular….[11(A)]….8

**Casual employees**
Definition of….[8(C)(1)]….6
Do not have seniority rights….[23(A)]….17
Time and quarter premium pay….[8(B)]….5
Union membership….[3(C)]….3
Wages of, included in calculating employer benefit contributions….[S.B(2)]….87

**Checkroom attendants**
Personal days….[30(C)]….27
Vacation, holidays, and call-in pay….[S.A-2]….83

**Citizenship, discrimination based on….[25]….20**

**Closing**
Automatic extension of contract term when major renovations ongoing….[72(B)]….59
Holiday pay entitlement during summer closings….[29(E)(3)]….26
Preferential hiring of employees from closed shops….[21(A)(2)(c)]….15
Proration of vacation due to absence of more than 60 days….[28(B)(2)]….24
SEVERANCE PAY (ARTICLE 52)….[52]….43

**Color, discrimination based on….[25]….19**

**Combination jobs**
Higher weekly and daily rate of pay….[22(B)]….17
RELIEF EMPLOYEES (ARTICLE 20)….[20]….14

**Concessionaire**
AREA STANDARDS AND WORK PRESERVATION (ARTICLE 45)….[45]….34
Automatic extension of contract term during and after major renovations….[72(B)]….59
Definition of….[1(A)(2)]….1
Hotel responsible for defaults by concessionaire on employees' wages and benefit contributions….[46(C)]….35
Joint employer….[45(C)]….34
Must furnish security, at union's request, to guarantee wages and benefits of employees….[46(A)]….35
Required to restore security if payments are made from it….[46(B)]….35
Return of security to….[46(D)]….35
Security furnished by….[46]….35
Severance entitlement in event of closing of….[52]….43
Status under contract as employer….[1(A)(3)]….2
SUCCESSORS AND ASSIGNS (ARTICLE 59)….[59]….46
Temporary closing of for renovations….[72(B)]….59

**Condos, conversion of hotel to (see Conversion to residential use)**

**Construction work, prevailing wage….[17(B)]….13**

**CONTRACT WITH NON-MEMBER HOTELS (ARTICLE 39)….[39]….32**

**Conversion to residential use**
CONVERSION TO RESIDENTIAL USE (ARTICLE 57)….[57]….46
Enhanced severance pay….[57(A)]….46
Partial conversion of premises….[57(C)]….46
Total conversion of premises….[57(B)]….46

**COST OF LIVING (ARTICLE 44)….[44]….34**

**Cots**
COTS (ARTICLE 16)….[16]….13
Wage increases applicable to all wage-related items….[14(F)]….12
Wage rates for….[16(A)]….13

**Creed, discrimination based on….[25]….19**

**Culinary training**
Employer required to interview all referred applicants and notify union who was hired….[36(F)(5)]….31
Employer required to notify the union and post culinary openings….[36(F)(3)]….31
Establishment of training course….[36(F)(1)]….30
ITP certification….[36(F)(2)]….31
Notification to employer of applicants eligible to work in banquet culinary….[36(F)(6)]….31
Provided on "first come, first served" basis….[36(F)(2)]….31
Transmission of applications for employees who are ITP-certified….[36(F)(4)]….31

**Day off in lieu of holiday pay**
Right not to take….[29(E)(1)]….26
Right to take voluntarily, with pay….[29(E)(2)]….26

**Default by concessionaire in payment of wages or benefit contributions (see Furnishing security)**

**Definitions**

Casual employees….[8(C)(1)]….6
Concessionaire….[1(A)(2)]….1
Cook's uniform….[49(A)]….40
Domestic partner….[S.B(2)]….87
Electrician….[61]….51
Employees of the employer….[S.B(2)]….86
Employer….[1(A)(3)]….2
Extra painters….[9(A)]….8
Family….[S.B(2)]….87
Funds….[S.B(2)]….87
Greater New York Metropolitan Area….[60(B)(2)]….50
Groups….[50(A)]….41
Hidden surveillance cameras….[64(E)]….53
Hotel….[1(A)(1)]….1
Immediate family….[32(A)(2)]….29
Serious offenses….[27(C)(3)(a)]….23
Steady banquet job openings….[47(C)(1)]….37
Substitute employees….[8(C)(1)]….6
Tour parties….[50(A)]….41
Wages….[S.B(2)]….87
Work week, regular….[11(A)]….8

**Delegates**

Notification to employer of….[23(D)]….19
Protection against unjust discharge or discipline of….[27(B)]….22
Restrictions on layoff of….[23(C)]….19
Right of, to remain on job pending arbitration hearing if discharged or suspended….[27(B)]….22
UNION TRAINING (ARTICLE 62)….[62]….51

**Dining room employees entitled to meals, included with wages….[S.A]….64**
**Direct deposit of wages….[13(C)]….11**
**Disability, discrimination based on….[25]….20**

**Discharge and discipline**

DISCHARGE AND DISCIPLINE (ARTICLE 27)….[27]….21
General….[27(A)]….21
Grievance procedure….[27(A)(2)]….21
Mitigation of damages….[27(A)(3)]….22
Probationary employees….[6(B)]….4
Registration with job referral office….[27(A)(3)]….22
Sick leave, abuse of….[54(A)(5)]….44
Spotter's report, time limit on imposing discharge or suspension as a result of….[63(A)(2)]….51
Spotters, protections against….[63(A)]….51
Sunset provision….[27(C)]….22
Translation assistance, right of employees to….[68]….55
UNION ACTIVITY (ARTICLE 24)….[24]….19

*Discharge and discipline (continued...)*

Union delegates, discharged or suspended, remain on job pending arbitration hearing….[27(B)]….22

Union delegates, protection of….[27(B)]….22

Unjust discharge or discipline, protection against….[27(A)(1)]….21

Unsafe conditions, right of employee to report, without fear of retaliation….[69(D)]….56

Warnings, union may challenge when relied upon by employer for subsequent discipline….[27(C)(3)(c)]….23

**Discipline (see Discharge and discipline)**

**Discrimination**

Age….[25]….19

Citizenship….[25]….20

Color….[25]….19

Creed….[25]….19

Disability….[25]….20

General….[25]….19

National origin….[25]….19

NO DISCRIMINATION (ARTICLE 25)….[25]….19

Race….[25]….19

Religion….[25]….20

Sex….[25]….19

Sexual orientation….[25]….20

Translation assistance, right of employees to….[68]….55

Union activity….[6(B)]….4

Union activity….[25]….20

UNION ACTIVITY (ARTICLE 24)….[24]….19

Union membership….[21(B)]….16

Work authorization status (by inquiring into or using to discriminate)….[67(F)]….55

**Doorpersons, tours (see also Groups and porterage)….[50]….41**

**DUTIES OF EXCLUDED CATEGORIES (ARTICLE 19)….[19]….14**

**Effective date of agreement….[Preamble]….1**

**Electrician, definition of….[61]….51**

**Electronic information**

ELECTRONIC INFORMATION (ARTICLE 66)….[66]….53

Employer claims unreasonable or infeasible….[66(B)]….53

Employer required to provide all information to which union is entitled in electronic form….[66(A)]….53

New employees, employer required to notify union of….[21(D)]….16

Searchable and importable form of….[66(A)]….53

**Employee Benefit Funds (see also Benefits)**

SCHEDULE B - EMPLOYEE BENEFIT FUNDS….[S.B]….86

Tax exempt status….[S.B(5)(C)]….91

**EMPLOYER RULES AND REGULATIONS (ARTICLE 18)….[18]….13**

**Employer theft….[26(L)]….21**

**Employer, definition of….[1(A)(3)]….2**

**Engineering employees, combination job pay….[22(B)]….17**

ADEQUATE SUPPLIES (ARTICLE 71)….[71]….58

**Engineering employees, combination job pay (continued…)**
PANIC BUTTONS (ARTICLE 70)….[70]….57
Safety and health….[69(A)]….55

**Equipment, Employer's duty to provide**

**Excessive amount of overtime or extra rooms…[11(G)(8)]….10**

**Excluded categories**
DUTIES OF EXCLUDED CATEGORIES (ARTICLE 19)….[19]….14
EXCLUDED CATEGORIES (ARTICLE 2)….[2]….2

**Expiration and renewal of contract**
Automatic extension of contract term when major renovations ongoing….[72(B)]….59
Effective date of contract….[72(A)(1)]….58
EXPIRATION AND RENEWAL (ARTICLE 72)….[72]….58
Manner of execution of contract….[72(A)(2)]….58
Renewal of contract ….[72(A)(1)]….58
Temporary closing for renovations….[72(B)]….59
Term of contract….[72(A)(1)]….58

**Extended sick leave**
Proof of illness and recovery….[23(B)(6)]….18
Right to be reinstated to job with full seniority for up to 52 weeks of….[23(B)(4)]….18
Right to next job opening after 52 but up to 208 weeks of, with seniority restored….[23(B)(5)]….18

**Extra employees**
Banquet….[8(D)]….6
Banquet cooks to be offered available work before extra employees can be used….[8(D)(4)]….6
Banquet housekeeping attendants to be offered available work before extra employees can be used….[8(D)(3)]….6
Employees on payroll as of effective date of contract, not to be converted to….[8(D)(5)]….7
Housekeeping….[8(D)]….6
Job classifications in which extra employees are permissible….[8(D)(1)]….6
Layoff, recall, reduced work week, or change of schedule, notice of, not required….[8(D)(6)(b)]….7
Limitation on number of….[8(D)(2)]….6
No use of, during layoff….[8(D)(7)]….7
PART-TIME WORK AND PREMIUM PAY; SUBSTITUTE AND EXTRA EMPLOYEES….[8]….5
Record-keeping by employer regarding scheduling of….[8(D)(10)]….7
Right to refuse work….[8(D)(11)]….8
Schedule, 5-day notice of, not required….[8(D)(6)(a)]….7
Seniority, right to accrue….[8(D)(8)]….7
Seniority, right to be offered regular jobs by….[8(D)(9)]….7
Seniority, right to be scheduled by….[8(D)(8)]….7
Subject to terms and conditions of contract, with exceptions….[8(D)(6)]….7
Time and a quarter premium for all hours, unless scheduled full work week with proper notice….[8(D)(6)(c)]….7

**Extra meal servers' wage increases….[14(C)]….12**

**Extra painters**
Definition….[9(A)]….8
EXTRA PAINTERS (ARTICLE 9)….[9]….8
Holidays….[9(A)]….8
Status after 18 weeks of work following probationary period….[9(B)]….8
Termination pay….[9(A)]….8
Vacation pay….[9(A)]….8
Wages….[9(A)]….8

**Extra Rooms**
Compensation, not to be assigned without….[A.V(a)(i)]….100
Excessive amount of, during industry-wide condition of unemployment….[11(G)(8)]….10
EXTRA ROOMS (ARTICLE 15)….[15]….12
No extra rooms during layoff….[11(G)(2)]….9
Room attendants not to be assigned, without compensation….[A.V]….100
Wage increases applicable to all wage-related items….[14(F)]….12
Wage rates….[15]….12

**Food preparation employees, combination job pay for….[22(B)]….17**

**Fringe benefits, no reductions in….[13(B)(1)]….11**

**Front office employees, combination job pay for….[22(B)]….17**

**Full-time employees' wages prorated based on hours worked….[13(B)(3)]….11**

**Furnishing security (see also Concessionaires)**
Concessionaire must furnish security, at union's request, to guarantee wages and benefits of employees….[46(A)]….35
Concessionaire required to restore security if payments are made from it….[46(B)]….35
Defaults by concessionaire on employees' wages, cost of benefits, etc.….[46(B)]….35
FURNISHING SECURITY (ARTICLE 46)….[46]….35
Hotel responsible for defaults by concessionaire on employees' wages and benefit contributions….[46(C)]….35
Return of security to concessionaire….[46(D)]….35

**Goggles….[69(C)]….56**

**Gratuities**
Banquet….[47(D)]….39
Groups where meals are included….[50(F)]….41
Payment of banquet gratuities, no later than 48 hours after function….[S.A-1/WC11]….79

**Greeters**
Work week, for which minimum wage rates are applicable….[13(B)(2)]….11
Work week, regular….[11(A)]….8

**Grievances and arbitration**
Compensation of Impartial Chairperson ….[26(I)]….21
COMPLAINTS, GRIEVANCES AND ARBITRATION (ARTICLE 26)….[26]….20
Decisions of Impartial Chairperson are final and binding….[26(A)]….20
Decisions of Impartial Chairperson, employer required to obey….[26(A)]….20
Decisions of Impartial Chairperson, enforceable in court….[26(K)]….21

**Grievances and arbitration (continued...)**
Emergency relief from Article 45(B),….[26(D)]….20
Ex parte decisions….[26(B)]….20
Expedited arbitration for cases involving overtime for 6th and 7th consecutive day of work….[11(G)(3)]….10
Expedited arbitration in case of temporary reduction in work week….[8(A)(3)]….5
Impartial Chairperson, vacancy in office of, or inability or unwillingness to act….[26(J)]….21
Impartial Chairperson's authority to fix date and time of hearing….[26(G)]….21
Labor Manager, Hotel Association, function of….[26(A)]….20
Legal documents, service of….[26(E)]….20
Liquidated damages in addition to back pay, for willful violations of contract….[26(L)]….21
Location of arbitration hearings….[26(F)]….20
Notice to parties of arbitration hearing date….[26(G)]….21
Probationary employees and….[6(B)]….4
Procedure for Hotel Association hotels….[26(A)]….20
Procedure for non-Hotel Association hotels and concessionaires….[26(C)]….20
Purpose of agreement, to adjust grievances….[Preamble]….1
Rules and regulations of employer, union's right to challenge….[18]….13
Scope of arbitration….[26(A)]….20
Speedy hearings….[26(G)]….21
Union's right to grieve layoffs and transfers….[22(A)]….17
Waiver of arbitrator's oath and CPLR requirements….[26(H)]….21

**Groups and porterage**
Athletic teams….[50(G)]….41
GROUPS AND PORTERAGE (ARTICLE 50)….[50]….41
Past practices….[50(I)]….42
Per bag rates….[50(B)]….41
Per person rate for block of rooms for airline or trucking company….[50(C)]….41
Rates subject to annual contractual wage increases….[50(D)]….41
Wage increases….[50(H)]….41
Wage increases applicable to all wage-related items….[14(F)]….12

**Health benefits**
Funded by employer….[33]….29
HEALTH BENEFITS FUND (ARTICLE 33)….[33]….29
Schedule B….[S.B(3)]….87

**Hidden surveillance cameras**
Circumstances under which camera evidence not allowed….[64(D)]….52
Circumstances where use of is absolutely prohibited….[64(A)]….52
Definition of….[64(E)]….53
Employer required to notify union of use of….[64(B)]….52
Employer required to preserve evidence from….[64(D)(2)]….52
Employer required to provide union with evidence from….[64(D)(3)]….52
HIDDEN SURVEILLANCE CAMERAS (ARTICLE 64)….[64]….52
Information, employer required to provide union about….[64(C)]….52
Time limitations on use of….[64(B)]….52

## Hiring

Arbitration….[21(A)(2)(j)]….15

Banquet A-List….[47(C)(1)(a)]….37

Banquet job openings, steady….[47(C)(1)]….37

Banquet job openings, steady, time period for submission of application for….[47(C)(1)(c)]….37

Banquet job opportunities for non-banquet personnel….[47(B)(2)]….36

Banquet servers….[47(A)]….35

Culinary training program, employer required to notify the union of and post….[36(F)(3)]….31

Culinary training program, employer to interview all applicants from, and notify union who was hired….[36(F)(5)]….31

Discrimination in hiring of banquet servers….[47(A)(2)]….36

Extra employees' right to be offered regular job openings by strict seniority….[8(D)(9)]….7

HIRING (ARTICLE 21)….[21]….14

Hotel Association members, use by….[21(A)(2)(h)]….15

Intentional and/or bad faith violation of hiring provisions, pattern of….[21(B)]….16

Internal candidates….[21(A)(2)(i)]….15

Job openings and cancellations of same, employer required to notify union of….[21(E)]….16

Job openings, permanent, posting of….[21(C)]….16

Job referral and hiring procedures, notice of….[47(A)(3)]….36

Job referral office, establishment of….[21(A)]….14

Job referral office, expenses of….[21(A)(2)(e)]….15

Job referral office, operation of….[21(A)(2)]….14

Joint advisory committee….[21(A)(2)(m)]….16

New employees, employer required to notify union of….[21(D)]….16

No fees for use of job referral office….[21(A)(2)(g)]….15

Preference for jobs in NYC hotel industry to  permanently laid off employees covered by this agreement….[21(A)(2)(c)]….15

Preference for jobs in NYC hotel industry to employees from closed shops covered by this agreement….[21(A)(2)(c)]….15

Preference for jobs in NYC hotel industry to workers covered by this agreement….[21(A)(2)(c)]….15

Records of job referral office, inspection of….[21(A)(2)(f)]….15

Referrals, time limit of….[21(A)(2)(d)]….15

Registration office….[21(A)(2)(a)]….14

Study committee….[21(F)]….16

Work by excluded categories justifies hiring new employees….[19]….14

## Holidays

Banquet bartenders….[S.A-3]….85

Banquet servers and captains….[S.A-1/WC19(D)]….81

Checkroom and washroom attendants….[S.A-2]….83

Day off in lieu of holiday pay, employee may not be forced to take….[29(E)(1)]….26

Day off in lieu of holiday pay, right of employee to take voluntarily, with pay….[29(E)(2)]….26

During layoff….[29(B)]….25

Entitlement - General….[29(A)]….25

**Holidays (continued...)**
HOLIDAYS (ARTICLE 29)….[29]….25
Leave of absence….[55(D)]….45
Night differential….[51(C)(2)]….43
Night differential, non-tip classification….[29(D)(1)]….26
Night differential, tip classification….[29(D)(2)]….26
No less than normal week's pay during week of….[29(D)(3)]….26
Overtime, non-tip classification….[29(D)(1)]….26
Overtime, tip classification….[29(D)(2)]….26
Payment….[29(D)]….26
Proration of pay for….[29(A)]….25
Roll-Call servers….[S.A-1/WC19(C)]….81
Sickness….[29(C)]….25
Summer closings….[29(E)(3)]….26
Work on….[29(E)]….26

**Hotel**
Definition….[1(A)(1)]….1
HOTEL CLASSIFICATION (ARTICLE 7)….[7]….5
Status under contract as employer….[1(A)(3)]….2

**Hours of work (see Working hours)**

**Housekeeping**
Bulk quantity, handling and transportation of items in….[S.A/Housekeeping]….65
Cots….[16(A)]….13
COTS (ARTICLE 16)….[16]….13
Excessive amount of, during industry-wide condition of unemployment….[11(G)(8)]….10
Extra housekeeping employees….[8(D)]….6
EXTRA ROOMS (ARTICLE 15)….[15]….12
Extra rooms, not to be assigned without compensation….[A.V(a)(i)]….100
No extra rooms during layoff….[11(G)(2)]….9
PANIC BUTTONS (ARTICLE 70)….[70]….57
Saunas credited towards room quota….[16(B)]….13

**Housekeeping attendants (see Housekeeping)**

**Housing**
Employer prohibited from discontinuing meals or housing….[10(D)]….8
Housing allowance per week….[10(A)]….8
Housing allowance per week with meals….[10(C)]….8
HOUSING-MEALS (ARTICLE 10)….[10]….8

**Immigrants' rights**
Change of name or Social Security Number shall not adversely affect employee's job….[67(E)]….54
Discrimination, by inquiring into or using employee's work authorization status, prohibited….[67(F)]….55
Employee's right to unpaid leave to attend to immigration matters….[67(B)]….54
Employer required to negotiate if new legislation impacts immigrants rights provisions….[67(J)]….55
Employer required to notify union of an employee who has a problem with his/her right to work in the U.S.….[67(A)]….54

**Immigrants' rights (continued...)**
IMMIGRANTS' RIGHTS (ARTICLE 67)….[67]….54
No re-verification….[67(H)]….55
No voluntary authorization programs….[67(G)]….55
No-match letters…[67(D)]….54
Pre-1986 employees….[67(I)]….55
Rehire rights for between 12 and 24 months after termination, with proof of work authorization….[67(C)(2)]….54
Reinstatement rights for 12 months after termination, with proof of work authorization….[67(C)(1)]….54

**Impartial Chairperson**
Authority to decide all disputes or grievances….[26(A)]….20
Compensation of….[26(I)]….21
COMPLAINTS, GRIEVANCES AND ARBITRATION (ARTICLE 26)….[26]….20
Enforceability of arbitration decisions in court….[26(K)]….21
Hiring violations….[21(B)(1)]….16
Location of hearings….[26(F)]….20
New legislation that impacts immigrant rights' provisions….[67(J)]….55
Probationary employees, wrongful termination of….[6(B)(2)]….4
Safety and health expert to conduct investigation in workplace, appointment of….[69(E)(1)]….56
Security furnished by concessionaire, payments from….[46(B)]….35
Security furnished by concessionaires deposited with….[46(B)]….35
Speedy hearings….[26(G)]….21
Vacancy in office of, or inability or unwillingness to act….[26(J)]….21

**Industry training program**
Banquet training….[47(C)(3)]….38
Certification of eligibility to apply for steady banquet job openings….[47(C)(2)]….38
Culinary training….[36(F)]….30
Established to train employees for promotion and advancement….[36(A)]….30
Industry Training and Scholarship Fund….[S.B(6)]….91
No other training programs shall be instituted by employer….[36(C)]….30
Notification to employers of applicants certified as eligible….[47(C)(4)]….38
Study committee….[36(E)]….30
Study committee to review advancement opportunities in non-culinary classifications….[36(G)]….31
TRAINING AND SCHOLARSHIP FUND (ARTICLE 36)….[36]….30

**Information**
ELECTRONIC INFORMATION (ARTICLE 66)….[66]….53
Hidden surveillance cameras….[64(C)]….52
Hidden surveillance cameras, employer required to preserve evidence from….[64(D)(2)]….52
Safety and health expert, documents provided to….[69(E)(7)]….57
Safety and health expert, employer required to provide information to ….[69(E)(5)]….56
Spotters' reports, notes, video or audio recordings, etc., relating to discipline, union's right to….[63(A)(3)]….51
Union's right to, not limited by Article 63 (Spotters)….[63(E)]….52

**Job openings**
   Culinary openings, employer required to notify the union of and post ….[36(F)(3)]….31
   Culinary training program, employer to interview all applicants from, and notify union who was hired….[36(F)(5)]….31
   Employer required to notify union of, and of cancellations of job openings….[21(E)]….16
   Extra employees' right to be offered, by strict seniority….[8(D)(9)]….7
   Offered to employees after extended sick leave of from 52 to 208 weeks, with seniority restored….[23(B)(5)]….18
   Posting of, required….[21(C)]….16
   Steady banquet….[47(C)]….37

**Job security**
   Automatic extension of contract term during major renovations….[72(B)]….59
   BANKRUPTCY (ARTICLE 65)….[65]….53
   Change of name or Social Security Number shall not adversely affect employee's job….[67(E)]….54
   Change of owner,management or operational control, protection of employees' jobs and of contract….[59]….46
   Concessionaire must furnish security at union's request, to guarantee wages and benefits of employees….[46(A)]….35
   Defaults by concessionaire to pay employees' wages and benefit contributions, hotel responsible for….[46(C)]….35
   Enforceability of arbitration decisions in court….[26(K)]….21
   Expedited arbitration in the event of a temporary reduction in work week….[8(A)(3)]….5
   Expiration of disciplinary records (sunset provision)….[27(C)]….22
   Extra employees' right to be offered regular job openings by seniority….[8(D)(9)]….7
   HIDDEN SURVEILLANCE CAMERAS (ARTICLE 64)….[64]….52
   Hidden surveillance cameras, employer required to preserve evidence from….[64(D)(2)]….52
   HIRING (ARTICLE 21)….[21]….14
   Hiring preference for jobs in NYC hotel industry to employees from closed shops covered by this agreement….[21(A)(2)(c)]….15
   Hiring preference for jobs in NYC hotel industry to permanently laid off employees covered by this agreement….[21(A)(2)(c)]….15
   Hiring preference for jobs in NYC hotel industry to workers covered by this agreement….[21(A)(2)(c)]….15
   Immigrants, grace period to correct work authorization issues of….[67(C)]….54
   IMMIGRANTS' RIGHTS (ARTICLE 67)….[67]….54
   Just cause protection….[27(A)(1)]….21
   Layoff and recall, by seniority….[23]….17
   Layoff, right to be recalled from….[23(B)(3)]….18
   Limitation on the number of times an employee can be laid off and recalled in any month….[23(B)(3)]….18
   No extra rooms during layoff….[11(G)(2)]….9
   No overtime during layoff….[11(G)(2)]….9
   No reduction in wages or benefits as a result of contract….[13(B)(1)]….11
   No use of extra employees during layoff….[8(D)(7)]….7
   Outsourcing, protection of employees against….[45(B)]….34

**Job security (continued...)**
Premium pay for reduced work week or part-time work….[8(B)]….5
Right not to lose work to less senior employees….[11(C)]….9
Right of regular employees not to be "on-call"….[11(C)]….9
Right of Union to claim back pay for management contract violations….[26]….20
Right to a full day's work….[11(B)]….9
Right to be reinstated to job with full seniority for up to 52 weeks of extended sick leave….[23(B)(4)]….18
Right to challenge unfair actions by management in arbitration….[26(A)]….20
Right to complain without fear of retaliation….[24]….19
Right to fair hearing before a neutral arbitrator for disciplined employees….[26(A)]….20
Right to have union representation in disciplinary situations….[26(A)]….20
Right to next job opening after 52, but up to 208, weeks of extended sick leave, with seniority restored….[23(B)(5)]….18
Scheduling abuses, protection against….[11(C)]….9
SENIORITY (ARTICLE 23)….[23]….17
Severance pay, employer required to pay employees in event of closing….[52]….43
Spotter's report, time limit on imposing discharge or suspension as a result of….[63(A)(2)]….51
Spotter's report, time limit on imposing written or verbal warnings as a result of….[63(B)]….51
SPOTTERS (ARTICLE 63)….[63]….51
Spotters' reports, notes, video or audio recordings, etc., relating to discipline, union's right to….[63(A)(3)]….51
Subcontracting, protection of employees against….[45(B)]….34
Sunset provision….[27(C)]….22
Temporary reduced work week, employer required to obtain union's written consent to….[8(A)(2)]….5
Temporary reduction in work week, union's right to challenge….[8(A)(2)]….5
UNION ACTIVITY (ARTICLE 24)….[24]….19
Union activity, protection of employees engaged in….[25]….19
Union activity, protection of employees engaged in….[6(B)]….4
Union delegates, discharged or suspended, remain on job pending arbitration hearing….[27(B)]….22
Union delegates, protection against unjust discharge or discipline of….[27(B)]….22
Union investigations, employer must provide information in importable, searchable, electronic form….[66]….53
Unjust discharge or discipline, protection against….[27(A)(1)]….21
Unsafe assignments, right of employee to refuse, without fear of retaliation….[69(D)]….56
Unsafe conditions, right of employee to report, without fear of retaliation….[69(D)]….56
Use of probationary period to evade contract, protection against….[6(B)(1)]….4

**Jury duty**
JURY DUTY (ARTICLE 31)….[31]….28
Night differential….[51(C)(2)]….43

**Just cause protection against unjust discharge or discipline**
General….[27(A)(1)]….21
Probationary period, exception during….[6(B)]….4

**Kitchen employees entitled to meals, included with wages....[S.A]....64**
**Layoff (see also Reduced work week)**
    Abuses of, union rights to grieve....[22(A)]....17
    General....[23(A)]....17
    Hiring preference for jobs in NYC hotel industry to permanently laid off employees covered by this agreement....[21(A)(2)(c)]....15
    Holiday pay during....[29(B)]....25
    Limitation on the number of times an employee can be laid off and recalled in any month....[23(B)(3)]....18
    Limited recall from layoff....[23(B)(2)]....18
    No extra rooms during....[11(G)(2)]....9
    No overtime during....[11(G)(2)]....9
    No use of extra employees during....[8(D)(7)]....7
    No work by excluded categories during....[19]....14
    Notice of, to employee....[11(C)]....9
    Notice of, to extra employees, not required....[8(D)(6)(b)]....7
    Notice of, to union....[23(A)]....17
    Notice of, to union....[23(B)(2)]....18
    Proration of vacation due to absence of more than 60 days....[28(B)(2)]....24
    Protection of union activity....[24]....19
    SENIORITY (ARTICLE 23)....[23]....17
    Seniority rights....[23(A)]....17
    Substitute employees....[8(C)(2)]....6
    Substitute employees, recall rights of, after 52 weeks....[8(C)(4)]....6
    Substitute employees, recall rights of, after 60 days of work....[8(C)(3)]....6
    Union delegates, restrictions on layoff of....[23(C)]....19
    Union's right to grieve and arbitrate....[22(A)]....17
**Leave of absence**
    Entitlement....[55(A)]....45
    Holidays....[55(D)]....45
    LEAVE OF ABSENCE (ARTICLE 55)....[55]....45
    Other employment during....[55(C)]....45
**LEGAL FUND (ARTICLE 37) (see also Prepaid Legal)....[37]....31**
**Limited recall from layoff**
    Notice of subsequent layoff (normal), 3 days....[23(B)(2)]....18
    Notice of subsequent layoff (special circumstances), 2 days....[23(B)(2)]....18
**Liquidated damages for willful violations (see also Grievances and arbitration)....[26(L)]....21**
**Lockouts....[38]....31**
**Long watches....[11(D)]....9**
**Maintenance employees**
    Combination job pay....[22(B)]....17
    MAINTENANCE AND ELECTRICAL WORK (ARTICLE 61)....[61]....50
    Work performed previously....[17(A)]....13
**Major structural alterations**
    Disputes relating to....[17(D)]....13
    Employer notice to union of....[17(D)]....13

**Major structural alterations (continued...)**
MAJOR STRUCTURAL ALTERATIONS (ARTICLE 17)….[17]….13
Mechanics and maintenance employees, work of….[17(A)]….13
Rate of pay for employees performing….[17(B)]….13

**Management rights**
Combination jobs….[22(B)]….17
Employer's right to direct and control employees….[22(A)]….17
MANAGEMENT RIGHTS (ARTICLE 22)….[22]….17
Union's right to grieve abuses of layoffs or transfers….[22(A)]….17

**Management, change of….[59]….46**

**Meals**
Allowance per meal….[10(B)]….8
Banquet servers and captains entitled to meals, included with wages….[S.A-1]….77
Dining room, kitchen & stewarding, and cafeteria employees entitled to, included with wages….[S.A]….64
HOUSING-MEALS (ARTICLE 10)….[10]….8
Meal period….[11(E)]….9
Vacation pay, no deductions for meals from….[28(C)]….24
Value of (if included with wages), included in calculating employer benefit contributions….[S.B(2)]….87

**Mechanics….[17(A)]….13**

**Minibar attendants to be equipped with panic buttons….[70]….57**

**Minimum wage**
MINIMUM WAGE (ARTICLE 12)….[12]….10
No change in rates except by agreement with union, all other employers….[13(A)(2)]….11
No change in rates except by agreement with union, ASSOCIATION member hotels….[13(A)(1)]….11
Schedule A-1, minimum banquet rates, increases to….[14(D)]….12
Schedule A, increases to….[14(E)]….12
WAGE INCREASES (ARTICLE 14)….[14]….12
Work week, for which minimum wage rates are applicable….[13(B)(2)]….11
Work week, regular….[11(A)]….8

**Mitigation of damages (see also DISCHARGE AND DISCIPLINE (ARTICLE 27))….[27(A)(3)]….22**

**MODIFICATION OF THIS AGREEMENT (ARTICLE 41)….[41]….33**

**National origin, discrimination based on….[25]….19**

**Neutrality….[60(B)]….49**

**New employees**
Condition of employment, to become and remain a union member in good standing….[3(A)]….2
Contributions to funds for….[6(D)]….5
Employer required to notify union of….[21(D)]….16
Grounds for termination of….[6(B)(1)]….4
NEW EMPLOYEES (ARTICLE 6)….[6]….4
New hire pay rate during first and second year of employment of….[6(C)(1)]….4
New hire pay rate during third and fourth year of employment of….[6(C)(2)]….4

**New employees (continued...)**
New hire pay rate, when not applicable….[6(C)]….4
Pay rate during probationary period….[6(B)(2)]….4
Personal days, entitlement of….[30(A)]….27
Probationary period, length of….[6(A)]….4
Restrictions on termination of….[6(B)(1)]….4
Substitute employees….[8(C)]….6
Substitute employees, accrual of seniority by….[8(C)(1)]….6
Termination of….[6(B)]….4
Wages and benefits of….[6(C)]….4

**New hire rate of pay (see New employees)**

**New job classifications, parties to negotiate wage rates of….[S.A]….76**

**Night shift differential**
Bereavement pay….[32(B)(2)]….29
Calculation….[51(C)]….43
General….[51(A)]….42
Holiday pay, non-tip classification….[29(D)(1)]….26
Holiday pay, tip classification….[29(D)(2)]….26
NIGHT SHIFT DIFFERENTIAL (ARTICLE 51)….[51]….42
Overtime….[51(C)(1)]….43
Payment - Rate….[51(B)]….42
Personal day pay….[30(B)(3)]….27
Vacation pay….[28(A)(2)]….23
Wage increases applicable to all wage-related items….[14(F)]….12

**No loss (see No reduction...)**

**No reduction in hours, wages or benefits….[13(B)(1)]….11**

**No reduction in porterage rates, terms or conditions….[50(E)]….41**

**No reduction in wages or benefits, banquets….[S.A-1/WC16]….79**

**Notices**
A-List and B-List servers, employer required to furnish names of, to union….[47(A)(1)]….35
Arbitration hearings, five days' notice to all interested parties of….[26(G)]….21
Banquet job referral and hiring procedures….[47(A)(3)]….36
C-List, employer required to notify union of addition to, before scheduling the employee for any function….[47(B)(2)(g)]….37
Culinary job openings, employer required to notify the union of and post ….[36(F)(3)]….31
Culinary training program, employer to interview all applicants from, and notify union who was hired….[36(F)(5)]….31
Employer required to notify union of steady banquet job openings….[47(C)(1)(b)]….37
Employer required to notify union prior to hiring employees of new property….[60(B)(3)]….50
Industry Training Program to notify employers of applicants certified as eligible….[47(C)(4)]….38
Layoff….[23(B)(2)]….18
Layoffs….[23(A)]….17
NOTICES (ARTICLE 43)….[43]….34

**Notices (continued...)**
Posting of all permanent job openings….[21(C)]….16
Procedures for notifying C-List of available work….[47(B)(2)(f)]….37
Right to work in the U.S., employer required to notify union of problems with, to protect the employee's rights….[67(A)]….54
Steady banquet job openings posted at union headquarters….[47(C)(1)(b)]….37
Transfer of ownership, management or operational control, employer required to notify union of possibility of ….[59(E)]….48
Union bulletin boards, employer to provide, for posting of union notices….[43]….34
Vacation schedule, four weeks' notice to union of….[28(D)]….24

**Operational control, change of….[59]….46**
**Organizing of non-union hotels (see ACCRETION AND NEUTRALITY /CARD CHECK (ARTICLE 60))**
**Outsourcing, protection of employees against….[45(B)]….34**
**Overtime**
6th & 7th consecutive day of work, expedited arbitration if employer refuses to pay….[11(G)(3)]….10
6th day in the week….[11(G)(2)]….9
Actual or constructive knowledge of, constitutes employer's authorization of….[11(G)(6)]….10
Banquet cooks entitled to, before work can be given to extra employees….[8(D)(4)]….6
Banquet function overtime….[S.A-1]….77
Banquet housekeeping employees entitled to, before work can be given to extra employees….[8(D)(3)]….6
Bereavement pay….[32(B)(2)]….29
Daily, after 7 or 8 hours per day….[11(G)(1)]….9
Employees to work reasonable amount of,….[11(G)(2)]….9
Excessive amount of, during industry-wide condition of unemployment….[11(G)(8)]….10
General….[11(G)]….9
Holiday pay, non-tip classification….[29(D)(1)]….26
Holiday pay, tip classification….[29(D)(2)]….26
Layoff, no overtime during….[11(G)(2)]….9
Night shift differential….[51(C)(1)]….43
Personal days pay….[30(B)(3)]….27
Servers, completion of guest service….[11(F)]….9
Shorter work day or shorter work week….[11(G)(7)]….10
Substitute employees, layoff of….[8(C)(2)]….6
Time and a half, pay rate of….[11(G)(1)]….9
Voluntary waiver of….[11(G)(4)]….10
Weekly, after 35 or 40 hours per week….[11(G)(1)]….9
WORKING HOURS, MEAL PERIOD, OVERTIME, ETC. (ARTICLE 11)….[11]….8

**Ownership, change of….[59]….46**
**Paid days off**
Anniversary of employment….[29(A)]….25
Benefit day rate for bellpersons and doorpersons….[50(H)(4)]….42
BEREAVEMENT PAY (ARTICLE 32)….[32]….29
Birthday….[29(A)]….25

**Paid days off (continued...)**
Double pay for tip classifications for….[29(D)(2)]….26
Floating personal day, in addition to birthday and anniversary date of employment….
[29(A)]….25
HOLIDAYS (ARTICLE 29)….[29]….25
JURY DUTY (ARTICLE 31)….[31]….28
Night differential and overtime, non-tip classification….[29(D)(1)]….26
Night differential and overtime, tip classification….[29(D)(2)]….26
Personal days….[29]….25
PERSONAL DAYS (ARTICLE 30)….[30]….27
SICK LEAVE (ARTICLE 54)….[54]….44
VACATIONS (ARTICLE 28)….[28]….23

**Panic buttons**
Device not to be used for any purpose other than employee protection….[70(E)]….58
Employee complaints, employer to respond to promptly and adequately….[70(D)]….58
Employer required to equip employees required to enter occupied guest rooms with
devices….[70(B)]….58
No retaliation against employees who complain….[70(D)]….58
PANIC BUTTONS (ARTICLE 70)….[70]….57
Right to request accompaniment prior to entering occupied room….[70(C)]….58
Safety from harassment by hotel guests is paramount….[70(A)]….57

**Part-time**
Banquet cooks to be offered available work before extra employees can be used….
[8(D)(4)]….6
Banquet housekeeping attendants to be offered available work before extra employ-
ees can be used….[8(D)(3)]….6
Extra employees subject to terms and conditions of contract, with exceptions….[8(D)
(6)]….7
Extra employees, 5-day notice of schedule not required….[8(D)(6)(a)]….7
Extra employees, employer's record-keeping requirement regarding scheduling of….
[8(D)(10)]….7
Extra employees, no use of, during layoff….[8(D)(7)]….7
Extra employees, notice to, of layoff, recall, reduced work week, or change of sched-
ule, not required….[8(D)(6)(b)]….7
Extra employees, permissible job classifications of….[8(D)(1)]….6
Extra employees, time and a quarter for all hours, unless scheduled full work week with
proper notice….[8(D)(6)(c)]….7
Extra employees' right to accrue seniority….[8(D)(8)]….7
Extra employees' right to be offered regular job openings by strict seniority….[8(D)
(9)]….7
Extra employees' right to be scheduled by seniority….[8(D)(8)]….7
Extra employees' right to refuse work….[8(D)(11)]….8
Extra housekeeping and banquet employees….[8(D)]….6
Limitation on number of extra employees employer can hire….[8(D)(2)]….6
No employee on payroll as of effective date of contract to be converted to….[8(D)
(5)]….7
PART-TIME WORK AND PREMIUM PAY; SUBSTITUTE AND EXTRA EMPLOYEES
(ARTICLE 8)….[8]….5
Pay in accordance with Article 8….[13(B)(3)]….11

**Part-time (continued...)**
Reduced work week, employer's obligation to notify union of….[8(A)(2)]….5
Reduced work week, employer's obligation to obtain union's written consent to….[8(A)(2)]….5
Substitute employees….[8(C)]….6
Substitute employees, accrual of seniority by….[8(C)(1)]….6
Substitute employees, layoff of….[8(C)(2)]….6
Substitute employees, recall rights of, after 52 weeks….[8(C)(4)]….6
Substitute employees, recall rights of, after 60 days of work….[8(C)(3)]….6
Temporary reduction in work week, expedited arbitration in the event of ….[8(A)(3)]….5
Time and quarter premium pay….[8(B)]….5
Wage rate for part-time worker who becomes full-time worker….[8(A)(1)]….5

**Pay cards**
Background check, proof of identity, address, Social Security Number, etc. must not be required….[13(C)(3)]….11
Cash payment of wages during working time, employees entitled to….[13(C)(2)]….11
Employer must pay by check or cash if pay card provider refuses to issue employee a pay card….[13(C)(5)]….11
General….[13(C)]….11
Must not trigger reporting or disclosure to third party or government agency….[13(C)(4)]….11
Withdrawal of pay without charge, penalty or fee, must be available….[13(C)(1)]….11

**Penalties for employer theft….[26(L)]….21**

**Pension (see also 401k Plan)**
PENSION FUND (ARTICLE 35)….[35]….30
Schedule B….[S.B(4)]….89
Start date for employer contributions….[6(D)]….5

**Permanently laid off employees, preferential hiring of….[21(A)(2)(c)]….15**

**Personal days**
Anniversary of employment….[29(A)]….25
Banquet employees….[30(C)]….27
Birthday….[29(A)]….25
Entitlement - New hires….[30(A)]….27
Entitlement - Regular full-time and regular part-time employees….[30(B)]….27
Floating personal day, in addition to birthday and anniversary date of employment….[29(A)]….25
General….[30(D)]….28
Night differential….[51(C)(2)]….43
PERSONAL DAYS (ARTICLE 30)….[30]….27
Proration of pay for….[29(A)]….25
Proration of pay for….[30(B)(1)]….27
Right of employee to apply all or a portion of, for an unusual or sudden occurrence….[30(D)(4)]….28
Sick leave during….[30(D)(3)]….28
Vacations during….[30(D)(2)]….28
When group of employees have the same anniversary date….[30(D)(1)]….28

**Political action fund….[56]….46**

**Porterage….[50]….41**

**Preamble….[Preamble]….1**

**Premium pay….[8]….5**

**Prepaid Legal**
LEGAL FUND (ARTICLE 37)….[37]….31
Pre-Paid Legal Fund….[S.B(5)]….90
Start date for employer contributions….[6(D)]….5

**Prevailing wage for major structural alterations….[17(B)]….13**

**Probationary period**
Discrimination against union members during….[6(B)]….4
Extra painters….[9(B)]….8
Full back pay if termination was to evade contract or discriminate against union members….[6(B)(2)]….4
Length of….[6(A)]….4
Pay rate during….[6(B)(2)]….4
Use for purpose of evading Agreement….[6(B)]….4

**Proration**
Extra painters' vacation pay….[9(A)]….8
Full-time employees' wages prorated based on hours worked….[13(B)(3)]….11
Holiday pay….[29(A)]….25
Personal days….[30(B)(1)]….27
Personal days pay….[29(A)]….25
Sick leave….[54(A)(3)]….44
Vacation days….[28(B)]….23

**Purpose of agreement….[Preamble]….1**

**Race, discrimination based on….[25]….19**

**RATIFICATION OF AGREEMENT (ARTICLE 74)….[74]….60**

**Recall (see Layoff)**

**Reduced work week (see also Layoff)**
Expedited arbitration if disputed….[8(A)(3)]….5
Limited recall from layoff….[23(B)(2)]….18
Notice of, to extra employees, not required….[8(D)(6)(b)]….7
Restricted use of extra employees during….[8(D)(7)]….7
Temporary reduction in work week for "business reasons"….[8(A)(2)]….5
Time and quarter premium pay….[8(B)]….5
Work by excluded categories during….[19]….14
Written consent of Union required….[8(A)(2)]….5
Written notice to Union required….[8(A)(2)]….5

**Relief appeals**
Applications for relief, procedure employers must follow in making….[48(B)]….40
Grant restricted to cases of unusual hardship….[48(A)]….40
Impartial Chairperson's authority to grant employer's application….[48(A)]….40
Reason for granting of relief….[48(A)]….40
RELIEF APPEALS (ARTICLE 48)….[48]….40

**RELIEF EMPLOYEES (ARTICLE 20)….[20]….14**

**Religion, discrimination based on….[25]….19**

**Representations**
    Union is duly empowered….[1(C)]….2
    Union represents majority of employees….[1(B)]….2

**Residential hotel….[7]….5**

**Residential use, conversion of hotel to….[57]….46**

**Respirators….[69(C)]….56**

**Retirement (see Pension)**

**Roll-Call (see Banquet)**

**Room attendants (see Housekeeping)**

**Room quota**
    Cots credited towards….[16(A)]….13
    EXTRA ROOMS (ARTICLE 15)….[15]….12
    Saunas credited towards….[16(B)]….13

**Room service servers, to be equipped with panic buttons….[70]….57**

**Safety and Health**
    Closure of areas of the employer's premises, safety and health expert authorized to order….[69(E)(9)]….57
    Documents provided to the safety and health expert….[69(E)(7)]….57
    Employer required to cooperate with safety and health expert….[69(E)(5)]….56
    Employer required to provide safe, healthy workplace ….[69(A)]….55
    Expense of safety and health expert paid for by employer….[69(E)(3)]….56
    Information to safety and health expert, employer required to provide….[69(E)(5)]….56
    Investigation by safety and health expert….[69(E)]….56
    No interference with safety and health expert….[69(E)(7)]….57
    Notice to union and employer of visit of safety and health expert….[69(E)(8)]….57
    PANIC BUTTONS (ARTICLE 70)….[70]….57
    Reason for safety and health expert investigation….[69(E)(1)]….56
    Recommendations of safety and health expert, employer required to comply promptly with….[69(E)(11)]….57
    Rules of employer not to delay or interfere with safety and health expert's investigation….[69(E)(6)]….57
    SAFETY AND HEALTH (ARTICLE 69)….[69]….55
    Safety and health expert authorized to full access to employer's premises….[69(E)(5)]….56
    Safety and health expert, selection of….[69(E)(2)]….56
    Safety equipment, employer required to provide and maintain….[69(C)]….56
    Sanitary eating areas, changing areas, and washrooms….[49(C)]….40
    Scope of safety and health expert's investigation….[69(E)(4)]….56
    Stop work order, safety and health expert authorized to issue….[69(E)(9)]….57
    Uniform design and maintenance….[49(A)]….40
    Unsafe assignments, right of employee to refuse….[69(D)]….56
    Unsafe conditions, right of employee to report, without fear of retaliation….[69(D)]….56
    Ventilation and air temperature….[69(B)]….56
    Written report of safety and health expert….[69(E)(10)]….57

Saunas....**[16(B)]**....13
**SCHEDULE 1....[S.1]....61**
**SCHEDULE A - MINIMUM WAGE SCALES....[S.A]....62**
  Banquet working conditions....[S.A-1/WC1]....78
  Bar....[S.A/Bar]....65
  Dining Room....[S.A/Dining_Room]....62
  Employees' Cafeteria....[S.A/Employees'_Cafeteria]....65
  Engineering....[S.A/Engineering]....73
  Front Service....[S.A/Front_Service]....67
  Housekeeping....[S.A/Housekeeping]....65
  Increases to....[14(E)]....12
  Kitchen & Stewarding....[S.A/Kitchen_&_Stewarding]....62
  Laundry....[S.A/Laundry]....66
  Miscellaneous....[S.A/Miscellaneous]....75
  New job classifications, parties to negotiate wage rates of....[S.A]....76
  Print Shop Department....[S.A/Print_Shop_Department]....74
  Turkish Baths....[S.A/Turkish_Baths]....75
  Valet Department....[S.A/Valet_Department]....74
  White Collar - Administrative....[S.A/White_Collar_-_Administrative]....71
**SCHEDULE A-1 - CLASSIFICATION OF MEALS, HOURS AND WAGES FOR BAN-
QUET SERVERS & CAPTAINS**
  General....[S.A-1]....77
  Increases to....[14(D)]....12
**SCHEDULE A-2 - VACATIONS, CALL-IN PAY AND HOLIDAY PAY FOR CHECKROOM
AND WASHROOM ATTENDANTS....[S.A-2]....83**
**SCHEDULE A-3 - VACATIONS AND HOLIDAYS FOR STEADY EXTRA BANQUET
BARTENDERS....[S.A-3]....84**
**SCHEDULE B - EMPLOYEE BENEFIT FUNDS....[S.B]....86**
  401(k) Savings Plan and Trust....[S.B(7)]....92
  Definitions....[S.B(2)]....86
  Health Benefits Fund....[S.B(3)]....87
  Industry Training and Scholarship Fund....[S.B(6)]....91
  Pension Fund....[S.B(4)]....89
  Pre-Paid Legal Fund....[S.B(5)]....90
  Provisions Common to All Funds....[S.B(8)]....92
  Tax exempt status of benefit funds....[S.B(5)(C)]....91
**Scheduling rights**
  Abuses of....[11(C)]....9
  Banquet C-List work offered on rotational basis....[47(B)(2)(e)]....37
  C-List, employer may not require any employee to register for or work on....[47(B)(2)
  (h)]....37
  C-List, right of, to refuse any function....[47(B)(2)(i)]....37
  Call-in pay....[11(B)]....9
  Day off in lieu of holiday pay, employee may not be forced to take....[29(E)(1)]....26
  Day off in lieu of holiday pay, right of employee to take voluntarily, with pay....[29(E)
  (2)]....26
  Extra employees....[8(D)(8)]....7
  Extra employees, 5-day notice of schedule not required....[8(D)(6)(a)]....7

**Scheduling rights (continued...)**

Extra employees, Employer's record-keeping requirement regarding scheduling of….[8(D)(10)]….7

Extra employees, time and a quarter for all hours worked, unless scheduled full work week with proper notice….[8(D)(6)(c)]….7

Extra employees' right to refuse call-in offer….[8(D)(11)]….8

Meal period….[11(E)]….9

No new long watches….[11(D)]….9

No new short watches….[11(D)]….9

No new split shifts….[11(D)]….9

No reduction in hours as a result of contract….[13(B)(1)]….11

Notice of change of, to extra employees, not required….[8(D)(6)(b)]….7

Notice of schedule….[11(C)]….9

Overtime….[11(G)]….9

Overtime, 6th and 7th consecutive day of work (even across 2 work weeks)….[11(G)(3)]….10

Procedures for notifying C-List of available work….[47(B)(2)(f)]….37

Right of employee to apply all or a portion of personal days, for an unusual or sudden occurrence….[30(D)(4)]….28

Seniority rights….[11(C)]….9

UNION TRAINING (ARTICLE 62)….[62]….51

Vacations….[28(D)]….24

Voluntary waiver of notice period….[11(G)(4)]….10

Work on holidays….[29(E)]….26

Work week, for which minimum wage rates are applicable….[13(B)(2)]….11

Work week, regular….[11(A)]….8

WORKING HOURS, MEAL PERIOD, OVERTIME, ETC. (ARTICLE 11)….[11]….8

**Scholarship fund**

Industry Training and Scholarship Fund….[S.B(6)]….91

TRAINING AND SCHOLARSHIP FUND (ARTICLE 36)….[36]….30

**Semi-transient hotel….[7]….5**

**Seniority**

Banquet A-List positions to be filled by, from B-List….[47(C)(1)(a)]….37

Extra employees' right to accrue….[8(D)(8)]….7

Extra employees' right to be offered regular job openings by strict seniority….[8(D)(9)]….7

Extra employees' right to be scheduled by….[8(D)(8)]….7

Layoff of union delegates, restrictions on….[23(C)]….19

Layoffs….[23(A)]….17

Leave of absence….[55(D)]….45

Limited recall from layoff….[23(B)(2)]….18

Recall….[23(B)]….17

Right to be recalled from layoff by….[23(B)]….17

Right to be reinstated to job with full seniority for up to 52 weeks of extended sick leave….[23(B)(4)]….18

Right to next job opening after 52, but up to 208, weeks of extended sick leave, with seniority restored….[23(B)(5)]….18

Scheduling in accordance with….[11(C)]….9

**Seniority (continued...)**
SENIORITY (ARTICLE 23)….[23]….17
Substitute employees' accrual of….[8(C)(1)]….6

**SEPARABILITY (ARTICLE 73)….[73]….59**

**Severance Pay**
Benefits extended for employees, funded by employer….[52(B)]….43
Enhanced, when hotel converts to residential use….[57(A)]….46
SEVERANCE PAY (ARTICLE 52)….[52]….43
Technological change….[53(B)]….44

**Sex, discrimination based on….[25]….19**

**Sexual orientation, discrimination based on….[25]….20**

**Short watches….[11(D)]….9**

**Sick leave (see also Extended Sick Leave)**
8 days per year….[54(A)(2)]….44
Abuse of, as grounds for discipline of employees….[54(A)(5)]….44
Accumulation of….[54(A)(4)]….44
Calculation and payment….[54(B)]….45
Entitlement….[54(A)]….44
Holiday or vacation, absence on work day immediately before or after….[54(C)]….45
Holiday pay during….[29(C)]….25
Night differential….[51(C)(2)]….43
Personal days during….[30(D)(3)]….28
Proration of….[54(A)(3)]….44
Proration of vacation due to absence of more than 60 days….[28(B)(2)]….24
SICK LEAVE (ARTICLE 54)….[54]….44
Solely intended as compensation, not limit on allowable sick time….[54(A)(5)]….44
Unused sick leave pay….[54(A)(6)]….45

**Side Agreements**
Side Agreement (2)….[Side(2)]….107
Side Agreement (3)….[Side(3)]….108
SIDE LETTER TO IWA (1)….[Side(1)]….106

**Split shifts….[11(D)]….9**

**Spotters**
Documents relating to report of, employer required to provide union with all….[63(A)(3)]….51
Information, union's right to, not limited by this article….[63(E)]….52
Non-disciplinary use of spotter report….[63(D)]….52
Notice to employee….[63(A)(1)]….51
SPOTTERS (ARTICLE 63)….[63]….51
Suspension or discharge….[63(A)]….51
Time limit on imposing discharge or suspension as a result of report of….[63(A)(2)]….51
Time limit on imposing written or verbal warnings as a result of….[63(B)]….51

**STATUS QUO AGREEMENT OF MARCH 23, 1938 (ARTICLE 40)….[40]….33**

**Steady banquet job openings….[47(C)]….37**
A-List openings filled by seniority from B-List….[47(C)(1)(a)]….37
Banquet training….[47(C)(3)]….38

**Steady banquet job openings (continued...)**
Certification of eligibility to apply….[47(C)(2)]….38
Definition….[47(C)(1)]….37
Eligibility for….[47(C)(2)(b)]….38
Employer required to notify union of….[47(C)(1)(b)]….37
Employer's obligation to interview all union-referred applicants….[47(C)(1)(e)]….37
Hiring procedure….[47(C)(1)]….37
Industry Training Program certifies eligibility of applicants….[47(C)(2)(d)]….38
Industry Training Program to notify employers of applicants certified as eligible….[47(C)(4)]….38
Limitation on number of positions held by banquet servers….[47(C)(5)]….38
Posted at union headquarters….[47(C)(1)(b)]….37
Time period for submission of application for….[47(C)(1)(c)]….37
Union to transmit to the employer applications of eligible employees/applicants….[47(C)(1)(d)]….37

**Stewarding employees entitled to meals, included with wages….[S.A]….64**

**Strikes and lockouts**
Exception to no-strike clause….[38(F)]….32
STRIKES AND LOCKOUTS (ARTICLE 38)….[38]….31

**Study committee**
Addendum VII….[A.VII]….101
Changes in tax laws….[A.II]….96
COST OF LIVING (ARTICLE 44)….[44]….34
Hiring….[21(F)]….16
To review advancement opportunities in non-culinary classifications….[36(G)]….31

**Subcontracting, protection of employees against….[45(B)]….34**

**Substitute employees**
Accrual of seniority by….[8(C)(1)]….6
Definition of….[8(C)(1)]….6
General….[8(C)]….6
Layoff of….[8(C)(2)]….6
PART-TIME WORK AND PREMIUM PAY; SUBSTITUTE AND EXTRA EMPLOYEES (ARTICLE 8)….[8]….5
Recall rights of, after 52 weeks….[8(C)(4)]….6
Recall rights of, after 60 days of work….[8(C)(3)]….6
Union membership….[3(C)]….3

**Successors and assigns**
Assumption agreement….[59(C)]….47
Assumption of contract a condition of sale or transfer of ownership or management….[59(B)]….47
Confidentiality of notice of possible transfer of ownership, management, or operational control….[59(F)]….48
Contract binding on successor employers….[59(A)]….46
Irreparable harm, violation of Article 59 constitutes….[59(G)]….49
SUCCESSORS AND ASSIGNS (ARTICLE 59)….[59]….46
Transfer of ownership, management or operational control, employer required to notify union of possibility of ….[59(E)]….48

**Summer closings….[29(E)(3)]….26**
**Sunset provision….[27(C)]….22**
**Supplies….[71]….58**
**Suspension**
    Spotter's report, time limit on imposing discharge or suspension as a result of….[63(A)(2)]….51
    Spotters….[63(A)]….51
    Union delegates, protection of….[27(B)]….22
**Technological change**
    Arbitration….[53(D)]….44
    Employer required to discuss modifications in advance of implementation of….[53(A)]….43
    Severance pay….[53(B)]….44
    TECHNOLOGICAL CHANGE (ARTICLE 53)….[53]….43
**Temperature….[69(B)]….56**
**Time and quarter premium pay**
    During limited recall….[23(B)(3)]….18
    Extra employees entitled to, for all hours, unless scheduled full work week with proper notice….[8(D)(6)(c)]….7
    General….[8(B)]….5
    Vacation pay….[28(A)(2)]….23
    Voluntary waiver of,….[11(G)(4)]….10
**Tip classifications**
    Banquet gratuity….[47(D)]….39
    Bereavement pay….[32(B)(2)]….29
    Holiday pay….[29(D)(2)]….26
    JURY DUTY (ARTICLE 31)….[31]….28
    List of….[S.1]….61
    Personal days pay rate….[30(B)(2)]….27
    Personal days, pay for work on….[30(B)(3)]….27
    Severance pay….[52(B)]….43
    Vacation pay….[28(A)(2)]….23
    Work week, for which minimum wage rates are applicable….[13(B)(2)]….11
    Work week, regular….[11(A)]….8
**Tours….[50]….41**
**Training and scholarship**
    Banquet training….[47(C)]….37
    Culinary training….[36(F)]….30
    Employer to fund….[36(B)]….30
    Industry Training and Scholarship Fund….[S.B(6)]….91
    No other training programs shall be instituted by employer….[36(C)]….30
    Start date for employer contributions….[6(D)]….5
    TRAINING AND SCHOLARSHIP FUND (ARTICLE 36)….[36]….30

**Training, safety and health….[69(A)]….55**

**Transfers….[22(A)]….17**

**Transient hotel….[7]….5**

**TRANSLATIONS (ARTICLE 68)….[68]….55**

**Unemployment, industry-wide condition of….[11(G)(8)]….10**

**Uniforms and employee facilities**
    Cook's uniform, defined….[49(A)]….40
    Design and maintenance of uniforms….[49(B)]….40
    Employer required to supply and launder uniforms….[49(A)]….40
    Sanitary eating areas, changing areas, and washrooms….[49(C)]….40
    UNIFORMS AND EMPLOYEE FACILITIES (ARTICLE 49)….[49]….40

**Union activity**
    Discrimination against union members during probationary period….[6(B)]….4
    Discrimination based on….[25]….20
    Protection of….[24]….19
    UNION ACTIVITY (ARTICLE 24)….[24]….19
    Unsafe conditions, right of employee to report, without fear of retaliation….[69(D)]….56

**Union dues**
    Check-off….[5]….3
    Concessionaire to furnish security to guarantee….[46(B)]….35
    Payment of….[3(B)]….3
    UNION DUES (ARTICLE 4)….[4]….3
    UNION DUES (ARTICLE 5)….[5]….3

**Union Membership**
    Casual employees….[3(C)]….3
    Condition of employment to become and remain a member in good standing….[3(A)]….2
    Discrimination based on….[21(B)]….16
    Failure to become and remain member in good standing….[3(B)]….3
    Substitute employees….[3(C)]….3
    UNION MEMBERSHIP (ARTICLE 3)….[3]….2

**Union recognition**
    HTC has sole authority to enforce the contract on behalf of the union, its affiliates, and members….[58]….46
    New York Hotel and Motel Trades Council is sole collective bargaining agency for covered employees….[1(E)]….2

**Union rights**
    ACCRETION AND NEUTRALITY/CARD CHECK (ARTICLE 60)….[60]….49
    Arbitrator's decisions are final and binding on the employer and union….[26(A)]….20
    BANKRUPTCY (ARTICLE 65)….[65]….53
    Concessionaire must furnish security, at union's request, to guarantee wages and benefits of employees….[46(A)]….35
    Employer required to notify union if an employee has a problem with his/her right to work in the U.S.….[67(A)]….54
    Hidden surveillance cameras, information relating to….[64(C)]….52
    HIRING (ARTICLE 21)….[21]….14

**Union rights (continued...)**

HTC has sole authority to enforce the contract on behalf of the union, its affiliates, and members….[58]….46

Liquidated damages, in addition to back pay, for willful violations of contract…. [26(L)]….21

No modification of the contract without the consent of the union….[41]….33

Right to speedy arbitration hearing to protect union activity….[24]….19

Right to strike if employer refuses to abide by the determination of a complaint or grievance….[38(F)]….32

SPOTTERS (ARTICLE 63)….[63]….51

Spotters, information relating to….[63(E)]….52

UNION ACTIVITY (ARTICLE 24)….[24]….19

Union delegates, discharged or suspended, remain on job pending arbitration hearing….[27(B)]….22

Union delegates, protection against unjust discharge or discipline of….[27(B)]….22

Union investigations, employer must provide information in importable, searchable, electronic form….[66]….53

Union representatives allowed to accompany safety and health expert during investigation….[69(E)(7)]….57

UNION TRAINING (ARTICLE 62)….[62]….51

Union's right to challenge employer decisions and actions in arbitration….[26]….20

Union's right to post notices on union bulletin boards provided by the Employer…. [43]….34

Union's visitation rights to the employer's premises….[42]….33

**UNION TRAINING (ARTICLE 62)….[62]….51**

**Vacations**

Banquet bartenders….[S.A-3]….84

Banquet bartenders….[28(A)(5)]….23

Banquet captains….[S.A-1/WC19(B)]….81

Banquet employees….[28(A)(3)]….23

Banquet servers….[S.A-1/WC19]….80

Break in service of more than 26 weeks….[28(B)(4)]….24

Checkroom and washroom attendants….[S.A-2]….83

Checkroom and washroom attendants….[28(A)(4)]….23

Day off in lieu of holiday pay, employer permitted to grant, with pay….[29(E)(1)]….26

Day off in lieu of holiday pay, right of employee to take voluntarily, with pay….[29(E)(2)]….26

Entitlement - General….[28(A)]….23

Extra painters….[9(A)]….8

Holidays during….[29(E)]….26

Night differential….[51(C)(2)]….43

Payment….[28(C)]….24

Personal days during….[30(D)(2)]….28

Premium pay, tip employees….[28(A)(2)]….23

Proration….[28(B)]….23

Proration due to absence of more than 60 days….[28(B)(2)]….24

Roll-Call servers….[S.A-1/WC19(C)]….81

Schedule, employer required to notify union of….[28(D)]….24

Scheduling….[28(D)]….24

**Vacations (continued...)**
Termination of employment, entitlement to receive vacation pay upon….[28(E)]….25
Termination of employment, proration of vacation upon….[28(B)(3)]….24
Tip employees….[28(A)(2)]….23
To be given as soon as practical….[28(C)]….24
Unpaid leave….[28(D)(2)]….25
VACATIONS (ARTICLE 28)….[28]….23

**Ventilation….[69(B)]….56**

**Visitation by union representatives**
Union representatives' right to visit employer's premises….[42(A)]….33
Union's right to hold conferences with employees on the employer's premises….[42(B)]….33
VISITATION CLAUSE (ARTICLE 42)….[42]….33

**VOLUNTARY POLITICAL ACTION FUND (ARTICLE 56)….[56]….46**

**Wage increases**
Applicable to all wage-related items….[14(F)]….12
Based on actual wages in effect….[S.1]….61
Bellpersons….[50(H)(1)]….41
Cots….[16(A)]….13
Doorpersons….[50(H)(2)]….42
Extra meal servers….[14(C)]….12
EXTRA ROOMS (ARTICLE 15)….[15]….12
For employees employed on the signing date of the contract….[14(A)]….12
For employees hired after the signing date of the contract….[14(B)]….12
Porterage….[50(D)]….41
SCHEDULE 1….[S.1]….61
Schedule A….[14(E)]….12
Schedule A-1….[14(D)]….12
WAGE INCREASES (ARTICLE 14)….[14]….12

**Wages**
BEREAVEMENT PAY (ARTICLE 32)….[32]….29
Call-in pay….[11(B)]….9
Combination job pay….[22(B)]….17
Concessionaire must furnish security, at union's request, to guarantee wages and benefits of employees….[46(A)]….35
Concessionaire to furnish security to guarantee….[46(B)]….35
Cots….[16(A)]….13
Direct deposit of wages….[13(C)]….11
Double pay for tip classifications for all paid days off….[29(D)(2)]….26
Employer permitted to pay higher wages than minimum….[12]….10
Extra employees, time and a quarter for all hours, unless scheduled full work week with proper notice….[8(D)(6)(c)]….7
Extra painters….[9(A)]….8
EXTRA ROOMS (ARTICLE 15)….[15]….12
Full-time employees' wages prorated based on hours worked….[13(B)(3)]….11
General….[13(A)]….11
Groups pay for Bellpersons and Doorpersons….[50]….41
Holiday pay….[29(D)]….26

**Wages (continued...)**
   Hotel responsible for any defaults by concessionaire to pay….[46(C)]….35
   Increases based on actual rate of pay in effect….[S.1]….61
   JURY DUTY (ARTICLE 31)….[31]….28
   Liquidated damages, in addition to back pay, for willful violations of contract….[26(L)]….21
   MINIMUM WAGE (ARTICLE 12)….[12]….10
   New employees required minimum wage rate….[6(C)]….4
   New job classifications, parties to negotiate wage rates of….[S.A]….76
   NIGHT SHIFT DIFFERENTIAL (ARTICLE 51)….[51]….42
   No change in rates except by agreement with union….[13(A)(1)]….11
   No change in rates except by agreement with union….[13(A)(2)]….11
   No reduction in as a result of contract….[13(B)(1)]….11
   Overtime….[11(G)]….9
   Overtime, 6th and 7th consecutive day of work (even across 2 work weeks)….[11(G)(3)]….10
   Overtime, employer's actual or constructive knowledge of requires payment….[11(G)(6)]….10
   Overtime, for shorter work day or work week….[11(G)(7)]….10
   Part-time employees, paid in accordance with Article 8….[13(B)(3)]….11
   Pay cards….[13(C)]….11
   PERSONAL DAYS (ARTICLE 30)….[30]….27
   Porterage pay for Bellpersons and Doorpersons….[50]….41
   Porterage rates, no reduction in….[50(E)]….41
   Prior wages and benefits….[13(B)]….11
   SCHEDULE A - MINIMUM WAGE SCALES….[S.A]….62
   Schedule A-1, increases to….[14(D)]….12
   Schedule A, increases to….[14(E)]….12
   Time and quarter premium pay….[8(B)]….5
   Tour pay for Bellpersons and Doorpersons….[50]….41
   Voluntary waiver of premium pay….[11(G)(4)]….10
   WAGE INCREASES (ARTICLE 14)….[14]….12
   Wage rate for part-time worker who becomes full-time worker….[8(A)(1)]….5
   WAGES (ARTICLE 13)….[13]….11
   Work week, for which minimum wage rates are applicable….[13(B)(2)]….11
**Warnings, union may challenge when relied upon by employer for subsequent discipline….[27(C)(3)(c)]….23**
**Washroom attendants**
   Personal days….[30(C)]….27
   Vacation, call-in pay, and holidays….[S.A-2]….83
**Willful violations, liquidated damages in addition to back pay for (see also Grievances and arbitration)….[26(L)]….21**
**Work preservation….[45(B)]….34**
**Work week**
   Full-time employees' wages prorated based on hours worked….[13(B)(3)]….11
   No less than normal week's pay during week of holiday….[29(D)(3)]….26
   Overtime, for shorter work day or work week….[11(G)(7)]….10
   Part-time employees, paid in accordance with Article 8….[13(B)(3)]….11

**Work week (continued...)**
Regular, definition of….[11(A)]….8
**Working hours (see also Scheduling rights)**
Call-in pay….[11(B)]….9
Meal period….[11(E)]….9
No new long or short watches….[11(D)]….9
No new split shifts….[11(D)]….9
No overtime during layoff….[11(G)(2)]….9
Overtime….[11(G)]….9
Overtime after 35 or 40 hours per week….[11(G)(1)]….9
Overtime after 7 or 8 hours per day….[11(G)(1)]….9
Overtime on the 6th day in the week….[11(G)(2)]….9
Overtime, 6th and 7th consecutive day of work (even across 2 work weeks)….[11(G)(3)]….10
Overtime, employer's actual or constructive knowledge of requires payment….[11(G)(6)]….10
Overtime, excessive amount of, during industry-wide condition of unemployment….[11(G)(8)]….10
Overtime, for shorter work day or work week….[11(G)(7)]….10
Overtime, voluntary waiver of….[11(G)(4)]….10
Reasonable amount of overtime….[11(G)(2)]….9
Schedule, notice of….[11(C)]….9
Servers, completion of guest service….[11(F)]….9
Work week, regular, definition of….[11(A)]….8
WORKING HOURS, MEAL PERIOD, OVERTIME, ETC. (ARTICLE 11)….[11]….8

**This contract expires on:**

# 7/1/19

# MEMORANDUM OF UNDERSTANDING

Memorandum of Understanding entered into by and between the Hotel Association of New York City, Inc. in its own behalf and in behalf of the HANYC Bargaining Group Hotels[1] (hereinafter collectively referred to as "Employer") and the New York Hotel and Motel Trades Council, AFL-CIO in its own behalf and in behalf of its members, now employed or hereafter to be employed by the Employer (hereinafter referred to as "Union").

WHEREAS, the Employer and the Union are signatories to a Collective Bargaining Agreement entered into as to be effective July 1, 2012, which Agreement by its terms, expires on June 30, 2019 (hereinafter referred to as the "IWA"); and

WHEREAS, the Employer and the Union desire to modify and extend the IWA as now restated in this Memorandum of Understanding (hereinafter referred to as "this Agreement").

NOW, THEREFORE, it is mutually agreed as follows:

1. Except as expressly provided for herein, the IWA is renewed and extended until midnight June 30, 2026.

2. The following wage increases to Schedule A minimum rates and actual rates, if higher, shall apply:

| | | |
|---|---|---|
| July 1, 2019 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |
| July 1, 2020 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |
| July 1, 2021 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |
| July 1, 2022 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |
| July 1, 2023 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |
| July 1, 2024 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |
| July 1, 2025 | All non-tipped employees: | An additional $1.00 per hour; |
| | All tipped employees: | An additional $.50 per hour. |

---

[1] A list of HANYC Bargaining Group Hotels is attached hereto as Exhibit 1. The aforesaid list is expected to increase on a continuing basis.

Nothing herein is intended to modify Article 6(C).

3.  The percentage, on an industry-wide basis, attributable to the wage increases provided for in paragraph 2 shall, in accordance with past practice, be applicable to all wage-related items contained in the IWA, e.g., extra room rates, cots, night shift differential rates, porterage and group fees, banquet rates, etc.

4.  IWA contribution rates to the Pension Fund shall be as follows:

| Effective Date | Contribution Rate |
|---|---|
| July 1, 2015 | 6% |
| July 1, 2016 | 6.5% |
| July 1, 2018 | 10.5% |
| January 1, 2026 | 11.5% |

5.  On the Effective Date of this Agreement, one-half (1/2) of the contributions currently payable to the Prepaid Legal Fund (0.25%) shall be reallocated to the Health Benefit Fund for the duration of this Agreement.  Notwithstanding the foregoing, the Trustees shall maintain the projected liquid assets of the Prepaid Legal Fund at not less than twenty-five percent (25%) of the following year's expenses of the Fund.  In the event the liquid assets fall below twenty-five percent (25%), the Association Bargaining Group Hotels shall have the right to reallocate up to the one-half (1/2) of the contributions reallocated to the Health Benefit Fund (0.25%) from the Health Benefit Fund back to the Prepaid Legal Fund, provided that it does not cause the Health Benefit Fund's liquid assets to fall below twenty-five percent (25%).  The Employers acknowledge and agree that they shall maintain all benefits currently provided by the Prepaid Legal Fund at no less than current eligibility and coverage during the life of this Agreement, and in no event shall any benefit, eligibility, or coverage be reduced for any reason absent signed agreement by the parties to the contrary.

6.  IWA contribution rates to the Health Benefit Fund (not inclusive of the reallocation of the contributions from the Prepaid Legal Fund referred to in Paragraph 5 nor the amount described in the paragraph immediately below) shall be as follows:

| Effective Date | Contribution Rate |
|---|---|
| January 1, 2015 | 23.5% |
| July 1, 2015 | 27% |
| January 1, 2016 | 27.5% |
| January 1, 2017 | 28% |
| July 1, 2018 | 24.5% |
| January 1, 2019 | 25.25% |
| January 1, 2020 | 26.5% |
| January 1, 2021 | 27% |

In the event the cost of renovations to the Queens Medical Center, as described in paragraph 7(a), and the cost of acquisition and construction of the Brooklyn Health Center

(collectively, "Construction Costs") exceed a sum equal to three and one-half percent (3.5%) of employee wages, as defined in Schedule B, for the period between July 1, 2015 and June 30, 2018 ("Funding Increase"), the above contributions to the Health Benefit Fund shall be increased on January 1, 2019, by up to an additional one (1) percentage point until such time as such contribution increase results in additional contributions to the Health Benefit Fund equal to the difference between the Construction Costs and Funding Increase.

Nothing herein is intended to modify the minimum funding or maintenance of benefits provisions of the IWA.

7. The parties agree that the following changes shall be made to the Health Benefit Plan as soon as is practicable after the ratification of this Agreement:

    a.    Queens Medical Center: The parties agree that the existing Queens Medical Center needs to be refurbished and expanded and, therefore, commencing as soon as is practicable, the Queens Medical Center shall be completely renovated, refitted, redesigned, and expanded to include the existing square footage that is currently utilized as or for ITP programs, the warehouse, and the noodle factory. The parties shall find a new location to house the ITP program or to provide ITP benefits that is more centrally located in order to better service employees, it being understood that any relocation or change to the ITP program shall not exceed Employer contributions on an annual basis.

    b.    Pharmacy: The pharmacy in each of the Health Centers shall remain open on Saturdays and Sundays. If, after a year, it is unanimously determined by the Trustees that this benefit is being underutilized, the Trustees may agree to keep the pharmacies open on only one (1) weekend day.

    c.    Ambulance: Provided the use thereof is justified under the terms of the Plan, ambulance costs shall be fully covered, absent unanimous agreement of the Trustees to change same.

    d.    Orthodontics: The Fund shall provide orthodontia benefits up to one thousand dollars ($1,000) for each minor dependent of a covered employee.

    e.    Vision: The current GVS vision benefit shall be discontinued. The contribution amount that was previously allocated to vision benefits shall be reallocated to the general Health Benefit Fund. The Health Benefit Fund will provide vision tests and exams at each Health Center free of charge. The Health Benefit Fund shall reimburse each eligible participant and dependent for vision related expenses (e.g., exams not performed at Health Benefit Fund facilities, frames, lenses, eyeglasses, and contact lenses) up to two hundred dollars ($200) per calendar year.

    f.    Health Reimbursement Arrangement ("HRA"): The Health Benefit Fund shall create and administer a HRA. Each calendar year, commencing January 1, 2017, the Health Benefit Fund shall pay into a HRA account on behalf of each employee who is eligible for health benefits two hundred dollars ($200) for individuals and four hundred dollars ($400) for families. Such HRA account may be used for any purposes permitted by law, including those under IRC Section 213(d). Any unused funds may be carried over into subsequent years

to the maximum extent permitted by law. Sums in a HRA account may not be forfeited for any reason, including cessation of employment, and contributions may continue to be made following any such cessation in accordance with COBRA.

8. Article 54(A) of the IWA shall be modified to include the following:

   "Employees employed less than one (1) year will accrue one (1) hour for every thirty (30) hours worked, up to a maximum of forty (40) hours of paid sick leave per calendar year, until they become entitled to benefits pursuant to Article 54."

9. The parties agree to meet within three (3) months of the Effective Date of this Agreement to discuss the Association's proposals for food and beverage (a la carte, room service, and banquet) relief unless the parties mutually agree to a later date for the commencement of such discussions.

10. The Employer shall not be permitted to hire from any employment referral agency that requires prospective applicants to pay a fee or commission. The Employer may not, directly or indirectly, charge any prospective applicant any fee or commission.

11. This Successor Agreement is subject to ratification by both parties ("Effective Date").


Dated: April _____, 2015

HOTEL ASSOCIATION OF NEW YORK CITY, INC. on behalf of its Bargaining Group Hotels

NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO


By: _____
Joseph E. Spinnato, President

By: _____
Peter Ward, President